Raymond M. Buddie, Esq. (SBN 121353)
Holiday D. Powell, Esq. (SBN 245135)
CLARK HILL LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Telephone: (415) 984-8500
Facsimile:  (415) 984-8599
Email:      Rbuddie@mpplaw.com
            HPowell@mpplaw.com

Attorneys for Plaintiff
CHRISTINA GAW

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINA GAW,<br><br>             Plaintiff,<br><br>vs.<br><br>MISSION STREET DEVELOPMENT LLC,<br>a Delaware limited liability company;<br>MISSION STREET HOLDINGS, LLC, a<br>Delaware limited liability company;<br>MILLENNIUM PARTNERS, a partnership;<br>and DOES 1-50 inclusive,<br><br>             Defendants. | Case No.<br><br>**COMPLAINT FOR FRAUD AND JURY DEMAND** |

## INTRODUCTION

Plaintiff Christina Gaw, by and through the undersigned attorneys, hereby files this Complaint for Fraud and Jury Demand and asserts the following allegations against defendants Mission Street Development LLC, a Delaware limited liability company, Mission Street Holdings, LLC, a Delaware limited liability company, Millennium Partners, a partnership, and Does 1-50, inclusive:

## THE PARTIES

1.    Plaintiff Christina Gaw ("Gaw") is a natural person.  She is a citizen of Singapore and resident of Hong Kong.

2.    Mission Street Development LLC ("MSD") is a Delaware limited liability company

216995679.1                                     1

doing business in California. It was the developer and seller of Unit 45C.

3. Mission Street Holdings, LLC ("MSH") is a Delaware limited liability company and is the sole and managing member of MSD.

4. Millennium Partners ("MP") is a partnership with its principal place of business in New York and doing business in California, through its partners and wholly owned and controlled subsidiaries, MSD and MSH.

5. Gaw does not know the true names or capacities of Defendants sued in this Complaint as Does 1 through 50, inclusive, and who are sued by such fictitious names. Gaw will amend this Complaint to allege said names and capacities when the information has been ascertained. Gaw is informed and believes and on that basis alleges that each of the fictitiously named Defendants is legally responsible in some manner for the acts or omissions alleged and the injuries and damages claimed in this Complaint.

6. At all times herein mentioned, each of the defendants, including the defendants identified herein as Does 1 through 50, inclusive, was a principal, agent and/or employee of each of the remaining defendants, and in so doing the things herein mentioned was acting as such principal, or within the scope of such agency and/or employment, by reason of which these defendants are liable to Gaw.

## JURISDICTION

7. Gaw brings her Complaint pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists between the parties.

8. Gaw is a citizen of Singapore and resident of Hong Kong, and is therefore an "alien" subject to the Court's jurisdiction pursuant to 28 U.S.C. § 1332(a)(2)-(4).

9. MSD is a limited liability company such that its citizenship for the purposes of diversity jurisdiction is the citizenship of its members. According to MSD's Statement of Information, which was filed with the California Secretary of State, its sole member is MSH.

10. MSH is a limited liability company such that its citizenship for the purposes of diversity jurisdiction is also the citizenship of its members. According to MSH's Statement of Information, which was filed with the California Secretary of State, its members include

Millennium Mission Street Partners LLC and WTR Properties, Inc.

a. According to the Statement of Information filed with the California Secretary of State, Millennium Mission Street Partners LLC's sole member is Mission Street Master Holding Co LLC. Mission Street Master Holding Co LLC is a limited liability company formed under the laws of the State of Delaware with its principal place of business in the State of New York. According to Mission Street Master Holding Co LLC's Certificate of Formation, which is filed with the State of Delaware Secretary of State, Mission Street Master Holding Co LLC's has no members.

b. WTR Properties, Inc. is a corporation organized under the laws of the State of California with its principal place of business in the State of California.

11. Accordingly, MSD and MSH are citizens of California.

12. MP is a partnership such that its citizenship for the purposes of diversity jurisdiction is the citizenship of its partners. The partners of MP include Christopher M. Jeffries, Philip E. Aarons, Philip H. Lovett, Steven L. Hoffman, Pamela Malkani, and Mario J. Palumbo, Jr.

a. Christopher M. Jeffries is a resident of and domiciled in the State of Florida, and is therefore a citizen of Florida for the purposes of determining diversity jurisdiction.

b. Philip E. Aarons is a resident of and domiciled in the State of New York, and is therefore a citizen of New York for the purposes of determining diversity jurisdiction.

c. Philip H. Lovett is a resident of and domiciled in the State of New York, and is therefore a citizen of New York for the purposes of determining diversity jurisdiction.

d. Steven L. Hoffman is a resident of and domiciled in the State of New York, and is therefore a citizen of New York for the purposes of determining diversity jurisdiction.

e. Pamela Malkani is a resident of and domiciled in the State of New York, and is therefore a citizen of New York for the purposes of determining diversity jurisdiction.

f. Mario J. Palumbo, Jr. is a resident of and domiciled in the State of New York, and is therefore a citizen of New York for the purposes of determining diversity jurisdiction.

13. Accordingly, MP is a citizen of Florida and New York.

14. Additionally, and as detailed in the Prayer for Relief, *infra*, the amount in

controversy exceeds $75,000.00, exclusive of interest and costs of suit.

## VENUE

15. Venue in the United States District Court for the Northern District of California is proper pursuant to 28 U.S.C. § 1391(b)(2) as the events or omissions giving rise to Gaw's Complaint occurred in the City of San Francisco, State of California, and the property at issue in this Complaint is located in the City of San Francisco, State of California.

## THE PROPERTY

16. Gaw is the owner of real property commonly known as 301 Mission Street, Unit 45C, San Francisco, California 94105. The real property is more particularly described as Unit 45C Lot 322 as shown on a condominium plan entitled "A Mixed-Use Condominium Plan for Millennium Tower 301 Mission Street, San Francisco, California" which was filed for record in the Official Records of the City and County of San Francisco, California on March 13, 2009, as Instrument No. 2009-I732547-00, in Book J847, Page 0102 ("The Condominium Plan"), and such real property is referred to in this Complaint as "Unit 45C" or "the Property". A description of the Property is included as part of the Residential Purchase Agreement and Escrow Instructions Grand Residences at Millennium Tower attached as **Exhibit A**.

17. The Property is a condominium located in the residential building known as the Millennium Tower, which has been the subject of press coverage and lawsuits due to the impact of settlement (sinking) and differential settlement (tilting) of the building and building systems. As used herein, the word "settlement" shall include both sinking and tilting of the building.

18. Gaw purchased and became the owner of Unit 45C on December 28, 2012 the "Closing Date."

19. Defendants Mission Street Development LLC, Mission Street Holdings, LLC, and Millennium Partners (collectively hereinafter "Defendants") are the developers of the Millennium Tower and the sellers of Unit 45C.

20. Gaw is informed and believes that MSP, MSH and MP were at all times relevant the alter egos of each other, and an unjust and inequitable result would follow if alter ego liability is not imposed. Alter ego is established by reason of the following allegations:

216995679.1                                        4

a. Among MP, MSD and MSH (collectively the "Developers"), there was a unity of interest in developing the Millennium Tower.

b. Developers' assets were commingled in the development of the Millennium Tower.

c. MSD and MSH are mere conduits or adjuncts for MP's interests in the Millennium Tower.

d. Richard Baumert, who signed the Purchase Agreement on behalf of MSH as a Vice President of MSH, was at all relevant times also a Partner and the Managing Director of MP. Richard Baumert was also at all relevant times the President of all three Millennium Tower Homeowners Associations.

e. Steven C. Hood was at all relevant times an employee, officer and/or partner of MP and MSD.

f. MSD, MSH and MP all share a business address at 1995 Broadway, New York, New York.

## FIRST CAUSE OF ACTION FOR FRAUD

## AGAINST ALL DEFENDANTS

21. Gaw realleges and incorporates by reference each and every allegation of Paragraphs 1 through 13 as if fully set forth in this cause of action.

22. On or about August 21, 2012, as indicated in **Exhibit A,** Gaw and Fair Breeze Company Limited, a corporation organized and existing under the laws of the British Virgin Islands ("FBCL"), entered into a written agreement entitled "Residential Purchase Agreement and Escrow Instructions Grand Residences at Millennium Tower," referred to in this Complaint as "Agreement," under which Gaw and FBCL proposed to buy Unit 45C from MSD. Said Agreement required MSD to provide copies of all pertinent property management documents, including but not limited to, disclosure statements as required by law prior to the close of escrow, in addition to any common law requirements to provide disclosure of all material facts.

23. Thereafter, Gaw and FBCL, on the one hand, and MSD and MSH, on the other hand, entered into a written agreement entitled "First Addendum to Residential Purchase Agreement

216995679.1                                                    5
COMPLAINT FOR FRAUD AND JURY DEMAND

and Escrow Instructions Grand Residences at Millennium Tower," referred to in this Complaint as "Addendum," under which the Agreement was amended to confirm that the close of escrow was contingent on Gaw's ability to sell her other home and conduct a 1031 exchange. A true and correct copy of the Addendum is attached hereto as **Exhibit B**.

24. Thereafter, Gaw and FBCL, on the one hand, and MSD and MSH, on the other hand, entered into a written agreement entitled "Second Addendum to Residential Purchase Agreement and Escrow Instructions Grand Residences at Millennium Tower," referred to in this Complaint as "Second Addendum," under which the Agreement was amended to confirm that all references to "Buyer" in the Agreement would be amended to refer to Gaw only and that all previously executed documents under the Agreement by Gaw and FBCL would remain fully executed and intact. A true and correct copy of the Second Addendum is attached hereto as **Exhibit C**.

25. All remaining documents and communications exchanged with the Defendants for the purchase of the Property was done by or on behalf of Gaw.

26. Under the terms of the contract, Gaw has performed all of her obligations and paid Defendants $2,250,000 for the purchase of Unit 45C.

27. Under the terms of the contract and California law, Defendants were required to disclose all material facts regarding the property to Gaw.

28. Defendants fraudulently concealed material information that was in their possession prior to the Closing Date, including but not limited to the following documents which are attached as **Exhibit D**:

February 18, 2009 – Letter to DeSimone Engineers from Treadwell & Rollo and copied to Steve Hood of MP;

February 18, 2009 – Letter from Handel Architects to DeSimone Engineers and copied to Steve Hood of MP;

February 25, 2009 – Letter from DeSimone Engineers to City and County of San Francisco and copied to Steve Hood of MP;

January 14, 2010 – Letter from TJPA to Steve Hood of MP;

November 11, 2010 – Memorandum to Steven C. Hood of MP, from DeSimone

COMPLAINT FOR FRAUD AND JURY DEMAND

Engineers;

January 18, 2011 – Email from John Luciano of Millennium Partners Management LLC to Steven C. Hood and Sean Jefferies of MP;

February 22, 2012 – Memorandum to Steven C. Hood of MP, from Treadwell & Rollo Engineers;

February 24, 2012 – Memorandum to Steven C. Hood of MP, from DeSimone Engineers

29. Gaw became aware of the existence of the grounds for rescission alleged in paragraphs 17 and 18 on or about May 2016 when she was first informed of the serious settlement problems at Millennium Tower.

30. Gaw intends service of this Complaint to serve as Notice of Rescission of the contract alleged in paragraph 12.

31. At the time Gaw entered into the Agreement to purchase her unit, Defendants MSD, MPH, MP and Does 1 through 50 had a duty to disclose to Gaw the conditions of the Millennium Tower and any material facts that would affect the value of purchased units.

32. The Defendants' "Property Disclosure and Information Statement for the Millennium Tower," dated May 2011, a 29 page document, discusses issues including but not limited to neighborhood conditions, external lighting, views, residence amenity floor, concrete, walls, window washing, parking garages, toilets, outdoor furniture, building noise, odors, construction activity, building condition, seismic potential and a host of other issues. Nowhere do Defendants' Disclosure Statements disclose that the Defendants' projection in 2005 was for 4-6 inches of total vertical settlement for the life of the Millennium Tower, but it already had 8.3 inches of vertical settlement by January 2009, which was prior to close of escrow for any units. Nor do Defendants disclose that their projected settlement in their foundation permit submittal to the San Francisco Department of Building Inspection called for only 1-2 inches of settlement upon the building's completion and 4-6 inches over the lifetime of the building. At no time in any subsequent disclosure statements to other purchasers which were updated from time to time by Defendant MSD include any disclosure of the sinking and tilting of the Millennium Tower.

33. The Defendants failed to disclose to Gaw that Defendants had adjusted the

216995679.1                                        7
**COMPLAINT FOR FRAUD AND JURY DEMAND**

acceptable design range for vertical settlement for the Millennium Tower in early 2009, after learning that the acceptable design range of 4-6 inches of vertical settlement for the life of the building had been exceeded shortly after completion of construction.

34. The Defendants intentionally concealed the facts and failed to disclose the material information from Gaw about the building's vertical settlement prior to close of escrow.

35. The Defendants knew that their representations at the time of close of escrow to Gaw about the Millennium Tower contained the omission of a material fact.

36. The Defendants intentionally changed the acceptable design range from 4-6 inches to 10.3-12.3 inches in early 2009 in an attempt to evade their duty to disclose that vertical settlement at the Millennium Tower had exceeded the original acceptable design range of 4-6 inches established by the Defendants for the Millennium Tower in the foundation permit in 2005.

37. The Defendants' failure to disclose to Gaw the facts of the vertical settlement beyond the originally stated acceptable range of 4-6 inches was a fraud on Gaw.

38. Prior to Gaw's close of escrow, the Defendants failed to disclose to Gaw that the vertical settlement of 8.3 inches that had occurred by January 2009 may have caused or would possibly cause different parts of the building to settle at different rates, thereby causing differential settlement and further damage unit owners' property value.

39. Prior to Gaw's close of escrow, the Defendants failed to disclose that in 2010 Defendants became aware that the excessive settlement was causing bulging and delaminating of concrete walls in the Millennium Tower basement.

40. Prior to Gaw's close of escrow, the Defendants failed to disclose that further reports from engineers in December 2011, January 2012 and February 2012 clearly indicated that the Millennium Tower was continuing to settle and to settle at an increased rate.

41. Prior to Gaw's close of escrow, the Defendants failed to disclose that differential settlement could cause the frame of the building to distort, floors to slope, walls and glass to crack, and doors and windows to malfunction.

42. Prior to Gaw's close of escrow, the Defendants failed to disclose that differential settlement could tilt the building, thereby raising the risk of further tilting as differential

216995679.1                                  8
COMPLAINT FOR FRAUD AND JURY DEMAND
ClarkHill\67430\383075\216995679.v1-4/5/18

settlement increased and further damaging unit owners' property value.

43. The Defendants have never disclosed to Gaw that the building has now sunk more than 16 inches from when it was first constructed and is tilting at least 2 inches at the base and 15 inches to the northwest at its highest point, and is continuing to further settle and tilt.

44. The Defendants have never disclosed to unit owners that the building is continuing to sink at an accelerated rate over time.

45. The failure to disclose to Gaw that the Defendants had ignored the original settlement assessment of the design engineers has resulted in a diminution of property values and may result in irreparable harm to Gaw should there be an earthquake of moderate to strong magnitude.

46. Said Defendants, and each of them, had knowledge of the true facts as set forth above and deliberately concealed and failed to disclose said facts.

47. Gaw would not have purchased her unit if she had known that the Millennium Tower not only was sinking in excess of the original design parameters of 4-6 inches but was in fact continuing to settle at an increasing rate.

48. The Defendants' failure to disclose that vertical settlement had exceeded the acceptable design range of 4-6 inches and had in fact vertically settled 8.3 inches by January 2009 and then continued to settle thereafter at an increased rate and to tilt has damaged Gaw.

49. Gaw has been damaged as a result of the Defendants' intentional concealment and failure to disclose the additional vertical and differential settlement that occurred prior to Gaw's close of escrow on Unit 45C.

50. Defendants had knowledge of the true facts. The intentional concealment and misrepresentations described above were made by Defendants with the intent to induce Gaw to enter into the Agreement to purchase Unit 45C, ultimately closing escrow to complete the transaction on the Closing Date.

51. Gaw, at the time of Defendants' misrepresentations and failure to disclose the true facts, was ignorant of the existence of those facts that said Defendants, and each of them, suppressed and failed to disclose. Had Gaw known the true facts, she would not have entered

into the Agreement to purchase Unit 45C. Gaw's reliance was justified in that she was misled by false misrepresentations and omissions and even after reasonable inquiry did not have knowledge of those facts that were suppressed or any way to reasonably discover the suppressed facts.

52. Gaw further alleges that Defendants deliberately set up MSD as a shell company to shield the profits from the sale of the Millennium Towers units from any potential future litigation. The Defendants, through Richard Baumert, reported in April 2013 that the Millennium Towers project had generated a 25% return for MP and that this amounted to a profit of over $150 million.

53. Defendants deliberately used MSD as a shell company and transferred all of the profits from the sales of the Millennium Towers units to MSH and possibly also to MP. The funds were transferred with full knowledge by Defendants that none of the purchasers of the units at Millennium Towers had been informed of the settlement problem which was known to MSD, MSH and MP at all times relevant herein and prior to the sale of Unit 45C to Gaw.

54. If MSH and MP are allowed to hide behind the assetless shell company, MSD, then a great injustice will occur because Gaw and others similarly situated will have no ability to recover damages for the fraudulent conduct of Defendants, and MSH and MP will be able to shield over $150 million in profits they obtained through their fraudulent conduct in collusion with MSD.

55. Defendants at all times knew that if they had told potential unit buyers the truth about the settlement problems at Millennium Towers, the units would either not sell or would sell at significantly reduced values, and Defendants would never have received the $150 million in profits that came from the sales and were transferred by MSD to MSH and/or MP.

56. At all relevant times, Richard Baumert, the Vice President of MSH, was also the President of all three of the Homeowner Associations for the unit owners of Millennium Towers and deliberately concealed from the homeowners, including Gaw and the members of the three Association Boards, the knowledge that the Millennium Towers was settling more and at a faster rate than it had been designed to sustain.

57. Gaw alleges that as the seller of Unit 45C, MSD is primarily liable to Gaw.

216995679.1                                    10
**COMPLAINT FOR FRAUD AND JURY DEMAND**
ClarkHill\67430\383075\216995679.v1-4/5/18

Defendants MSH and MP are both secondarily liable to Gaw as set forth herein due to the knowing and active participation of MSH and MP in a scheme to defraud Gaw by concealing material information and profiting at least $150 million from the scheme.

58. Gaw hereby offers to restore to MSD and MSH all consideration that has passed from Defendants to Gaw on the condition that MSD and MSH restore to Gaw the sum of $2,250,000 plus consequential damages.

59. As a proximate result of the misrepresentations and the failure to disclose the true facts, Gaw has been damaged in that the value of Unit 45C is far less than the market value of similar properties in San Francisco. The exact amount by which Gaw has been damaged is unknown at this time, but it is believed to be at least $1,000,000 in damages, according to proof at trial.

60. In doing the things alleged in this Complaint, said Defendants MSD, MSH, MPLP and Does 1 through 50 acted with oppression, fraud, and malice, and said acts were approved and/or ratified by MP. Gaw is therefore entitled to punitive damages of at least $1,000,000 according to proof at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Gaw prays for judgment as follows:

1. Declaring and adjudicating that the Agreement has been and is rescinded and ordering restitution of $2,250,000 to Gaw.

2. Awarding consequential damages in the sum of $1,000,000.

3. Awarding punitive damages of at least $1,000,000.

4. Awarding interest as allowed by law on all sums awarded to Gaw;

5. Awarding costs of suit and attorney's fees; and

6. Awarding such other relief that the Court considers proper.

/ / /

/ / /

/ / /

/ / /

**JURY DEMAND**

Gaw hereby demands a jury trial.

Dated:  April 4, 2018                              CLARK HILL LLP

By: _____
                                         Raymond M. Buddie
                                         Holiday D. Powell
                                         Attorney for Plaintiff
                                         CHRISTINA GAW

216995679.1                                              12
**COMPLAINT FOR FRAUD AND JURY DEMAND**
ClarkHill\67430\383075\216995679.v1-4/5/18

# Exhibit A

**RESIDENTIAL PURCHASE AGREEMENT**
**AND ESCROW INSTRUCTIONS**
**GRAND RESIDENCES AT MILLENNIUM TOWER**
**[FINAL PUBLIC REPORT]**

"IMPORTANT NOTICE REGARDING YOUR DEPOSIT: UNDER CALIFORNIA LAW, IN A CONTRACT FOR THE INITIAL SALE OF A NEWLY CONSTRUCTED ATTACHED CONDOMINIUM UNIT IN A BUILDING OVER EIGHT STORIES TALL, CONTAINING 20 OR MORE RESIDENTIAL UNITS, AND LOCATED IN A HIGH-DENSITY INFILL DEVELOPMENT IN A CITY, COUNTY, OR CITY AND COUNTY WITH 1,900 RESIDENTS OR MORE PER SQUARE MILE, WHERE THE PRICE IS MORE THAN ONE MILLION DOLLARS ($1,000,000), AS ADJUSTED BY THE DEPARTMENT OF REAL ESTATE, LIQUIDATED DAMAGES OF 6 PERCENT OF THE PURCHASE PRICE ARE PRESUMED VALID IF THE BUYER DEFAULTS, UNLESS THE BUYER ESTABLISHES THAT THE AMOUNT IS UNREASONABLE."
Buyer's Initials _____    Buyer's Initials _____

NOTICE OF ARBITRATION AND JUDICIAL REFERENCE:
THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT AND JUDICIAL REFERENCE REQUIREMENTS. YOU SHOULD READ THESE PROVISIONS CAREFULLY AND SHOULD CONSULT WITH LEGAL COUNSEL IF YOU HAVE ANY QUESTIONS.

This Purchase Agreement and Escrow Instructions (the "Agreement") is entered into on the 21st day of August, 2012, by and between the following parties and with regard to the Property herein described, which Property is part of a condominium Common Interest Development, at times referred to herein as the "Project."

1. **Parties; Property Description:**

Buyer(s):                Christina Gaw and Fair Breeze Company Limited
                         as buyer in "Tenants as Common"
Buyer(s) Address:
Buyer(s) Tel. No(s):

Buyer(s) Fax No(s):    _____

Seller:                  Mission Street Development LLC,
                         a Delaware limited liability company,
                         301 Mission Street,
                         San Francisco, CA  94105.

**The Property:** Seller shall sell to Buyer and Buyer shall buy from Seller Unit **45C** of the Grand Residences at Millennium Tower in the City and County of San Francisco, California (the "Residence" or the "Property"). The legal description of the Unit shall be as set forth upon the Condominium Plan (the "Plan") for the Center that is recorded in the Official Records of The County of San Francisco, State of California.

Gaw 45C

-1-

Buyer _____ _____ Seller _____

The Property is to be subject to the Declaration of Covenants and Restrictions for The Grand Residences at Millennium Tower made and recorded in the Official Records of The County of San Francisco, State of California by the Seller before the Close of Escrow (the "Residential Declaration").   Title to the Property shall include an undivided percentage interest in the Residential Common Area as to be described in the Plan and Residential Declaration, subject to all easements, dedications, and rights of way of record. See Paragraph **10.A.**

The Property is subject to The Millennium Tower Declaration of Covenants, Conditions and Restrictions and Reciprocal Easement Agreement (the "Center Declaration") made and recorded in the Official Records of The County of San Francisco, State of California by the Seller before the Close of Escrow.  See Paragraph **10.D.**

     **2.**     **Purchase Price:** The Purchase Price of the Property, with all improvements to be installed or constructed thereon by Seller shall be $2,175,000. The Purchase Price will be paid as follows:

| | | | |
|---|---|---|---|
| **(a)** | Initial Deposit: | | $130,500 |
| **(b)** | Additional Deposit:<br>Due Date: | | $0.00 |
| **(c)** | **Parking Space [if applicable] [See Para 4.D]**<br>**[See Parking Addendum]** | | $75,000 |
| **(d)** | Estimated Cash Balance Due at Closing: | | $2,119,500 |

**TOTAL: $2,250,000**

> **Buyer shall also, in addition, be responsible for Buyer's Pro-rations and Closing Costs as set forth in Section 6(b).**

     **3.**     **Deposits:**     Buyer hereby delivers to Seller the Initial Deposit indicated in Paragraph 2(a), which shall be deposited with Stewart Title Guaranty Company, at 100 Pine Street, Suite 450, San Francisco, California 94111 ("Escrow Holder"). In the event Seller does not execute its acceptance of this Agreement, Seller shall immediately return to Buyer the Initial Deposit or instruct the Escrow Holder to return the Initial Deposit to Buyer.  In the event the Initial Deposit is given to Seller or Escrow Holder in the form of a check, it shall not be considered delivered and any written acceptance by Seller of this Agreement shall not be effective and Escrow shall not be considered open, until such check has cleared and such funds are available on an unrestricted basis.

     In the event Seller accepts this offer, Buyer shall also deliver to Escrow Holder the Additional Deposit (if any) described in Paragraph 2(b), above, before the Due Date set forth, which Additional Deposit shall become part of the total Deposit and subject to the liquidated damages provisions of Paragraph 12 (if both parties have initialed the liquidated damages provision).

Buyer shall execute promptly all documents and make all deposits required by Seller, Escrow Holder, lender, or governmental agency having jurisdiction over matters in question.

Gaw 45C

-2-

Buyer _____ _____ Seller _____

**4.    The Millennium Tower Center:**    Buyer acknowledges that The Grand Residences at Millennium Tower Project is part of the Millennium Tower Center (the "Center"), luxury, high-rise, project that is described in more detail in the Center Declaration. The Center consists of The Grand Residences Residential Project and two other Residential Projects, the Residences at Millennium Tower Project and The City Residences at Millennium Tower Project. The Center also contains two Commercial Components that contain or will contain commercial uses, and the Center Common Elements. The Center Common Elements contain, among other facilities and amenities, the Parking Garage and the Residence Amenity Floor.

**A.    Residential Owners Association:** The Buyer acknowledges that The Grand Residences at Millennium Tower Owners Association has been established for the purpose of operating and maintaining the Residential Common Areas and facilities of the Grand Residences Residential Project and Buyer agrees to become a member of The Grand Residences at Millennium Tower Owners Association and to abide by the Bylaws thereof and the Residential Declaration for The Grand Residences at Millennium Tower Project. The proposed monthly Regular Assessments to be paid to The Grand Residences at Millennium Tower Owners Association by the Buyer and each other owner of a unit in the Residential Project (which assessments are set forth in the budget filed by the Seller with the Department of Real Estate) for maintenance and operations of the Residential Project are based upon Seller's best estimates.  The budget of The Grand Residences at Millennium Tower Owners Association Association's may be revised annually.

**B.    Center Association:**    The Center is managed and operated by the Millennium Tower Center Association of which The Grand Residences at Millennium Tower Owners Association is a member.  The Center is a luxury high rise development; portions of the Center will be utilized for non-residential purposes.   The Center will be created with four associations, the Center Association, providing overall management and administration to the Center, and three Residential Associations for management and administration of the three Residential Projects.

**C.    Residence Amenity Floor:** The Residence Amenity Floor, which is part of the Common Elements of the Center, includes the following amenities and facilities: lap pool, whirlpool spa,   media room, gym, locker rooms, Pilates room, private dining room, children's' play room, wine storage room, and owners' lounge. The use of the Residence Amenity Floor is to be shared among the owners of condominium residences in all three of the Residential Projects. The Residence Amenity Floor is to be operated by the Center Association, with the costs and expenses of the Residence Amenity Floor to be shared among all three of the Residential Projects.

**D.    Parking Garage:** The Parking Garage is part of the Common Elements of the Center.

---

**The right of use of the Parking Garage is provided under separate license agreements for those Units that have been extended the right to use the Parking Garage.  Not all Units will be provided the right to use the Parking Garage. [See Parking Addendum]**

---

**5.    Construction/Failure to Complete:**
    **(a)    Models and Specifications:**    The Residence shall be constructed in substantial conformity with the plans and specifications therefore which are on file with the City

Gaw 45C

-3-

Buyer _____ Seller _____

and County of San Francisco.  Seller is not building the Residence specifically for Buyer, or to the precise specifications or design of any model home, plan or brochure.  Any model home is displayed for illustrative purposes only and such display shall not constitute an agreement or commitment on the part of Seller to deliver the Property in exact accordance with any such model home.  Buyer is purchasing a completed Residence, and Seller is not acting as Buyer's general contractor.  Consultation with Buyer with respect to the specifications of the Residence to be built shall not, in any case, be deemed a waiver of Seller's rights to make any such changes or substitutions as Seller in its sole discretion deemed necessary.  Any changes requested by Buyer will not be made unless Seller agrees in writing.

**Models**: The Unit being sold is unfurnished and will contain only the appliances and equipment installed at the time of inspection of the Unit by the Buyer.  Buyer acknowledges that the furnishing, equipment and interior design of Seller's models may not exactly represent the Unit which the Buyer is purchasing due to changes in design and/or components made during or after the furnishing, equipping or interior design of the models. Furniture, wallcoverings, furnishings or the like as shown in or about any model unit are for display purposes only and are not considered part of such unit for the purposes of this Purchase Agreement.  The location of wall switches, thermostats, utility chases, plumbing installations, electrical outlets and similar items may vary from unit to unit and may not be as shown in any model unit.  Any floor plans, sketches or sales drawings shown to the Buyer are for display purposes only and may not be exactly duplicated in the completed Unit.  Any scale model or rendering of the Residential Project or of the Center is only an artist's conception and is subject to change. During the course of construction, Seller may substitute, eliminate or modify materials, appliances and fixtures in the Property from those used in the models or shown in the plans and specifications, provided that such modifications meet with the approval of the appropriate governmental entity or agency having jurisdiction over the construction of the Residence and that the substitute materials, appliances and fixtures are of approximately equal or better quality.  None of the appurtenances, furnishings and finishes shown in any model home is included in the Residence unless Buyer and Seller specifically agree in writing that the same are included in the total Purchase Price or added as an Optional Item pursuant to a written addendum to this Agreement.

**Seller shall not be responsible for any additions or modifications to the Unit unless Seller and Buyer have signed a Unit Modifications Addendum.**

    **(b)**    **Construction Period:**  If construction of the Residence and the Project's Common Areas have not been completed as of the date of signing of this Agreement by Buyer, the Residence and the Project's Common Areas shall be completed in no more than two (2) years after the date of the signing of this Agreement by Buyer, with extensions as necessary for work, for military commitments of the United States, or other causes resulting in material economic disruption of the prices and practices of the building industry, weather or labor conditions or availability of materials, or other causes beyond Seller's control.

    It is estimated, but not guaranteed, that construction will be completed by April 30, 2009, (the "Estimated Completion Date").

    **(c)**    **Completion:**  Buyer agrees that filing of a Notice of Completion and/or the issuance of a Temporary Certificate of Occupancy for the Property by the appropriate City or County, or department or agency, shall constitute conclusive evidence of Seller having met the time deadlines for completion of construction as set forth in Paragraph 5(b), above.

Gaw 45C

-4-

Buyer _____  _____ Seller _____

**(d)    Failure to Complete:**    If Seller fails to complete construction of the Property within ninety (90) days of the Estimated Completion Date, or two (2) years from the date of Buyer's signing of this Purchase Agreement (as extended for causes beyond control of Seller as provided in Paragraph 5(b)), whichever occurs first, Buyer, on written notice to Seller, may terminate this Agreement or may require specific performance.  On termination, Buyer's deposit shall be returned in full within fifteen (15) days of such notice and this Agreement shall be terminated.

6.    **Escrow:**

**(a)    Opening of Escrow:**    An escrow (the "Escrow") shall be opened by Seller with Escrow Holder to consummate the purchase and sale of the Property, within five (5) business days of the acceptance of this Agreement by Seller.  The parties agree to execute supplemental or additional Escrow Instructions consistent with this Agreement as may be reasonably required by Escrow Holder.  Buyer shall execute promptly all documents and make all Deposits required by Seller, Escrow Holder, Lender or governmental agency having jurisdiction over matters in question.  If Buyer fails to perform under this provision, Buyer shall be in material default hereunder, and Seller shall be entitled to terminate this Agreement and the Escrow and retain Buyer's deposit as liquidated damages as provided in Paragraph 12 hereof (if both parties have initialed the liquidated damages provision).

**(b)    Prorations/Costs:**

(i) As of the Close of Escrow, the following shall be pro-rated:  Current real property taxes and assessments; cost of any fire and extended coverage insurance paid by Seller, if applicable; and current Homeowners Association assessment, if any.

(ii)  The following items shall be paid by Buyer at the Close of Escrow: recording costs, local City and County transfer taxes, loan fees, inspection fees, title insurance fees, escrow fees and all fees and impounds required by any lender.

**(c)    Delay Due to Buyer:**    In the event Escrow does not close upon the Closing Date provided for in Paragraph 6(e), due to Buyer's failure to timely perform its obligations under this Agreement, Buyer acknowledges that Seller will be materially harmed due to additional expenses that will be incurred by Seller as carrying costs for the Property (which include, without limitation, loan interest charges, property taxes and insurance costs). Therefore, in such event, Seller shall have the right to terminate this Agreement and retain Buyer's Deposit as liquidated damages under Paragraph 12 (if both parties have initialed the liquidated damages provision.

**(d)    Title Insurance:**    Buyer shall receive a CLTA policy of title insurance effective as of the Closing Date, insuring title to the Property in Buyer's name free and clear from liens and encumbrances (except those created by Buyer) and subject to the lien of current taxes (not delinquent), the recorded Declaration, and any other easements, reservations, rights, and rights of way of record.  All bonds and assessments which are part of or paid with the Property tax bill will be assumed by Buyer.  Current installments will be pro-rated as of the Closing Date. Buyer and Seller agree that if Buyer does not desire that the title insurance be obtained from the title company represented by Escrow Holder, Buyer may designate any other responsible title insurance company, and, if such other insurance company is acceptable to Seller, and to Buyer's lender, such insurance policy will be obtained from the company designated by Buyer. If Buyer fails to so designate an alternate insurance company within five (5) days after Buyer's execution of this Agreement, such failure shall constitute an irrevocable

Gaw 45C

-5-

Buyer _____    Seller _____

waiver of Buyer's right to designate an alternate insurance company. Buyer's designation of an alternate insurance company shall not affect Seller's right to designate the Escrow Holder, or result in the transfer of the Escrow to some other escrow holder.

**(e)    Close of Escrow:**   Escrow shall close (the "Closing") on or before thirty (30) days but not less than five (5) days after Buyer receives notice from Seller that the Property is ready for occupancy and Seller is prepared to close.  The notice shall contain the scheduled Closing Date (the "Closing Date").  The Closing Date shall not be more than 24 months after Seller's acceptance of this Agreement, unless Buyer and Seller agree to an extension.

If Escrow does not close on the Closing Date (or any extended Closing Date) for reasons other than Buyer's default, Seller shall instruct Escrow Holder to return all Deposits to Buyer within fifteen (15) days thereafter and then this Agreement shall be terminated.  As used herein the term "Close of Escrow," "Closing Date" or "Closing" shall mean the date the grant deed conveying the Property to Buyer is recorded in the Office of the Recorder in the county in which the Property is located.

Because of the nature of the home building industry, the actual Closing Date could be extended by weeks, or even months.  Should Seller be delayed in substantially completing the Residence by reason of causes beyond Seller's control (as described in Paragraph 21) the time of such delay shall be automatically added to the time specified for the Closing Date. Notwithstanding the foregoing, if the Escrow does not close within two (2) years following the date of acceptance of this Agreement by Seller other than due to Buyer's default, this Agreement shall, upon Buyer's written request to Escrow Holder, be terminated, and any Deposit shall be returned to Buyer within fifteen (15) days, and following such termination neither party shall have any further obligation to the other under this Agreement.  However, if Buyer does not provide a written request for termination to Escrow Holder within seven (7) days following the second anniversary of the date of acceptance of this Agreement by Seller, Buyer shall be deemed to have consented to a later Closing, and shall no longer have the right to terminate the Agreement.  In addition, in the event Escrow does not close within two (2) years following the date of acceptance of this Agreement due to causes beyond the control of Seller as described in Paragraph 21, Seller shall have the right to terminate this Agreement by delivering a written request to Escrow Holder within thirty (30) days following the second anniversary date of this Agreement.  Upon such termination by Seller, any deposit shall be returned to Buyer within fifteen (15) days of Seller's notice of termination, and, following such termination, neither party shall have any further obligation to the other under this Agreement.

The foregoing notwithstanding, the Closing shall not occur until the following events have occurred:

**(i)**      All blanket encumbrances affecting the Property, if any, as defined in Section 11013 of the Business and Professions Code, have been fully released and reconveyed; or the holder of the deed of trust has executed a release agreement per Regulation 2791.1(b)(2)(A), which agreement has been deposited with Escrow Holder, and Buyer has been provided with a policy of title insurance insuring against loss by reason of the deed of trust, and until legal title, or leasehold interest, as applicable, is conveyed to the Buyer;

**(ii)**      Seller has recorded a Notice of Completion, as defined in Section 3093 of the Civil Code, for the construction of all structures, landscaping and other improvements on the Property, as applicable, to be constructed or installed pursuant to this Agreement or any addenda hereto; and

Gaw 45C

-6-

Buyer _____   Seller _____

(iii)    The statutory period for recording of any mechanic's liens against the Property has expired, or Buyer is provided with a policy of title insurance and endorsement insuring Buyer against unrecorded mechanics' liens.

(f)    **RE621 Procedures:**  As an alternative to subparagraphs 6(e)(i), (ii) and (iii) above, the Escrow for the purchase and sale of the Property covered by this Agreement shall close if Seller has provided security or evidence of cash deposit or letter of credit pursuant to Business and Professions Code Sections 11018.5(a)(2)(A) or 11018.5(a)(2)(E) for purposes of assuring lien-free completion of the subdivision improvements in the Subdivision which have not been completed as of the date of issuance of the Final Public Report for the Project pursuant to Department of Real Estate Form RE621A, and Buyer will receive a policy of title insurance covering the Property which Buyer is to purchase under this Agreement insuring against possible future mechanics liens which are not recorded as of the date of Close of Escrow for the Property.

7.    **Title:**  Buyer will receive a copy of the preliminary title report for the Property for review and approval prior to Close of Escrow.  If Buyer does not notify Escrow Holder in writing on or before _5_ days after receipt of the report that Buyer disapproves of the preliminary title report, the preliminary title report will be deemed approved.

Unless otherwise designated by Buyer to Escrow Holder prior to the Close of Escrow, title shall vest in Buyer as follows:

_____    Husband and Wife as Community Property

_____    A Married Person as his/her Sole and Separate Property

_____    Joint Tenants, Each With a _____% Undivided Interest

_____    A Single/Unmarried Person

__✓__    Tenants as Common, Each with a _____% Undivided Interest

_____    _____ and _____ as Trustees of The _____

         Trust

_____    To be Determined

[*Note: The matter of taking title may have significant legal and tax consequences. You should consult with a professional regarding such consequences.  Unless you otherwise designate in further instructions to Escrow Holder, title to the Property shall be vested as stated above.*]

8.    **Possession:**

(a)    **Entry Upon the Property:**  Buyer acknowledges that entry upon the Property during construction can be dangerous and that hazards may exist which are not observable.  Buyer's entry upon the Property shall be solely at Buyer's risk.  Buyer must obtain permission from Seller prior to entering the Property and must be accompanied by an authorized representative of Seller, and, if required, wear a hard hat and comply with all safety procedures established by Seller.  Buyer hereby waives any and all claims against Seller for injury or loss to person or property arising out of or in connection with, such entry by Buyer or any other person accompanying Buyer or entering at Buyer's direction.  Buyer shall indemnify, defend and hold Seller and its officers, employees, contractors, subcontractors and agents harmless from and against any injury, loss, damage or expense to persons or property arising out of, or in connection with, any such entry.  Under no circumstances may any work be performed on the Property prior to Close of Escrow by Buyer or any agents of Buyer, or anyone other than Seller and its authorized agents, without Seller's written consent.

Gaw 45C

-7-

Buyer _____  Seller _____

**(b)**   **Occupancy:**   Possession and occupancy of the Property shall be delivered to Buyer at the Close of Escrow, and Buyer shall have no right to possession or occupancy prior to the Close of Escrow.

**(c)**   **Custom Finishing; Access:**   Items in the nature of custom finishes, decorating, custom installations, and similar custom work to the Unit, shall be the sole responsibility of the Buyer and shall be performed only after the close of Escrow and possession being obtained by Buyer, unless otherwise permitted in writing by the Seller.  The Buyer shall not bring any furniture or other property into the Residential Project, the Unit, or the Center before the close of Escrow, and shall not have access to the Unit, the Residential Project, or the non-public portions of the Center prior to the close of Escrow and delivery of possession of the Unit to the Buyer.

**9.**   **Destruction of the Property Prior to Close of Escrow:**   If the improvements on the Property are destroyed or materially damaged as a result of such damage prior to Close of Escrow, the Seller may terminate this Agreement by written notice delivered to Buyer or his or her Broker, and all Deposits will be returned.

**10.**   **Receipt of Documents:**   Buyer has received and has had the opportunity to read, prior to the execution of this Agreement, the California Department of Real Estate's Final Subdivision Public Report for the Property, including the statement entitled "Common Interest Development General Information" that was included as a part of the Subdivision Public Report. Buyer acknowledges receipt of the documents listed below which are incorporated into this Agreement by reference herein, and Buyer agrees to be bound by all the terms and provisions set forth therein. Seller may deliver additional addenda or disclosures to Buyer in connection with the sale of the Property, the receipt of which shall be acknowledged in writing by Buyer and thereafter shall be incorporated into the terms of this Agreement:

**Document**                                                                                    **Buyer's Initials**

A.   Declaration of Covenants and Restrictions for The Grand Residences
     at Millennium Tower ("Residential Declaration")
B.   Articles of Incorporation of The Grand Residences at
     Millennium Tower Owners Association ("Residential Association")
C.   Bylaws of the Residential Association
D.   The Millennium Tower Declaration of Covenants, Conditions and
     Restrictions and Reciprocal Easement Agreement ("Center Declaration")
E.   Articles of Incorporation of The Millennium Tower
     Association ("Center Association")
F.   Bylaws of the Center Association
G.   Residential Association's Budget (as submitted to DRE)
H.   Center Association's Budget (as submitted to DRE)

Buyer agrees to provide copies of all these documents to any subsequent purchasers from Buyer, prior to the transfer of title.         Buyer's Initials _____   Buyer's Initials _____

**11.**   **Association Membership and Assessments:**   Buyer acknowledges that the Residential Association has been established for the purpose of operating and maintaining certain portions of the Residential Project and Buyer understands that by purchasing the Property Buyer automatically becomes a member of the Association and is bound to abide by the provisions of the Project legal documents, including those referred to in Paragraph 10, and any rules and regulations that may be adopted by the Association. The monthly assessments to be paid to the Residential Association by the Owner of each Unit in the Project are set forth in

Gaw 45C

-8-

Buyer _____   Seller _____

the approved Project budget.  The budget is based upon Seller's best estimates.  The budget shall be revised annually.

12.    **LIQUIDATED DAMAGES:**  IF BUYER FAILS TO COMPLETE THE PURCHASE OF THE PROPERTY BY REASON OF A DEFAULT OF BUYER, SELLER SHALL BE RELEASED FROM ALL OBLIGATIONS TO SELL THE PROPERTY TO BUYER, AND SELLER MAY PURSUE ANY REMEDY THAT SELLER MAY HAVE IN LAW OR EQUITY AGAINST BUYER ON ACCOUNT OF THE DEFAULT; PROVIDED, HOWEVER, THAT BY PLACING THEIR INITIALS HERE   (BUYER _____) (SELLER_____) THE PARTIES AGREE THAT:

(a)    THE DEPOSIT, AS DEFINED ABOVE IN Paragraph 2, IN THE AMOUNTS OF $130,500 (THE "LIQUIDATED DAMAGES AMOUNT") REPRESENTING SELLER'S ESTIMATE OF THE PROBABLE COST OF TAKING THE PROPERTY BACK INTO INVENTORY, IT BEING AGREED THAT SELLER'S ACTUAL DAMAGES WOULD BE DIFFICULT TO COMPUTE AND THAT SAID AMOUNT OF LIQUIDATED DAMAGES BEARS A REASONABLE RELATIONSHIP TO SELLER'S PROBABLE ACTUAL DAMAGES IN THE EVENT OF BUYER'S DEFAULT, SHALL CONSTITUTE LIQUIDATED DAMAGES PAYABLE TO SELLER IN THE EVENT OF A DEFAULT BY BUYER; AND

(b)    THE PAYMENT OF SUCH LIQUIDATED DAMAGES TO SELLER SHALL CONSTITUTE THE EXCLUSIVE REMEDY OF SELLER ON ACCOUNT OF THE DEFAULT OF BUYER AND SHALL BE IN LIEU OF ANY OTHER MONETARY RELIEF TO WHICH SELLER MIGHT OTHERWISE BE ENTITLED; AND

(c)    THE SUM STIPULATED AS LIQUIDATED DAMAGES SHALL BE PAYABLE TO SELLER OUT OF BUYER'S DEPOSITS TOWARD THE PURCHASE PRICE OF THE PROPERTY ACCORDING TO THE FOLLOWING PROCEDURES:

(i) AT ANY TIME AFTER THE DATE PROVIDED HEREIN FOR THE CLOSE OF ESCROW, OR ANY EXTENDED DATE FOR CLOSING, SELLER SHALL GIVE WRITTEN NOTICE TO ESCROW HOLDER AND TO BUYER IN THE MANNER PRESCRIBED IN §116.340 OF THE CODE OF CIVIL PROCEDURE FOR SERVICE IN A SMALL CLAIMS ACTION, STATING THAT THE BUYER IS IN DEFAULT AND DEMANDING THAT THE ESCROW HOLDER REMIT TO THE SELLER THE LIQUIDATED DAMAGES AMOUNT FROM THE PURCHASE MONEY HELD BY THE ESCROW HOLDER AS LIQUIDATED DAMAGES, UNLESS THE BUYER GIVES WRITTEN OBJECTION TO THE ESCROW HOLDER WITHIN 20 DAYS.  THE BUYER SHALL HAVE 20 DAYS FROM THE DATE OF RECEIPT OF THE SELLER'S NOTICE AND DEMAND IN WHICH TO GIVE THE ESCROW HOLDER BUYER'S WRITTEN OBJECTION TO DISBURSEMENT OF THE PURCHASE MONEY AS LIQUIDATED DAMAGES AND INSTRUCTIONS TO THE ESCROW HOLDER NOT TO SO DISBURSE THE PURCHASE MONEY.

(ii) IF BUYER GIVES SUCH WRITTEN OBJECTION AND INSTRUCTIONS TO ESCROW HOLDER, WITHIN 20 DAYS AFTER THE RECEIPT OF SELLER'S NOTICE AND DEMAND, THE CONTROVERSY AND THE DISPOSITION OF THE FUNDS DEPOSITED INTO THE ESCROW BY BUYER SHALL BE SETTLED BY BINDING ARBITRATION WITH THE JUDICIAL ARBITRATION MEDIATION SERVICES ("JAMS"), AS PROVIDED IN PARAGRAPH 13.  JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.

Gaw 45C

-9-

Buyer _____ Seller _____

(iii)  IF BUYER FAILS TO GIVE TO ESCROW HOLDER, WITHIN TWENTY (20) DAYS AFTER RECEIPT OF SELLER'S NOTICE AND DEMAND, WRITTEN NOTICE OF BUYER'S OBJECTIONS: (a) ESCROW HOLDER SHALL PROMPTLY REMIT THE LIQUIDATED DAMAGES AMOUNT TO SELLER; AND (b) SELLER SHALL BE RELEASED FROM ANY OBLIGATION TO SELL THE PROPERTY TO BUYER.

(iv)  IF THE CONTROVERSY IS REFERRED TO ARBITRATION, THE PROVISIONS OF [PARAGRAPH 13] SHALL APPLY.

(v)  SELLER AGREES TO INDEMNIFY AND HOLD ESCROW HOLDER HARMLESS FROM ANY CLAIM ARISING OUT OF ANY DISTRIBUTIONS MADE BY ESCROW HOLDER IN ACCORDANCE WITH AND PURSUANT TO THE PROVISIONS OF THIS PARAGRAPH.

(vi)  PRIOR TO SELLER RETAINING ANY AMOUNT OF THE DEPOSIT IN EXCESS OF **SIX PERCENT (6%)** OF THE PURCHASE PRICE FOR THE SALE OF THE UNIT, THE FOLLOWING SHALL OCCUR IN THE EVENT OF BUYER'S DEFAULT;

1.  THERE SHALL BE AN ACCOUNTING AS FOLLOWS:

(A) THE SELLER IS TO PERFORM AN ACCOUNTING OF ITS COSTS AND REVENUES RELATED TO AND FAIRLY ALLOCABLE TO THE CONSTRUCTION AND SALE OF THE RESIDENTIAL UNIT WITHIN SIXTY (60) CALENDAR DAYS AFTER THE FINAL CLOSE OF ESCROW OF THE SALE OF THE UNIT [WITHIN THE PHASE IN WHICH THE UNIT IS LOCATED].

(B) THE ACCOUNTING SHALL INCLUDE ANY AND ALL COSTS AND REVENUES RELATED TO THE CONSTRUCTION AND SALE OF THE RESIDENTIAL UNIT AND ANY DELAY CAUSED BY BUYER'S DEFAULT.

2.  THE SELLER IS REQUIRED TO MAKE REASONABLE EFFORTS TO MITIGATE ANY DAMAGES ARISING FROM THE DEFAULT.

3.  THE SELLER IS TO REFUND TO THE BUYER ANY AMOUNTS PREVIOUSLY RETAINED AS LIQUIDATED DAMAGES IN EXCESS OF THE GREATER OF EITHER **SIX PERCENT (6%)** OF THE ORIGINALLY AGREED-UPON PURCHASE PRICE OF THE UNIT OR THE AMOUNT OF THE SELLER'S LOSSES RESULTING FROM THE BUYER'S DEFAULT, AS CALCULATED BY THE ACCOUNTING.

THE REFUND IS TO BE SENT TO THE BUYER'S LAST KNOWN ADDRESS WITHIN NINETY (90) AFTER THE FINAL CLOSE OF ESCROW OF THE SALE OR LEASE OF ALL THE UNITS WITHIN THE PROJECT.

IF THE AMOUNT RETAINED BY THE SELLER AFTER THE ACCOUNTING DOES NOT EXCEED **SIX PERCENT (6%)** OF THE PURCHASE PRICE, THE AMOUNT IS VALID UNLESS THE BUYER ESTABLISHES THAT THE AMOUNT IS UNREASONABLE AS LIQUIDATED DAMAGES PURSUANT TO CIVIL CODE §1675, subd.(e).

NOTWITHSTANDING THE TIME PERIODS REGARDING THE PERFORMANCE OF THE ACCOUNTING SET FORTH HEREINABOVE, IF A "NEW QUALIFIED BUYER" HAS ENTERED INTO A CONTRACT TO PURCHASE THE UNIT THE SELLER SHALL PERFORM

Gaw 45C

-10-

Buyer _____  Seller _____

THE ACCOUNTING WITHIN SIXTY (60) CALENDAR DAYS AFTER A NEW QUALIFIED BUYER HAS ENTERED INTO A CONTRACT TO PURCHASE. THE TERM "NEW QUALIFIED BUYER" IS DEFINED TO MEAN A BUYER THAT: (A) HAS BEEN ISSUED A LOAN COMMITMENT, WHICH SATISFIES THE PURCHASE AGREEMENT LOAN CONTINGENCY REQUIREMENT, BY AN INSTITUTIONAL LENDER TO OBTAIN A LOAN FOR AN AMOUNT EQUAL TO THE PURCHASE PRICE LESS ANY DOWN PAYMENT IN ESCROW OR POSSESSED BY THE SELLER; AND (B) HAS CONTRACTED TO PAY A PURCHASE PRICE THAT IS GREATER THAN OR EQUAL TO THE PURCHASE PRICE TO BE PAID BY THE ORIGINAL BUYER.

NOTE:   IF BOTH BUYER AND SELLER DO NOT INITIAL THIS PARAGRAPH IN THE SPACES PROVIDED ABOVE, THIS PARAGRAPH 12 IS NOT OPERATIVE.   THE BALANCE OF THE AGREEMENT REMAINS OPERATIVE.

13.    ARBITRATION OF DISPUTES:    BY THE INITIALING OF THE SPACE BELOW, IT IS AGREED THAT ANY CLAIM OR DISPUTE BETWEEN THE BUYER AND THE SELLER, OR THE BUILDER, GENERAL CONTRACTOR, ESCROW HOLDER, OR BROKER, ARISING OUT OF THIS CONTRACT OR RELATING IN ANY WAY TO THE PROPERTY BEING PURCHASED HEREUNDER AND EVERY OTHER DISPUTE BETWEEN SELLER AND BUYER THAT HAS ARISEN UNDER THE CONTRACT, (EXCEPT FOR CLAIMS FOR DAMAGES FOR  CONSTRUCTION DEFECTS, WHICH SHALL BE SUBJECT TO AND GOVERNED BY THE PROVISIONS OF PARAGRAPH 15 OF THIS AGREEMENT), SHALL BE DETERMINED BY SUBMISSION TO  BINDING ARBITRATION PURSUANT TO THE FOLLOWING:

(a)    costs and fees of the arbitration, including ongoing costs and fees of the arbitration shall be paid as agreed by the parties, and, if the parties cannot agree, as determined by the arbitrator; provided, however, if the Seller is a party to the arbitration, then any fee to initiate arbitration shall be paid by Seller, but the cost of arbitration shall ultimately be borne as determined by the arbitrator;

(b)    a neutral and impartial individual shall be appointed to serve as arbitrator, with the arbitrator to be selected by mutual agreement of the parties.   If the parties are unable to agree on an arbitrator within fifteen (15) days after any party initiates the arbitration, a neutral and impartial arbitrator shall be selected by the JAMS. In selecting the arbitrator, the provisions of §1297.121 of the Code of Civil Procedure shall apply.  An arbitrator may be challenged for any of the grounds listed in §1297.121, or in §1297.124 of the Code of Civil Procedure;

(c)    venue of the arbitration to be in the County;

Gaw 45C

-11-

Buyer _____ / Seller ____

**(d)**  the arbitration shall commence in a prompt and timely manner in accordance with (i) the Commercial Rules of the JAMS, or if the rules do not specify a date by which arbitration is to commence, then (ii) by a date agreed upon by the parties, and if they cannot agree as to a commencement date, (iii) a date determined by the arbitrator. The arbitrator shall apply California substantive law in rendering a final decision. The arbitrator shall have the power to grant all legal and equitable remedies and award compensatory damages. When the arbitrator is prepared to make the award, the arbitrator shall first so inform the parties, who shall have ten (10) days to attempt to resolve the matter by a binding agreement between them. If the parties resolve the matter, the arbitrator shall not make any award. If the parties do not so resolve the matter within the ten (10) day period, the arbitrator shall make the award on the eleventh day following the arbitrator's notice of being prepared to make the award;

**(e)**  the arbitration shall be conducted in accordance with the Commercial Rules of the JAMS;

**(f)**  the arbitration shall be conducted and concluded in a prompt and timely manner;

**(g)**  the arbitrator shall be authorized to provide all recognized remedies available in law or equity for any cause of action that is the basis of arbitration;

**(h)**  A judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction or application may be made to such court for judicial acceptance of the award and an order of enforcement. The parties agree to be bound by the decision of the arbitrator, which shall be final and non-appealable.

**(i)**  Preliminary Procedures.  If state or federal law requires an Owner, the Association or Seller to take steps or procedures before commencing an action in arbitration, then the Owner, the Association or Seller must take such steps or follow such procedures, as the case may be, before commencing the arbitration. For example, any claim or Disputes pursuant to California Civil Code Section 895 et seq., as hereafter amended may be subject to the non-adversarial procedures set forth in California Civil Code Section 910 through 938, prior to the initiation of any arbitration. In addition, nothing contained herein shall be deemed a waiver or limitation of the provisions of California Civil Code Sections 1368.5, 1375, 1375.05 or 1375.1;

**(j)**  Participation by Other Parties.  An Owner, the Association and Seller, to such extent any such party is defending a claim in the arbitration, may, if it chooses, have all necessary and appropriate parties included as parties to the arbitration;

**(k)**  Federal Arbitration Act.  Because many of the materials and products incorporated into the home are manufactured in other states, the development and conveyance of the Property evidences a transaction involving interstate commerce and the Federal Arbitration Act (9 U.S.C. §1 et seq.) now in effect and as it may be hereafter amended will govern the interpretation and enforcement of the arbitration provisions set forth herein;

**NOTICE:**  BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT TRIAL.  BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL,

Gaw 45C

-12-

Buyer _____  Seller _____

EXCEPT AS HEREIN PROVIDED. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

IF THE MATTER PROCEEDS TO ARBITRATION, DISCOVERY SHALL BE ALLOWED PURSUANT TO CODE OF CIVIL PROCEDURE § 1283.05. ARBITRATION OF ANY MATTER PURSUANT TO THIS CLAUSE SHALL NOT BE DEEMED A WAIVER OF THE ATTORNEY/CLIENT OR ATTORNEY/WORK PRODUCT PRIVILEGE IN ANY MANNER.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL BINDING ARBITRATION PURSUANT TO THE FEDERAL ARBITRATION ACT. BY PLACING THEIR INITIALS HERE THE PARTIES AGREE TO ARBITRATION.   (BUYER _____ _____ ) (SELLER _____ )

**14.    Notices:**   All notices must be in writing and delivered to the addresses set forth on page 1, above. All notices of default must be sent by certified or registered mail, return receipt requested, or receipt of hand delivery. Notices are deemed received two (2) days after mailing or on the date shown on the receipt for hand delivery. Either party may change its address for the purposes of this Paragraph by giving written notice in the manner set forth herein.

BUYER UNDERSTANDS AND ACKNOWLEDGES THAT BUYER IS RESPONSIBLE FOR ADVISING SELLER OF ANY CHANGE IN BUYER'S ADDRESS FROM THE ADDRESS STATED IN THIS AGREEMENT, AND SELLER SHALL BE ENTITLED TO RELY UPON THE ADDRESS OF BUYER STATED IN THIS AGREEMENT UNLESS AND UNTIL IT HAS BEEN CHANGED BY BUYER IN THE MANNER SET FORTH IN THIS PARAGRAPH.

Buyer's Initials _____ Seller's Agent's Initials: _____

**15.    Warranties and Representations; Construction Disputes:**

**(a)    Disclaimer - Consumer within Products, Warranties Limited to Manufacturers:**   Buyer acknowledges that Seller makes no warranties, including, without limitation, warranties as to merchantability or fitness, either express or implied, with respect to appliances or other Consumer Products, either attached to or installed in the Residence, and Seller is not responsible for any promise or warranty made by the manufacturers of such products. Seller shall make available to Buyer all written warranties of Consumer Products which may be installed in the Residence as the term "Consumer Products" is defined in the U.S. Code, and in the Federal Trade Commission Rules and Regulations. Buyer agrees to look solely to the manufacturers and not the Seller with respect to warranties on such Consumer Products which include, but are not limited to, the following, as applicable:   heat pump; air-conditioner; exhaust fan; thermostat; smoke detector; door chime; electric meter; water meter; gas meter; garbage disposal; water heater; dishwasher; range; oven; oven hood; washer; dryer; refrigerator; freezer; microwave oven and other similar appliances and items.

**(b)    LIMITED WARRANTY:** SELLER WILL PROVIDE BUYER WITH A LIMITED WARRANTY AT CLOSING PROVIDING: (I) LIMITED WARRANTY FOR THE BUILDING COMPONENTS OF THE UNIT SET FORTH IN CALIFORNIA CIVIL CODE SECTION 900. (THIS INCLUDES THE FIT AND FINISH OF

Gaw 45C

-13-

Buyer _____ Seller _____

CABINETS, MIRRORS, FLOORING, INTERIOR AND EXTERIOR WALLS, COUNTER TOPS, PAINT FINISHES, AND TRIM); AND (II) A WARRANTY OF THE "FUNCTIONALITY STANDARDS" AS SET FORTH IN CALIFORNIA CIVIL CODE SECTIONS 895 THROUGH 897. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, AND IN THE LIMITED WARRANTY SELLER IS NOT MAKING OR OFFERING ANY WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, THE UNIT, OR THE PROJECT, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, HABITABILITY, QUALITY OF CONSTRUCTION OR FITNESS FOR A PARTICULAR PURPOSE. SELLER EXPRESSLY DISCLAIMS ANY WARRANTIES OTHER THAN SELLER'S AS STATED HEREIN. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, BUYER ACKNOWLEDGES AND AGREES, IN THE EVENT OF ANY POST-CLOSING DISPUTES IN WHICH IT IS DETERMINED THAT SELLER HAS BREACHED ITS CONTRACTUAL, STATUTORY, OR COMMON LAW DUTIES TO BUYER, OR HAS BREACHED THE LIMITED WARRANTY, THAT SELLER SHALL BE LIABLE ONLY FOR THE DAMAGES RECOVERABLE UNDER CIVIL CODE SECTION 944. UNDER NO CIRCUMSTANCES SHALL SELLER BE LIABLE FOR ANY OTHER DAMAGES, WHETHER SPECIAL, CONSEQUENTIAL, INDIRECT, INCIDENTAL OR PUNITIVE DAMAGES, OR DAMAGES FOR EMOTIONAL DISTRESS. ANY DISPUTE BETWEEN THE BUYER AND THE SELLER ARISING OUT OF THE WARRANTY SHALL BE SUBMITTED TO JUDICIAL REFERENCE OR ARBITRATION AS PROVIDED IN THE LIMITED WARRANTY AGREEMENT.

Buyer's Initials _____

**(c)   Customer Care Program and Homeowner/Association Maintenance:** Buyer understands that Buyer is obligated to follow all reasonable maintenance obligations and schedules communicated in writing to the Buyer by Seller and by product manufacturers, as well as commonly accepted maintenance practices, as provided in Civil Code Section 907, and that failure of the Buyer to satisfy the obligations may result in invalidation of warranties and provide Seller with a defense to any claim of breach of warranty. BUYER AGREES TO FOLLOW THE MAINTENANCE REQUIREMENTS SET FORTH IN AND/OR REFERRED TO IN THE COVENANTS, CONDITIONS & RESTRICTIONS, IN THE LIMITED WARRANTY, AND IN THE HOMEOWNERS MANUAL AND MAINTENANCE GUIDE (IF APPLICABLE), AS SUPPLIED BY SELLER AT THE CLOSE OF ESCROW.

> Buyer agrees to provide copies of the Limited Warranty and the Homeowners Manual and Maintenance Guide (if applicable) to any subsequent purchasers from Buyer, prior to the transfer of title.
>
> Buyer's Initials _____ Buyer's Initials _____

**(d)   CONSTRUCTION DISPUTES:** BY INITIALING THE SPACE BELOW, THE PARTIES AGREE THAT ANY CIVIL ACTION OR PROCEEDING INVOLVING A DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT, RELATING TO CONSTRUCTION DEFECTS, DESIGN, PLANNING, ENGINEERING, TESTING, SURVEYING, AND CONSTRUCTION OF IMPROVEMENTS TO THE PROPERTY, SHALL BE RESOLVED AS PROVIDED IN **EXHIBIT "C"** ATTACHED HERETO.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS REFERRED TO IN THIS PROVISION TO JUDICIAL REFERENCE PURSUANT TO THE PROVISIONS OF **EXHIBIT "C"**.

INITIALS:   BUYER _____ SELLER _____

**16.   Assignments; Successors and Assigns:** This Agreement may not be assigned by the Buyer without written consent of Seller, which consent may be granted or withheld by Seller in Seller's absolute discretion. Neither Buyer nor Buyer's agent may sell or market the Property to others, or sign any agreement for the listing, sale or transfer of the

Gaw 45C

-14-

Buyer _____ Seller _____

Property until after the Close of Escrow. Violation of the foregoing shall constitute a material breach of this Agreement entitling Seller, at its option, to terminate this Agreement, and to retain Buyer's deposit pursuant to Paragraph 12 of this Agreement (if both parties have initialed Paragraph 12). This Agreement shall bind the heirs, executors, administrators, and successors of the parties, and their assigns (subject to the limitations stated above).

**17.** **Lease of Units:** Buyer understands that Seller reserves the right to lease remaining unsold Units from time to time, pending sale and Close of Escrow of said Units.

**18.** **Inspection:** Unless otherwise agreed upon by Buyer and Seller, prior to the Closing Date, Seller shall provide Buyer with a reasonable opportunity to inspect the Property by notifying Buyer of the date upon which Buyer shall be provided with an orientation and walk-through of the Property. Immediately after such orientation and walk-through, Buyer shall deliver to Seller, or Seller's agent, on a form provided by Seller, a list of all items or conditions of the Property which, in Buyer's opinion, are in need of correction. All corrective work requested which is deemed necessary and appropriate by Seller, in its sole and absolute discretion, and which Seller agrees to correct, will be completed by Seller as soon as reasonably possible. Buyer agrees that the corrective work to be completed by Seller pursuant to this Paragraph may be completed after the Close of Escrow and the Closing Date shall not be extended by reason of any corrective work. Buyer's failure to attend a walk-through inspection of the Property after Seller's notice to schedule such inspection shall be deemed acceptance by Buyer of the condition of the Property at the Closing Date, subject only to the terms and conditions covered in the warranties described in Paragraph 15, above.

**19.** **Contingencies:** Unless Buyer and Seller have executed a written Contingency Addendum, the purchase of the Property is not contingent on the prior sale of other property. Buyer acknowledges and agrees that Seller has no obligation to execute a Contingency Addendum.

**20.** **Cooperation/Non-Interference:** Buyer shall cooperate with Seller in the process of completing the construction and delivery of the Unit by meeting required deadlines and providing such cooperation as may be reasonably requested by Seller. Buyer shall not interfere with the work in progress in any manner, including, without limitation, by unauthorized visits to the construction site, by directing or attempting to direct, or advise construction personnel on methods of completion or installation, by requesting custom work (other than that agreed to by Buyer and Seller in writing) or by any other activity that would interfere with completion of the home on a timely basis.

**21.** **Force Majeure Events:** Seller is not responsible for "force majeure events," which means events which are beyond Seller's reasonable control, including, but not limited to, strikes, boycotts, unavailability of materials, labor shortages, delays in receiving materials, governmental interference in the market place, moratoriums, civil riot, insurrection, war, acts of terrorism, foreign military commitments, flood, fire, earthquake, act of God, unusually severe weather, delays or inaction of independent contractors, litigation, or delays caused by conditions imposed on the Project (or any part thereof) by any governmental entity resulting in significantly increased costs or delays.

**22.** **Interpretation:** Any rule of law (including California Civil Code Section 1654), or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the purposes of the parties and this

Gaw 45C

-15-



Buyer _____    Seller ____

Agreement. Buyer and Seller acknowledge that changes in economic conditions during the Escrow period may cause the terms and conditions not to appear as satisfactory as when the Agreement is signed. Nonetheless, Buyer and Seller agree they are bound to such terms and conditions and agree to take all necessary and appropriate actions to cause Escrow to close in a timely fashion.

**23.    Modifications:** All amendments or other modifications of this Agreement must be in writing and signed by the parties hereto.

**24.    Time:** Time is of the essence of this Agreement.

**25.    Severability:** Should any provision or portion of this Agreement be declared invalid or in conflict with any law of the jurisdiction where this Project is situated, the validity of all other provisions and portions of this Agreement shall remain unaffected and in full force and effect. The parties further agree to replace any such invalid, illegal or unenforceable portion with a valid and enforceable provision which will achieve, to the extent possible, the economic, business or other purposes of the invalid, illegal or unenforceable portion.

**26.    No Waiver:** The waiver by Seller of any term, condition or provision of this Agreement shall not be construed as a waiver of any other term, condition or provision of this Agreement.

**27.    FIRPTA:** The Foreign Investment and Real Property Tax Act (FIRPTA) requires a buyer purchasing real property from a foreign person to withhold tax from the sale proceeds unless an exemption applies. Seller agrees to provide Buyer with a certification establishing that no Federal income tax is required to be withheld under FIRPTA.

**28.    Headings; Pronouns:** The headings of this Agreement are for convenience only and do not in any way limit or amplify the terms or provisions of this Agreement. All pronouns and variations thereof shall be deemed to refer to the masculine, feminine or neuter, and to the singular or plural, as the identity of the party or parties may require.

**29.    Calendar Days:** All periods of time referred to in this Agreement shall include all Saturdays and Sundays and any holidays. In the event the day upon which any action is required to be taken under the terms of this Agreement is not a business day, the action shall be taken on the next succeeding business day.

**30.    Disclosures:** Buyer acknowledges receipt of the Millennium Tower Disclosure and Information Statement from Seller.

INITIALS:    BUYER _____    SELLER _____

**31.    Reassessment Notice:** The Property may be reassessed on the change of ownership. The reassessment will be effective as of Close of Escrow and a supplemental tax bill may be sent to the Buyer requiring the payment of additional property taxes. It shall be the responsibility of the Buyer to pay this supplemental tax bill. If an impound account for the payment of property taxes is used, the amount of impound payments may increase.

**32.    Brokers:** Buyer represents and warrants that, except for any cooperative broker identified on in this Agreement, Buyer has engaged no broker or finder in connection with this transaction, and agrees to defend and hold Seller harmless from claims by any broker or finder consistent with this representation and warranty. Buyer is aware that Seller's sales

Gaw 45C

-16-

Buyer _____    _____ Seller _____

person is an agent of the Seller exclusively and acknowledges receipt of this disclosure regarding real estate agency relationships.
INITIALS:   BUYER [signature] SELLER [signature]

**[Seller's broker/agent is MP Marketing of California Inc.]**

**[Buyer's broker/agent is  Alain Pinel Realtors,  Denise Paulson]**

**33.     Megan's Law:**   Notice:  Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**34.     Views.**  The Seller makes no representations that the current views from any direction from the Residential Project, or from the Unit, will not be obstructed in the future.

**35.     Default by Buyer:**   Any of the following actions or failures to act by Buyer under this Agreement, without limitation, constitutes a default of the Buyer ("Default"):

- Failure to make any deposit due under this Agreement on a timely basis.
- Failure of Buyer to safeguard Buyer's funds so that sufficient funds are available to make all deposits and to close Escrow.
- Failure to make Optional Item selections on or before dates required.
- Any attempt by Buyer to assign its rights in violation of this Agreement, or to attempt to arrange a double escrow.
- Failure to close Escrow on time.

**Termination:**   Seller may (but is not required to) terminate this Agreement within thirty (30) days of the occurrence of any Default by Buyer as per Paragraph 35, above.

Seller will notify Buyer in writing if Seller elects to terminate the Agreement, and, if so, will direct Escrow Holder to return all Deposits to Buyer without any deduction, except for such sums (if any) as may then be subject to a claim for liquidated damages under Paragraph 12 (provided both parties have initialed Paragraph 12).

**36.     SB 800 Notices:**
     **(a)     Notice of SB 800 Adoption:**   The California Legislature has enacted Title 7 of  Division 2 of the Civil Code, commonly referred to as SB 800 (hereinafter "the Code"), which provides certain standards, requirements and procedures for claims of construction defects in new homes.   Under the Code the builder/seller (hereinafter "Seller") shall elect whether it will adopt the standards and procedures of the Code or provide some alternative standards and procedures in compliance with the Code.  Buyer acknowledges receipt of this notice that the Code provides procedures that impact the legal rights of homeowners, and that a copy of Title 7 of Division 2 has been delivered to and received by Buyer as **Exhibit "D"**.

Initials: Buyer [signature]  Seller's  Sales  Representative [signature]
Initials: Buyer [signature]

Gaw 45C

-17-

Buyer [signature]   Seller [signature]

**(b)    Notice to Buyer of Adoption of Standards and Procedures.** Buyer is hereby notified that Seller has elected to adopt the standards and procedures set forth in the Code. Chapter 2 of the Code provides certain standards regarding the functionality of the home ("Functionality Standards") and lengths of time for these standards during which the Buyer may pursue repair/redress under the Code (Sections 896 and 897). Buyer is further notified that Seller has also elected to adopt the Pre-Litigation Procedures set forth in Chapter 4 of the Code. In the event of a claim by Buyer that falls within the parameters of the Code, Seller and Buyer mutually acknowledge and agree that Chapter 4 of the Code sets forth the process for maintaining a valid claim (Civ. Code §§ 910, et seq.).

Initials: Buyer _____    Seller's    Sales    Representative _____
Initials: Buyer _____

**(c)    Notice Regarding Subsequent Purchasers.** By initialing below, Buyer further acknowledges that the Code is binding on Buyer's successors-in-interest pursuant to Civil Code Section 945. Therefore, Buyer acknowledges being obligated to provide the Code and a copy of all documents provided by Seller to Buyer to a subsequent purchaser of Buyer's unit. Buyer shall indemnify Seller from any adverse effects upon Seller due to Buyer's failure to provide a subsequent purchaser with copies of all documents provided by Seller to Buyer.

Initials: Buyer _____    Seller's    Sales    Representative _____
Initials: Buyer _____

**(d)    Receipt of Maintenance Manual.** By initialing below, Buyer acknowledges that Seller will provide on or before Close of Escrow a maintenance manual and guidelines prepared on Seller's behalf]. Buyer acknowledges that he/she has an affirmative obligation under the Code to carefully follow the requirements in the maintenance manual [and guidelines] (Civil Code Section 907). Failure to follow the maintenance requirements may result in Buyer's inability to recover under the Code. (Civil Code 945.5).

Initials: Buyer _____    Seller's    Sales    Representative _____
Initials: Buyer _____

**(e)    Claim Notification.** If Buyer makes a claim for violation of the Functionality Standards pursuant to the Code, the Notice of Claim shall be served upon Seller at the address as provided on page 1, above. In the event Seller can no longer be contacted at the address set forth above, and has not provided an alternative address for notices, Buyer shall contact the California Secretary of State to locate Seller's agent for service of process. The Secretary of State can be contacted at: 1500 11th Street, Sacramento, California 95814, phone number 916-657-5448 or at www.ss.ca.gov.

Initials: Buyer _____    Seller's    Sales    Representative _____
Initials: Buyer _____

**(f) Limited Warranty.** Seller has provided a Limited Warranty in compliance with Section 900 for "fit and finish" items. (See Paragraph 15 (b).) Buyer agrees that any claims made for fit and finish items shall be made under the terms and conditions of the Limited Warranty. THE LIMITED WARRANTY PROVIDES FOR RESOLUTION OF ANY DISPUTE ARISING OUT OF THE LIMITED WARRANTY THROUGH JUDICIAL REFERENCE OR BINDING ARBITRATION. Claims regarding such "fit and finish" items are not subject to the procedures set forth in Chapter 4 of the Code. Seller has not elected to provide an Enhanced Protection Agreement ("EPA")

Gaw 45C

-18-

Buyer _____    Seller _____

pursuant to Civil Code sections 901-906, and Buyer acknowledges that nothing in the Seller's Limited Warranty shall be deemed to constitute the offering of an EPA to Buyer.

Initials: Buyer _____ Seller's Sales Representative _____
Initials: Buyer _____

(g) **Disclaimer of all other Warranties.** No other warranties, whether express or implied, exist beyond those set forth in the Limited Warranty. By initialing below, Buyer acknowledges receipt of the Limited Warranty.

Initials: Buyer _____ Seller's Sales Representative _____
Initials: Buyer _____

(h) **Customer Care Program and Homeowner/Association Maintenance**: Buyer understands that Buyer is obligated to follow all reasonable maintenance obligations and schedules communicated in writing to the Buyer by Seller and by product manufacturers, as well as commonly accepted maintenance practices, as provided in Civil Code Section 907, and that failure of the Buyer to satisfy the obligations may result in invalidation of warranties and provide Seller with a defense to any claim of breach of warranty. BUYER AGREES TO FOLLOW THE MAINTENANCE REQUIREMENTS SET FORTH IN AND/OR REFERRED TO IN THE RESIDENTIAL DECLARATION, SELLER'S WARRANTY, AND IN THE HOMEOWNERS MANUAL AND MAINTENANCE GUIDE, AS SUPPLIED BY SELLER AT THE CLOSE OF ESCROW.

Buyer agrees to provide copies of the Limited Warranty and the Homeowners Manual and Maintenance Guide as furnished by Seller to any subsequent purchasers from Buyer, prior to the transfer of title.

Initials: Buyer _____ Seller's Sales Representative _____
Initials: Buyer _____

37.    **Anti-Terrorism Regulations:** Buyer represents and warranties to Seller that: (1) Buyer is not on the prohibited parties list of the Office of Foreign Assets Control maintained pursuant to the Patriot Act and Executive Order 13224 and (2) Buyer's purchase of the Property is not designed, even in part, to conceal or disguise the "nature, the location, the source, the ownership, or the control" of proceeds of criminal activity in violation of the Money Laundering Control Act. Buyer acknowledges and agrees that Seller may be legally obligated to report any suspicious activity related to this Agreement to the Department of Treasury and/or terminate this Agreement if Seller obtains information about Buyer that would result in a violation of the Patriot Act or Money Laundering Control Act.

38.    **Notice of Your Supplemental Property Tax Bill:**
California property tax law requires the assessor to revalue real property at the time the ownership of the property changes. Because of this law, you may receive one or two supplemental tax bills, depending on when your loan closes. The supplemental tax bills are not mailed to your lender. If you have arranged for your property tax payments to be paid through an impound account, the supplemental tax bills will not be paid by your lender. It is your responsibility to pay these supplemental tax bills directly to the tax collector. If you have any questions regarding this matter, please call your local tax collector's office.

NOTE: The County of San Francisco may not segregate and reallocate the real estate taxes [Property Taxes] on the Units immediately after the sale. It may be several months before the

Gaw 45C

-19-

Buyer _____ Seller _____

County segregates and reallocates such real estate taxes [Property Taxes] to the Unit. Until such time as the real estate [Property Taxes] taxes are segregated and reallocated by the County, the Declarant, the Center Association or the Residential Association shall have the right to pay the real estate [Property Taxes] taxes for the entire Center or the Condominium Project. the Owner of a Condominium Unit understands that the Owner will be obligated to reimburse the Declarant, the Center Association or the Residential Association that makes such payment for the real estate [Property Taxes] taxes based upon an allocation of such payment to the Unit as determined by the Declarant as reasonably equating to the real estate [Property Taxes] taxes that are to be paid by the Owner as the owner of the Unit upon such segregation and reallocation of the real estate [Property Taxes] taxes.

**39.     Merger with Deed:** The terms and provisions of this Purchase Agreement shall be merged with and extinguished by delivery of the deed at the close of Escrow, except for Paragraphs 12, 13, 15 and 36, which shall survive delivery of the deed at close of Escrow, and shall not be merged therein.

**40.     Status of Buyer:** If this Purchase Agreement is signed by an individual who is then unmarried, and at the time of the close of Escrow is married, the Buyer shall notify the Seller and Escrow Holder of such event, and shall indemnify the Seller and the Escrow Holder from any loss that may arise by reason of the failure of the Seller's spouse to sign any applications, mortgages, notes, agreements, or other documents with respect to the transaction represented by this Purchase Agreement. If Buyer is married and Buyer's spouse is not also a purchaser under this Purchase Agreement, then Buyer shall be responsible for such spouse signing any mortgage loan documents, agreements, or other documents required by Seller, a lender, or other entity with respect to the transaction represented by this Purchase Agreement, and Buyer shall hold Seller and Escrow Holder harmless from any loss as a result of the failure or refusal of such spouse to sign any such documents. If Buyer is not a natural person, Buyer shall indemnify Seller and Escrow Holder for any loss that may arise by reason of the failure of any of Buyer's principal officers, owners, beneficiaries, or their spouses, to sign any applications, mortgages, notices, agreements, or other documents required by a lender or other entity with respect to the transaction represented by this Purchase Agreement. If Buyer files for or is adjudicated bankrupt, makes an assignment or arrangement for benefit of creditors, files for divorce or legal separation, dies, [or notifies Seller of a desire to be released from this Purchase Agreement], Seller, may, at Seller's sole option, terminate this Purchase Agreement and cause the Deposit to be returned to Buyer, whereupon neither party shall have any further obligation to the other hereunder.

**41.     Counterparts:** This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument

**42.     Entire Agreement:** This Agreement (together with Seller's Limited Warranty) constitutes the sole and entire agreement between Buyer and Seller for the purchase and sale of the Property. This Agreement supersedes all prior agreements, representations or understandings, oral or written. All advertising material and/or prior statements and representations, if any, whether oral or written, are replaced and superseded by this Agreement. The terms of this Agreement may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. No addition or modification of any term or provision of this Agreement shall be effective except by a written document signed by both Buyer and Seller. Buyer acknowledges and agrees that Buyer has not and will not rely upon any representation made by Seller or any of its agents, employees or representative concerning the Property or the Project, including, without limitation, the condition or use of the Property or the Project, or the

Gaw 45C

-20-

Buyer _____   Seller _____

rights or duties of the parties under this Agreement, except as expressly set forth in this Agreement. Any right or duty described herein that by its terms extends beyond the Close of Escrow shall survive the Close of Escrow and remain in full force and effect in accordance with its terms. Any and all additions, deletions, omissions and or deviations from the printed form or any attachments hereto, other than the appropriate completion of "blanks" which appear herein are agreed to be in excess of the authority of the Seller's sales representatives and shall be of no force nor effect. Only an officer of Seller has the authority to sign this Purchase Agreement on behalf of Seller.

**43.** **Unit Layout/Unit Specification: By initialing the Unit Layout set forth as Exhibit "A" and the Unit Specification set forth as Exhibit "B" to this Agreement, Buyer confirms that the layout shown on Exhibit "A" and the specifications shown on Exhibit "B" are the layout and specifications for the Residence that is the subject of this Agreement. It is understood that the layout in Exhibit "A" is preliminary and, as such, all dimensions are approximate and are subject to normal construction variances and tolerances. Seller reserves the right to modify Exhibit "B" in any way not material, including without limitation, changing materials, appliances, equipment, fixtures, and other construction and design details and to substitute in their place similar materials, appliances, equipment, fixtures, and other details of substantially equal or better quality or design.**

Initials: Buyer _____ Seller's Sales Representative _____
Initials: Buyer _____

Gaw 45C

Buyer _____ /Seller _____

**Buyer's Offer:**  Buyer has read and understood the provisions contained herein and offers and agrees to purchase the Property on these terms.  Buyer further understands that this Agreement initially is an offer only and will not become a binding contract until accepted by Seller, and is subject to the possible acceptance by Seller of an offer from another Buyer.  Buyer grants the undersigned agent the irrevocable right for a period of five (5) days from the date hereto to obtain an acceptance of this offer by Seller.  The signature of the sales person receipting for the Initial Deposit is not an acceptance by Seller.   A valid acceptance of this offer requires a signature of a representative of Seller authorized to accept Buyer's offer.

<u>THIS IS A LEGALLY BINDING CONTRACT.  READ IT CAREFULLY BEFORE SIGNING.</u>
**OFFER TO PURCHASE BY BUYER:**

**BUYER:**
Date: _Aug 27_, 20_12_

_____
Christina Gaw

_____
Fair Breeze Company Limited

**RECEIPT FOR DEPOSIT:**
Date: _8/30_, 20_12_

**SALES REPRESENTATIVE:**

_____
Diana Nelson
*[Signature is not acceptance]*

*THIS CONTRACT IS NOT BINDING UPON SELLER UNTIL AND UNLESS THE SELLER HAS EXECUTED THE SIGNATURE PAGE THAT FOLLOWS AND RETURNS THE SIGNATURE PAGE TO BUYER.*

**ACCEPTANCE BY SELLER:**

Date: _8/30_, 20_12_

Mission Street Development LLC, a Delaware limited liability company

By:     Mission Street Holdings LLC, its sole member

By:_____
Richard Baumert, Vice President

Gaw 45C

-22-

Buyer _____ Seller ____

**EXHIBIT "A"**
**UNIT LAYOUT**

Gaw 45C

-23-

Buyer _____ Seller _____



**EXHIBIT "B"**
**UNIT SPECIFICATION**

Gaw 45C

-24-

Buyer _____ Seller _____

Page 19

## EXHIBIT "B"

### The Grand Residences
### C-Line Floors 45, 46

| | |
|---|---|
| Entry Door and Frame: | Honduras Mahogany |
| Entry Door Hardware: | Satin Chrome |
| Entry Threshold: | Absolute Black Granite |
| Wood Floor: | Umbra Beech, 7/8 inch thick |
| | (in living-dining area, kitchen and entry) |
| Window Seats: | Mocha Crème Limestone |
| Kitchen Counter Top: | Calacatta Luccicoso Marble – Honed |
| Island Counter Top: | Calacatta Luccicoso Marble – Honed |
| Kitchen Base Cabinets: | Teak, manufactured in |
| | Germany by Studio Becker |
| Kitchen Wall Cabinets: | Satin Glass with Aluminum Frame |
| Backsplash: | Calacatta Luccicoso Marble - Honed – full height |

**Appliances:**

| | |
|---|---|
| Refrigerator: | Sub-Zero, 36 inch wide with Teak panel |
| Cook Top: | Wolf, 30 inch four burner, in Stainless Steel |
| Hood: | Bosch in Stainless Steel |
| Wall Oven: | Wolf, 30 inch, Stainless Steel |
| Microwave: | Wolf in Stainless Steel |
| Dishwasher: | Miele Optima with Teak panel |
| Wine Cooler: | U-Line with Teak Frame |
| Sink: | Elkay Lustertone, Satin Chrome |
| Faucet: | Grohe Ladylux Pro, Polished Chrome |
| Washer/Dryer: | Whirlpool |

**Master Bath:**

| | |
|---|---|
| Floor: | Walnut Travertine - Honed |
| Shower Wall: | Walnut Tavertine – Honed |
| Tub Wainscot: | Walnut Travertine - Honed |
| Counter Top: | Calacatta Oro Marble - Polished |
| Cabinet: | Walnut, manufactured in Germany by Studio Becker |
| Lavatory: | Starck 3 by Duravit |
| Fittings: | Grohe Atrio |
| Bath Tub: | Kaldewei Centro Duo |
| WC: | Starck 3 by Duravit |
| Shower: | Frameless, full height glass enclosure |
| Shower Fittings: | Grohe Atrio |

**Second Bath:**

| | |
|---|---|
| Floor: | Bella Crema Limestone - Honed |
| Shower/Tub Walls: | Bella Crema Limestone - Honed |
| Counter Top: | Bella Crema Limestone - Polished |
| Cabinet: | Dark Cherry, manufactured in Germany by Studio Becker |
| Lavatory: | Architec by Duravit |
| Fittings: | Grohe Atrio |
| WC: | Starck 3 by Duravit |
| Bath Tub: | Kaldewei Valo Set |

Seller's Initials _____        Buyer's Initials _____

## EXHIBIT "C"

## DEPOSIT RECEIPT
## CONSTRUCTION OR DESIGN DISPUTE RESOLUTION
## JUDICIAL REFERENCE

Actions by the Buyer pertaining to or based upon a claim for defects in the design or construction of improvements within the Project against the Seller, or any architect, engineer or other consultant, or any contractor, subcontractor or materials supplier engaged by or on behalf of Seller for the design and/or construction of the Project, or any element thereof, or otherwise defined in Civil Code sections 896 or 897 as an Actionable Defect ("Claim"), shall be resolved and administered in accordance with Civil Code sections 895 through 945.5, and Civil Code sections 1375 and 1375.05, as such sections may be amended, revised or superseded, from time to time.   If a Claim is subject to pre-litigation procedures in Civil Code sections 910 through 938, or any successor statutes, prior to filing any civil action, arbitration or action in judicial reference regarding such Claim, shall comply with the pre-litigation procedures of Civil Code sections 910 through 938.  Notices of Claims shall specify all of the matters as set forth in Civil Code section 1368.5 and/or Civil Code sections 910 through 938, as applicable, and any successor statutes or laws.

If the Claim is not resolved by and pursuant to the prelitigation procedures of under Civil Code sections 910 through 938, subject to the provisions of Civil Code section 1375 and 1375.05, then notwithstanding the provisions of California Code of Civil Procedure Section 1298.7, the Claim shall be resolved in accordance with the following provisions:

(1)   The dispute shall be submitted to binding general judicial reference pursuant to California Code of Civil Procedure Sections 638 through 645.2, or any successor statutes thereto pertaining to proceedings under judicial reference ("Judicial Reference").   The parties shall cooperate in good faith to ensure that all necessary and appropriate parties are included in the Judicial Reference proceeding.  Seller shall not be required to participate in the Judicial Reference proceeding unless it is satisfied that all necessary and appropriate parties will participate. The parties shall share the fees and costs of the Referee for the Judicial Reference proceeding as determined by the Referee.

(2)   The Referee shall have the authority to try all issues, whether of fact or law, and to report a statement of decision to the court.  The parties shall use the procedures adopted by Judicial Arbitration and Mediation Services ("JAMS") for judicial reference (or any other entity offering judicial reference dispute resolution procedures as may be mutually acceptable to the parties), provided that the following rules and procedures shall apply in all cases unless the parties agree otherwise:

(a) If the Seller is a party to the Judicial Reference, then any fee to initiate the Judicial Reference shall be paid by Seller, provided however, that the cost of the judicial reference shall ultimately be borne as determined by the Referee;

(b) The proceedings shall be heard in the County;

Gaw 45C

-25-

Buyer _____ Seller _____

(c) The Referee must be a neutral and disinterested party who is a retired judge or a licensed attorney with at least ten (10) years' experience in relevant real estate matters;

(d) Any dispute regarding the selection of the Referee shall be resolved by JAMS or the entity providing the reference services, or, if no entity is involved, by the court with appropriate jurisdiction;

(e) The Referee may require one or more pre-hearing conferences;

(f) The parties shall be entitled to discovery, and the Referee shall oversee discovery and may enforce all discovery orders in the same manner as any trial court judge;

(g) A stenographic record of the Judicial Reference proceedings shall be made, provided that the record shall remain confidential except as may be necessary for post-hearing motions and any appeals;

(h) The Referee's statement of decision shall contain findings of fact and conclusions of law to the extent applicable;

(i) The Referee shall have the authority to rule on all post-hearing motions in the same manner as a trial judge;

(j) The Referee shall be authorized to provide all recognized remedies available in law or equity for any cause of action that is the basis of the Judicial Reference; and

(k) The statement of decision of the Referee upon all of the issues considered by the Referee shall be binding upon the parties, and upon filing of the statement of decision with the clerk of the court, or with the judge where there is no clerk, judgment may be entered thereon. The decision of the Referee shall be appealable as if rendered by the court.

(l) If submission of a disputed matter, referenced in paragraph A above, to Judicial Reference is not permitted under the then applicable law, then notwithstanding California Code of Civil Procedure Section 1298.7, if the dispute is not resolved through mediation, the Buyer and Seller shall resolve such dispute exclusively through binding arbitration conducted in accordance with the Judicial Arbitration and Mediation Services ("JAMS") pursuant to Paragraph 13 of the Purchase Agreement.

(3) Judicial Reference shall only proceed for any matter that is subject to the requirements of California Civil Code sections 1369.510-1369.580 after the parties have attempted to reasonably comply with the alternative dispute resolution requirements set forth in California Civil Code sections 1369.510-1369.580, as same may be amended from time to time.

Gaw 45C

-26-

Buyer _____ Seller _____

BY INITIALING THE SPACE BELOW, EACH PARTY TO THE FULLEST EXTENT THEN ALLOWED BY LAW WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY FOR ALL CIVIL ACTIONS OR PROCEEDINGS INVOLVING A DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS REFERRED TO IN THIS PROVISION TO JUDICIAL REFERENCE AS PROVIDED ABOVE.

BUYER _____          SELLER _____

Gaw 45C

-27-

Buyer _____ / Seller ____

**EXHIBIT "D"**

| |
|---|
| CALIFORNIA CIVIL CODE<br>Sections 895 Through 945.5 |

**TABLE OF CONTENTS**

**TITLE 7.  REQUIREMENTS FOR ACTIONS FOR CONSTRUCTION DEFECTS**
    **CHAPTER 1.  DEFINITIONS** ...............................895
    **CHAPTER 2.  ACTIONABLE DEFECTS** .........................896-897
    **CHAPTER 3.  OBLIGATIONS** ...............................900-907
    **CHAPTER 4.  PRELITIGATION PROCEDURE** ....................910-938
    **CHAPTER 5.  PROCEDURE** ................................941-945.5

**895.**

(a) "Structure" means any residential dwelling, other building, or improvement located upon a lot or within a common area.

(b) "Designed moisture barrier" means an installed moisture barrier specified in the plans and specifications, contract documents, or manufacturer's recommendations.

(c) "Actual moisture barrier" means any component or material, actually installed, that serves to any degree as a barrier against moisture, whether or not intended as such.

(d) "Unintended water" means water that passes beyond, around, or through a component or the material that is designed to prevent that passage.

(e) "Close of escrow" means the date of the close of escrow between the builder and the original homeowner. With respect to claims by an association, as defined in subdivision (a) of Section 1351, "close of escrow" means the date of substantial completion, as defined in Section 337.15 of the Code of Civil Procedure, or the date the builder relinquishes control over the association's ability to decide whether to initiate a claim under this title, whichever is later.

(f) "Claimant" or "homeowner" includes the individual owners of single-family homes, individual unit owners of attached dwellings and, in the case of a common interest development, any association as defined in subdivision (a) of Section 1351.

**896.**

In any action seeking recovery of damages arising out of, or related to deficiencies in, the residential construction, design, specifications, surveying, planning, supervision, testing, or observation of construction, a builder, and to the extent set forth in Chapter 4 (commencing with Section 910), a general contractor, subcontractor, material supplier, individual product manufacturer, or design professional, shall, except as specifically set forth in this title, be liable for, and the claimant's claims or causes of action shall be limited to violation of, the following standards, except as specifically set forth in this title. This title applies to original construction intended to be sold as an individual dwelling unit. As to condominium conversions, this title does not apply to or does not supersede any other statutory or common law.

Gaw 45C

Buyer _____ Seller _____

(a) With respect to water issues:

(1) A door shall not allow unintended water to pass beyond, around, or through the door or its designed or actual moisture barriers, if any.

(2) Windows, patio doors, deck doors, and their systems shall not allow water to pass beyond, around, or through the window, patio door, or deck door or its designed or actual moisture barriers, including, without limitation, internal barriers within the systems themselves. For purposes of this paragraph, "systems" include, without limitation, windows, window assemblies, framing, substrate, flashings, and trim, if any.

(3) Windows, patio doors, deck doors, and their systems shall not allow excessive condensation to enter the structure and cause damage to another component. For purposes of this paragraph, "systems" include, without limitation, windows, window assemblies, framing, substrate, flashings, and trim, if any.

(4) Roofs, roofing systems, chimney caps, and ventilation components shall not allow water to enter the structure or to pass beyond, around, or through the designed or actual moisture barriers, including, without limitation, internal barriers located within the systems themselves. For purposes of this paragraph, "systems" include, without limitation, framing, substrate, and sheathing, if any.

(5) Decks, deck systems, balconies, balcony systems, exterior stairs, and stair systems shall not allow water to pass into the adjacent structure. For purposes of this paragraph, "systems" include, without limitation, framing, substrate, flashing, and sheathing, if any.

(6) Decks, deck systems, balconies, balcony systems, exterior stairs, and stair systems shall not allow unintended water to pass within the systems themselves and cause damage to the systems. For purposes of this paragraph, "systems" include, without limitation, framing, substrate, flashing, and sheathing, if any.

(7) Foundation systems and slabs shall not allow water or vapor to enter into the structure so as to cause damage to another building component.

(8) Foundation systems and slabs shall not allow water or vapor to enter into the structure so as to limit the installation of the type of flooring materials typically used for the particular application.

(9) Hardscape, including paths and patios, irrigation systems, landscaping systems, and drainage systems, that are installed as part of the original construction, shall not be installed in such a way as to cause water or soil erosion to enter into or come in contact with the structure so as to cause damage to another building component.

(10) Stucco, exterior siding, exterior walls, including, without limitation, exterior framing, and other exterior wall finishes and fixtures and the systems of those components and fixtures, including, but not limited to, pot shelves, horizontal surfaces, columns, and plant-ons, shall be installed in such a way so as not to allow unintended water to pass into the structure or to pass beyond, around, or through the designed or actual moisture barriers of the system, including any internal barriers located within the system itself. For purposes of this paragraph, "systems" include, without limitation, framing, substrate, flashings, trim, wall assemblies, and internal wall cavities, if any.

Gaw 45C

-29-

Buyer _____ Seller _____

(11) Stucco, exterior siding, and exterior walls shall not allow excessive condensation to enter the structure and cause damage to another component. For purposes of this paragraph, "systems" include, without limitation, framing, substrate, flashings, trim, wall assemblies, and internal wall cavities, if any.

(12) Retaining and site walls and their associated drainage systems shall not allow unintended water to pass beyond, around, or through its designed or actual moisture barriers including, without limitation, any internal barriers, so as to cause damage. This standard does not apply to those portions of any wall or drainage system that are designed to have water flow beyond, around, or through them.

(13) Retaining walls and site walls, and their associated drainage systems, shall only allow water to flow beyond, around, or through the areas designated by design.

(14) The lines and components of the plumbing system, sewer system, and utility systems shall not leak.

(15) Plumbing lines, sewer lines, and utility lines shall not corrode so as to impede the useful life of the systems.

(16) Sewer systems shall be installed in such a way as to allow the designated amount of sewage to flow through the system.

(17) Showers, baths, and related waterproofing systems shall not leak water into the interior of walls, flooring systems, or the interior of other components.

(18) The waterproofing system behind or under ceramic tile and tile countertops shall not allow water into the interior of walls, flooring systems, or other components so as to cause damage. Ceramic tile systems shall be designed and installed so as to deflect intended water to the waterproofing system.

(b) With respect to structural issues:

(1) Foundations, load bearing components, and slabs, shall not contain significant cracks or significant vertical displacement.

(2) Foundations, load bearing components, and slabs shall not cause the structure, in whole or in part, to be structurally unsafe.

(3) Foundations, load bearing components, and slabs, and underlying soils shall be constructed so as to materially comply with the design criteria set by applicable government building codes, regulations, and ordinances for chemical deterioration or corrosion resistance in effect at the time of original construction.

(4) A structure shall be constructed so as to materially comply with the design criteria for earthquake and wind load resistance, as set forth in the applicable government building codes, regulations, and ordinances in effect at the time of original construction.

Gaw 45C

-30-

Buyer _____ Seller _____

(c) With respect to soil issues:

(1) Soils and engineered retaining walls shall not cause, in whole or in part, damage to the structure built upon the soil or engineered retaining wall.

(2) Soils and engineered retaining walls shall not cause, in whole or in part, the structure to be structurally unsafe.

(3) Soils shall not cause, in whole or in part, the land upon which no structure is built to become unusable for the purpose represented at the time of original sale by the builder or for the purpose for which that land is commonly used.

(d) With respect to fire protection issues:

(1) A structure shall be constructed so as to materially comply with the design criteria of the applicable government building codes, regulations, and ordinances for fire protection of the occupants in effect at the time of the original construction.

(2) Fireplaces, chimneys, chimney structures, and chimney termination caps shall be constructed and installed in such a way so as not to cause an unreasonable risk of fire outside the fireplace enclosure or chimney.

(3) Electrical and mechanical systems shall be constructed and installed in such a way so as not to cause an unreasonable risk of fire.

(e) With respect to plumbing and sewer issues:

Plumbing and sewer systems shall be installed to operate properly and shall not materially impair the use of the structure by its inhabitants. However, no action may be brought for a violation of this subdivision more than four years after close of escrow.

(f) With respect to electrical system issues:

Electrical systems shall operate properly and shall not materially impair the use of the structure by its inhabitants. However, no action shall be brought pursuant to this subdivision more than four years from close of escrow.

(g) With respect to issues regarding other areas of construction:

(1) Exterior pathways, driveways, hardscape, sidewalls, sidewalks, and patios installed by the original builder shall not contain cracks that display significant vertical displacement or that are excessive. However, no action shall be brought upon a violation of this paragraph more than four years from close of escrow.

(2) Stucco, exterior siding, and other exterior wall finishes and fixtures, including, but not limited to, pot shelves, horizontal surfaces, columns, and plant-ons, shall not contain significant cracks or separations.

(3)(A) To the extent not otherwise covered by these standards, manufactured products, including, but not limited to, windows, doors, roofs, plumbing products and fixtures, fireplaces, electrical fixtures, HVAC units, countertops, cabinets, paint, and appliances shall be installed so

Gaw 45C

-31-

Buyer _____  Seller _____

as not to interfere with the products' useful life, if any.

(B) For purposes of this paragraph, "useful life" means a representation of how long a product is warranted or represented, through its limited warranty or any written representations, to last by its manufacturer, including recommended or required maintenance. If there is no representation by a manufacturer, a builder shall install manufactured products so as not to interfere with the product's utility.

(C) For purposes of this paragraph, "manufactured product" means a product that is completely manufactured offsite.

(D) If no useful life representation is made, or if the representation is less than one year, the period shall be no less than one year. If a manufactured product is damaged as a result of a violation of these standards, damage to the product is a recoverable element of damages. This subparagraph does not limit recovery if there has been damage to another building component caused by a manufactured product during the manufactured product's useful life.

(E) This title does not apply in any action seeking recovery solely for a defect in a manufactured product located within or adjacent to a structure.

(4) Heating, if any, shall be installed so as to be capable of maintaining a room temperature of 70 degrees Fahrenheit at a point three feet above the floor in any living space.

(5) Living space air-conditioning, if any, shall be provided in a manner consistent with the size and efficiency design criteria specified in Title 24 of the California Code of Regulations or its successor.

(6) Attached structures shall be constructed to comply with interunit noise transmission standards set by the applicable government building codes, ordinances, or regulations in effect at the time of the original construction. If there is no applicable code, ordinance, or regulation, this paragraph does not apply. However, no action shall be brought pursuant to this paragraph more than one year from the original occupancy of the adjacent unit.

(7) Irrigation systems and drainage shall operate properly so as not to damage landscaping or other external improvements. However, no action shall be brought pursuant to this paragraph more than one year from close of escrow.

(8) Untreated wood posts shall not be installed in contact with soil so as to cause unreasonable decay to the wood based upon the finish grade at the time of original construction. However, no action shall be brought pursuant to this paragraph more than two years from close of escrow.

(9) Untreated steel fences and adjacent components shall be installed so as to prevent unreasonable corrosion. However, no action shall be brought pursuant to this paragraph more than four years from close of escrow.

(10) Paint and stains shall be applied in such a manner so as not to cause deterioration of the building surfaces for the length of time specified by the paint or stain manufacturers' representations, if any. However, no action shall be brought pursuant to this paragraph more than five years from close of escrow.

(11) Roofing materials shall be installed so as to avoid materials falling from the roof.

Gaw 45C

-32-

Buyer _____ Seller _____

(12) The landscaping systems shall be installed in such a manner so as to survive for not less than one year. However, no action shall be brought pursuant to this paragraph more than two years from close of escrow.

(13) Ceramic tile and tile backing shall be installed in such a manner that the tile does not detach.

(14) Dryer ducts shall be installed and terminated pursuant to manufacturer installation requirements. However, no action shall be brought pursuant to this paragraph more than two years from close of escrow.

(15) Structures shall be constructed in such a manner so as not to impair the occupants' safety because they contain public health hazards as determined by a duly authorized public health official, health agency, or governmental entity having jurisdiction. This paragraph does not limit recovery for any damages caused by a violation of any other paragraph of this section on the grounds that the damages do not constitute a health hazard.

**897.** The standards set forth in this chapter are intended to address every function or component of a structure. To the extent that a function or component of a structure is not addressed by these standards, it shall be actionable if it causes damage.

**900.** As to fit and finish items, a builder shall provide a homebuyer with a minimum one-year express written limited warranty covering the fit and finish of the following building components. Except as otherwise provided by the standards specified in Chapter 2 (commencing with Section 896), this warranty shall cover the fit and finish of cabinets, mirrors, flooring, interior and exterior walls, countertops, paint finishes, and trim, but shall not apply to damage to those components caused by defects in other components governed by the other provisions of this title. Any fit and finish matters covered by this warranty are not subject to the provisions of this title. If a builder fails to provide the express warranty required by this section, the warranty for these items shall be for a period of one year.

**901.** A builder may, but is not required to, offer greater protection or protection for longer time periods in its express contract with the homeowner than that set forth in Chapter 2 (commencing with Section 896). A builder may not limit the application of Chapter 2 (commencing with Section 896) or lower its protection through the express contract with the homeowner. This type of express contract constitutes an "enhanced protection agreement."

**902.** If a builder offers an enhanced protection agreement, the builder may choose to be subject to its own express contractual provisions in place of the provisions set forth in Chapter 2 (commencing with Section 896). If an enhanced protection agreement is in place, Chapter 2 (commencing with Section 896) no longer applies other than to set forth minimum provisions by which to judge the enforceability of the particular provisions of the enhanced protection agreement.

**903.** If a builder offers an enhanced protection agreement in place of the provisions set forth in Chapter 2 (commencing with Section 896), the election to do so shall be made in writing with the homeowner no later than the close of escrow. The builder shall provide the homeowner with a complete copy of Chapter 2 (commencing with Section 896) and advise the homeowner that the builder has elected not to be subject to its provisions. If any provision of an enhanced protection agreement is later found to be unenforceable as not meeting the minimum standards

Gaw 45C

-33-

Buyer _____ Seller ___

of Chapter 2 (commencing with Section 896), a builder may use this chapter in lieu of those provisions found to be unenforceable.

**904.** If a builder has elected to use an enhanced protection agreement, and a homeowner disputes that the particular provision or time periods of the enhanced protection agreement are not greater than, or equal to, the provisions of Chapter 2 (commencing with Section 896) as they apply to the particular deficiency alleged by the homeowner, the homeowner may seek to enforce the application of the standards set forth in this chapter as to those claimed deficiencies. If a homeowner seeks to enforce a particular standard in lieu of a provision of the enhanced protection agreement, the homeowner shall give the builder written notice of that intent at the time the homeowner files a notice of claim pursuant to Chapter 4 (commencing with Section 910).

**905.** If a homeowner seeks to enforce Chapter 2 (commencing with Section 896), in lieu of the enhanced protection agreement in a subsequent litigation or other legal action, the builder shall have the right to have the matter bifurcated, and to have an immediately binding determination of his or her responsive pleading within 60 days after the filing of that pleading, but in no event after the commencement of discovery, as to the application of either Chapter 2 (commencing with Section 896) or the enhanced protection agreement as to the deficiencies claimed by the homeowner. If the builder fails to seek that determination in the timeframe specified, the builder waives the right to do so and the standards set forth in this title shall apply. As to any nonoriginal homeowner, that homeowner shall be deemed in privity for purposes of an enhanced protection agreement only to the extent that the builder has recorded the enhanced protection agreement on title or provided actual notice to the nonoriginal homeowner of the enhanced protection agreement. If the enhanced protection agreement is not recorded on title or no actual notice has been provided, the standards set forth in this title apply to any nonoriginal homeowners' claims.

**906.** A builder's election to use an enhanced protection agreement addresses only the issues set forth in Chapter 2 (commencing with Section 896) and does not constitute an election to use or not use the provisions of Chapter 4 (commencing with Section 910). The decision to use or not use Chapter 4 (commencing with Section 910) is governed by the provisions of that chapter.

**907.** A homeowner is obligated to follow all reasonable maintenance obligations and schedules communicated in writing to the homeowner by the builder and product manufacturers, as well as commonly accepted maintenance practices. A failure by a homeowner to follow these obligations, schedules, and practices may subject the homeowner to the affirmative defenses contained in Section 944.

**910.** Prior to filing an action against any party alleged to have contributed to a violation of the standards set forth in Chapter 2 (commencing with Section 896), the claimant shall initiate the following prelitigation procedures:
(a) The claimant or his or her legal representative shall provide written notice via certified mail, overnight mail, or personal delivery to the builder, in the manner prescribed in this section, of the claimant's claim that the construction of his or her residence violates any of the standards set forth in Chapter 2 (commencing with Section 896). That notice shall provide the claimant's name, address, and preferred method of contact, and shall state that the claimant alleges a violation pursuant to this part against the builder, and shall describe the claim in reasonable detail sufficient to determine the nature and location, to the extent known, of the claimed violation. In the case of a group of homeowners or an association, the notice may identify the claimants solely by address or other description sufficient to apprise the builder of the locations

Gaw 45C

-34-

Buyer _____ / Seller ____

of the subject residences. That document shall have the same force and effect as a notice of commencement of a legal proceeding.

(b) The notice requirements of this section do not preclude a homeowner from seeking redress through any applicable normal customer service procedure as set forth in any contractual, warranty, or other builder-generated document; and, if a homeowner seeks to do so, that request shall not satisfy the notice requirements of this section.

**911.** (a) For purposes of this title, except as provided in subdivision (b), "builder" means any entity or individual, including, but not limited to a builder, developer, general contractor, contractor, or original seller, who, at the time of sale, was also in the business of selling residential units to the public for the property that is the subject of the homeowner's claim or was in the business of building, developing, or constructing residential units for public purchase for the property that is the subject of the homeowner's claim.

(b) For the purposes of this title, "builder" does not include any entity or individual whose involvement with a residential unit that is the subject of the homeowner's claim is limited to his or her capacity as general contractor or contractor and who is not a partner, member of, subsidiary of, or otherwise similarly affiliated with the builder. For purposes of this title, these nonaffiliated general contractors and nonaffiliated contractors shall be treated the same as subcontractors, material suppliers, individual product manufacturers, and design professionals.

**912.** A builder shall do all of the following:

(a) Within 30 days of a written request by a homeowner or his or her legal representative, the builder shall provide copies of all relevant plans, specifications, mass or rough grading plans, final soils reports, Department of Real Estate public reports, and available engineering calculations, that pertain to a homeowner's residence specifically or as part of a larger development tract. The request shall be honored if it states that it is made relative to structural, fire safety, or soils provisions of this title. However, a builder is not obligated to provide a copying service, and reasonable copying costs shall be borne by the requesting party. A builder may require that the documents be copied onsite by the requesting party, except that the homeowner may, at his or her option, use his or her own copying service, which may include an offsite copy facility that is bonded and insured. If a builder can show that the builder maintained the documents, but that they later became unavailable due to loss or destruction that was not the fault of the builder, the builder may be excused from the requirements of this subdivision, in which case the builder shall act with reasonable diligence to assist the homeowner in obtaining those documents from any applicable government authority or from the source that generated the document. However, in that case, the time limits specified by this section do not apply.

(b) At the expense of the homeowner, who may opt to use an offsite copy facility that is bonded and insured, the builder shall provide to the homeowner or his or her legal representative copies of all maintenance and preventative maintenance recommendations that pertain to his or her residence within 30 days of service of a written request for those documents. Those documents shall also be provided to the homeowner in conjunction with the initial sale of the residence.

(c) At the expense of the homeowner, who may opt to use an offsite copy facility that is bonded and insured, a builder shall provide to the homeowner or his or her legal representative copies of all manufactured products maintenance, preventive maintenance, and limited warranty information within 30 days of a written request for those documents. These documents shall also be provided to the homeowner in conjunction with the initial sale of the residence.

(d) At the expense of the homeowner, who may opt to use an offsite copy facility that is bonded and insured, a builder shall provide to the homeowner or his or her legal representative copies of all of the builder's limited contractual warranties in accordance with this part in effect at the time of the original sale of the residence within 30 days of a written request for those

Gaw 45C

-35-

Buyer _____ Seller _____

documents.  Those documents shall also be provided to the homeowner in conjunction with the initial sale of the residence.

(e) A builder shall maintain the name and address of an agent for notice pursuant to this chapter with the Secretary of State or, alternatively, elect to use a third party for that notice if the builder has notified the homeowner in writing of the third party's name and address, to whom claims and requests for information under this section may be mailed.  The name and address of the agent for notice or third party shall be included with the original sales documentation and shall be initialed and acknowledged by the purchaser and the builder's sales representative.

This subdivision applies to instances in which a builder contracts with a third party to accept claims and act on the builder's behalf.  A builder shall give actual notice to the homeowner that the builder has made such an election, and shall include the name and address of the third party.

(f) A builder shall record on title a notice of the existence of these procedures and a notice that these procedures impact the legal rights of the homeowner.  This information shall also be included with the original sales documentation and shall be initialed and acknowledged by the purchaser and the builder's sales representative.

(g) A builder shall provide, with the original sales documentation, a written copy of this title, which shall be initialed and acknowledged by the purchaser and the builder's sales representative.

(h) As to any documents provided in conjunction with the original sale, the builder shall instruct the original purchaser to provide those documents to any subsequent purchaser.

(i) Any builder who fails to comply with any of these requirements within the time specified is not entitled to the protection of this chapter, and the homeowner is released from the requirements of this chapter and may proceed with the filing of an action, in which case the remaining chapters of this part shall continue to apply to the action.

**913.** A builder or his or her representative shall acknowledge, in writing, receipt of the notice of the claim within 14 days after receipt of the notice of the claim.  If the notice of the claim is served by the claimant's legal representative, or if the builder receives a written representation letter from a homeowner's attorney, the builder shall include the attorney in all subsequent substantive communications, including, without limitation, all written communications occurring pursuant to this chapter, and all substantive and procedural communications, including all written communications, following the commencement of any subsequent complaint or other legal action, except that if the builder has retained or involved legal counsel to assist the builder in this process, all communications by the builder's counsel shall only be with the claimant's legal representative, if any.

**914.** (a) This chapter establishes a nonadversarial procedure, including the remedies available under this chapter which, if the procedure does not resolve the dispute between the parties, may result in a subsequent action to enforce the other chapters of this title.  A builder may attempt to commence nonadversarial contractual provisions other than the nonadversarial procedures and remedies set forth in this chapter, but may not, in addition to its own nonadversarial contractual provisions, require adherence to the nonadversarial procedures and remedies set forth in this chapter, regardless of whether the builder's own alternative nonadversarial contractual provisions are successful in resolving the dispute or ultimately deemed enforceable.

At the time the sales agreement is executed, the builder shall notify the homeowner whether the builder intends to engage in the nonadversarial procedure of this section or attempt to enforce alternative nonadversarial contractual provisions.  If the builder elects to use alternative nonadversarial contractual provisions in lieu of this chapter, the election is binding, regardless of

Gaw 45C

-36-

Buyer _____ Seller _____

whether the builder's alternative nonadversarial contractual provisions are successful in resolving the ultimate dispute or are ultimately deemed enforceable.

(b) Nothing in this title is intended to affect existing statutory or decisional law pertaining to the applicability, viability, or enforceability of alternative dispute resolution methods, alternative remedies, or contractual arbitration, judicial reference, or similar procedures requiring a binding resolution to enforce the other chapters of this title or any other disputes between homeowners and builders. Nothing in this title is intended to affect the applicability, viability, or enforceability, if any, of contractual arbitration or judicial reference after a nonadversarial procedure or provision has been completed.

**915.** If a builder fails to acknowledge receipt of the notice of a claim within the time specified, elects not to go through the process set forth in this chapter, or fails to request an inspection within the time specified, or at the conclusion or cessation of an alternative nonadversarial proceeding, this chapter does not apply and the homeowner is released from the requirements of this chapter and may proceed with the filing of an action. However, the standards set forth in the other chapters of this title shall continue to apply to the action.

**916.** (a) If a builder elects to inspect the claimed unmet standards, the builder shall complete the initial inspection and testing within 14 days after acknowledgment of receipt of the notice of the claim, at a mutually convenient date and time. If the homeowner has retained legal representation, the inspection shall be scheduled with the legal representative's office at a mutually convenient date and time, unless the legal representative is unavailable during the relevant time periods. All costs of builder inspection and testing, including any damage caused by the builder inspection, shall be borne by the builder. The builder shall also provide written proof that the builder has liability insurance to cover any damages or injuries occurring during inspection and testing. The builder shall restore the property to its pretesting condition within 48 hours of the testing. The builder shall, upon request, allow the inspections to be observed and electronically recorded, videotaped, or photographed by the claimant or his or her legal representative.

(b) Nothing that occurs during a builder's or claimant's inspection or testing may be used or introduced as evidence to support a spoliation defense by any potential party in any subsequent litigation.

(c) If a builder deems a second inspection or testing reasonably necessary, and specifies the reasons therefor in writing within three days following the initial inspection, the builder may conduct a second inspection or testing. A second inspection or testing shall be completed within 40 days of the initial inspection or testing. All requirements concerning the initial inspection or testing shall also apply to the second inspection or testing.

(d) If the builder fails to inspect or test the property within the time specified, the claimant is released from the requirements of this section and may proceed with the filing of an action. However, the standards set forth in the other chapters of this title shall continue to apply to the action.

(e) If a builder intends to hold a subcontractor, design professional, individual product manufacturer, or material supplier, including an insurance carrier, warranty company, or service company, responsible for its contribution to the unmet standard, the builder shall provide notice to that person or entity sufficiently in advance to allow them to attend the initial, or if requested, second inspection of any alleged unmet standard and to participate in the repair process. The claimant and his or her legal representative, if any, shall be advised in a reasonable time prior to the inspection as to the identity of all persons or entities invited to attend. This subdivision does not apply to the builder's insurance company. Except with respect to any claims involving a repair actually conducted under this chapter, nothing in this subdivision shall be construed to

Gaw 45C

-37-

Buyer _C9z/4_ Seller _Ω_

relieve a subcontractor, design professional, individual product manufacturer, or material supplier of any liability under an action brought by a claimant.

917.  Within 30 days of the initial or, if requested, second inspection or testing, the builder may offer in writing to repair the violation.  The offer to repair shall also compensate the homeowner for all applicable damages recoverable under Section 944, within the timeframe for the repair set forth in this chapter.  Any such offer shall be accompanied by a detailed, specific, step-by-step statement identifying the particular violation that is being repaired, explaining the nature, scope, and location of the repair, and setting a reasonable completion date for the repair.  The offer shall also include the names, addresses, telephone numbers, and license numbers of the contractors whom the builder intends to have perform the repair.  Those contractors shall be fully insured for, and shall be responsible for, all damages or injuries that they may cause to occur during the repair, and evidence of that insurance shall be provided to the homeowner upon request.  Upon written request by the homeowner or his or her legal representative, and within the timeframes set forth in this chapter, the builder shall also provide any available technical documentation, including, without limitation, plans and specifications, pertaining to the claimed violation within the particular home or development tract.  The offer shall also advise the homeowner in writing of his or her right to request up to three additional contractors from which to select to do the repair pursuant to this chapter.

918.  Upon receipt of the offer to repair, the homeowner shall have 30 days to authorize the builder to proceed with the repair.  The homeowner may alternatively request, at the homeowner's sole option and discretion, that the builder provide the names, addresses, telephone numbers, and license numbers for up to three alternative contractors who are not owned or financially controlled by the builder and who regularly conduct business in the county where the structure is located.  If the homeowner so elects, the builder is entitled to an additional noninvasive inspection, to occur at a mutually convenient date and time within 20 days of the election, so as to permit the other proposed contractors to review the proposed site of the repair.  Within 35 days after the request of the homeowner for alternative contractors, the builder shall present the homeowner with a choice of contractors.  Within 20 days after that presentation, the homeowner shall authorize the builder or one of the alternative contractors to perform the repair.

919.  The offer to repair shall also be accompanied by an offer to mediate the dispute if the homeowner so chooses.  The mediation shall be limited to a four-hour mediation, except as otherwise mutually agreed before a nonaffiliated mediator selected and paid for by the builder. At the homeowner's sole option, the homeowner may agree to split the cost of the mediator, and if he or she does so, the mediator shall be selected jointly.  The mediator shall have sufficient availability such that the mediation occurs within 15 days after the request to mediate is received and occurs at a mutually convenient location within the county where the action is pending.  If a builder has made an offer to repair a violation, and the mediation has failed to resolve the dispute, the homeowner shall allow the repair to be performed either by the builder, its contractor, or the selected contractor.

920.  If the builder fails to make an offer to repair or otherwise strictly comply with this chapter within the times specified, the claimant is released from the requirements of this chapter and may proceed with the filing of an action.  If the contractor performing the repair does not complete the repair in the time or manner specified, the claimant may file an action.  If this occurs, the standards set forth in the other chapters of this part shall continue to apply to the action.

Gaw 45C

-38-

Buyer _____    Seller ___

**921.** (a) In the event that a resolution under this chapter involves a repair by the builder, the builder shall make an appointment with the claimant, make all appropriate arrangements to effectuate a repair of the claimed unmet standards, and compensate the homeowner for all damages resulting therefrom free of charge to the claimant. The repair shall be scheduled through the claimant's legal representative, if any, unless he or she is unavailable during the relevant time periods. The repair shall be commenced on a mutually convenient date within 14 days of acceptance or, if an alternative contractor is selected by the homeowner, within 14 days of the selection, or, if a mediation occurs, within seven days of the mediation, or within five days after a permit is obtained if one is required. The builder shall act with reasonable diligence in obtaining any such permit.

(b) The builder shall ensure that work done on the repairs is done with the utmost diligence, and that the repairs are completed as soon as reasonably possible, subject to the nature of the repair or some unforeseen event not caused by the builder or the contractor performing the repair. Every effort shall be made to complete the repair within 120 days.

**922.** The builder shall, upon request, allow the repair to be observed and electronically recorded, videotaped, or photographed by the claimant or his or her legal representative. Nothing that occurs during the repair process may be used or introduced as evidence to support a spoliation defense by any potential party in any subsequent litigation.

**923.** The builder shall provide the homeowner or his or her legal representative, upon request, with copies of all correspondence, photographs, and other materials pertaining or relating in any manner to the repairs.

**924.** If the builder elects to repair some, but not all of, the claimed unmet standards, the builder shall, at the same time it makes its offer, set forth with particularity in writing the reasons, and the support for those reasons, for not repairing all claimed unmet standards.

**925.** If the builder fails to complete the repair within the time specified in the repair plan, the claimant is released from the requirements of this chapter and may proceed with the filing of an action. If this occurs, the standards set forth in the other chapters of this title shall continue to apply to the action.

**926.** The builder may not obtain a release or waiver of any kind in exchange for the repair work mandated by this chapter. At the conclusion of the repair, the claimant may proceed with filing an action for violation of the applicable standard or for a claim of inadequate repair, or both, including all applicable damages available under Section 944.

**927.** If the applicable statute of limitations has otherwise run during this process, the time period for filing a complaint or other legal remedies for violation of any provision of this title, or for a claim of inadequate repair, is extended from the time of the original claim by the claimant to 100 days after the repair is completed, whether or not the particular violation is the one being repaired. If the builder fails to acknowledge the claim within the time specified, elects not to go through this statutory process, or fails to request an inspection within the time specified, the time period for filing a complaint or other legal remedies for violation of any provision of this title is extended from the time of the original claim by the claimant to 45 days after the time for responding to the notice of claim has expired. If the builder elects to attempt to enforce its own nonadversarial procedure in lieu of the procedure set forth in this chapter, the time period for filing a complaint or other legal remedies for violation of any provision of this part is extended from the time of the original claim by the claimant to 100 days after either the completion of the

Gaw 45C

-39-

Buyer _____ Seller _____

builder's alternative nonadversarial procedure, or 100 days after the builder's alternative nonadversarial procedure is deemed unenforceable, whichever is later.

928. If the builder has invoked this chapter and completed a repair, prior to filing an action, if there has been no previous mediation between the parties, the homeowner or his or her legal representative shall request mediation in writing. The mediation shall be limited to four hours, except as otherwise mutually agreed before a nonaffiliated mediator selected and paid for by the builder. At the homeowner's sole option, the homeowner may agree to split the cost of the mediator and if he or she does so, the mediator shall be selected jointly. The mediator shall have sufficient availability such that the mediation will occur within 15 days after the request for mediation is received and shall occur at a mutually convenient location within the county where the action is pending. In the event that a mediation is used at this point, any applicable statutes of limitations shall be tolled from the date of the request to mediate until the next court day after the mediation is completed, or the 100-day period, whichever is later.

929. (a) Nothing in this chapter prohibits the builder from making only a cash offer and no repair. In this situation, the homeowner is free to accept the offer, or he or she may reject the offer and proceed with the filing of an action. If the latter occurs, the standards of the other chapters of this title shall continue to apply to the action.
   (b) The builder may obtain a reasonable release in exchange for the cash payment. The builder may negotiate the terms and conditions of any reasonable release in terms of scope and consideration in conjunction with a cash payment under this chapter.

930. (a) The time periods and all other requirements in this chapter are to be strictly construed, and, unless extended by the mutual agreement of the parties in accordance with this chapter, shall govern the rights and obligations under this title. If a builder fails to act in accordance with this section within the timeframes mandated, unless extended by the mutual agreement of the parties as evidenced by a postclaim written confirmation by the affected homeowner demonstrating that he or she has knowingly and voluntarily extended the statutory timeframe, the claimant may proceed with filing an action. If this occurs, the standards of the other chapters of this title shall continue to apply to the action.
   (b) If the claimant does not conform with the requirements of this chapter, the builder may bring a motion to stay any subsequent court action or other proceeding until the requirements of this chapter have been satisfied. The court, in its discretion, may award the prevailing party on such a motion, his or her attorney's fees and costs in bringing or opposing the motion.

931. If a claim combines causes of action or damages not covered by this part, including, without limitation, personal injuries, class actions, other statutory remedies, or fraud-based claims, the claimed unmet standards shall be administered according to this part, although evidence of the property in its unrepaired condition may be introduced to support the respective elements of any such cause of action. As to any fraud-based claim, if the fact that the property has been repaired under this chapter is deemed admissible, the trier of fact shall be informed that the repair was not voluntarily accepted by the homeowner. As to any class action claims that address solely the incorporation of a defective component into a residence, the named and unnamed class members need not comply with this chapter.

932. Subsequently discovered claims of unmet standards shall be administered separately under this chapter, unless otherwise agreed to by the parties. However, in the case of a detached single family residence, in the same home, if the subsequently discovered claim is for a violation of the same standard as that which has already been initiated by the same claimant and the subject of a currently pending action, the claimant need not reinitiate the process as to

Gaw 45C

-40-

Buyer _____   Seller _____

the same standard. In the case of an attached project, if the subsequently discovered claim is for a violation of the same standard for a connected component system in the same building as has already been initiated by the same claimant, and the subject of a currently pending action, the claimant need not reinitiate this process as to that standard.

933. If any enforcement of these standards is commenced, the fact that a repair effort was made may be introduced to the trier of fact. However, the claimant may use the condition of the property prior to the repair as the basis for contending that the repair work was inappropriate, inadequate, or incomplete, or that the violation still exists. The claimant need not show that the repair work resulted in further damage nor that damage has continued to occur as a result of the violation.

934. Evidence of both parties' conduct during this process may be introduced during a subsequent enforcement action, if any, with the exception of any mediation. Any repair efforts undertaken by the builder, shall not be considered settlement communications or offers of settlement and are not inadmissible in evidence on such a basis.

935. To the extent that provisions of this chapter are enforced and those provisions are substantially similar to provisions in Section 1375 of the Civil Code, but an action is subsequently commenced under Section 1375 of the Civil Code, the parties are excused from performing the substantially similar requirements under Section 1375 of the Civil Code.

936. Each and every provision of the other chapters of this title apply to general contractors, subcontractors, material suppliers, individual product manufacturers, and design professionals to the extent that the general contractors, subcontractors, material suppliers, individual product manufacturers, and design professionals caused, in whole or in part, a violation of a particular standard as the result of a negligent act or omission or a breach of contract. In addition to the affirmative defenses set forth in Section 945.5, a general contractor, subcontractor, material supplier, design professional, individual product manufacturer, or other entity may also offer common law and contractual defenses as applicable to any claimed violation of a standard. All actions by a claimant or builder to enforce an express contract, or any provision thereof, against a general contractor, subcontractor, material supplier, individual product manufacturer, or design professional is preserved. Nothing in this title modifies the law pertaining to joint and several liability for builders, general contractors, subcontractors, material suppliers, individual product manufacturer, and design professionals that contribute to any specific violation of this title. However, the negligence standard in this section does not apply to any general contractor, subcontractor, material supplier, individual product manufacturer, or design professional with respect to claims for which strict liability would apply.

937. Nothing in this title shall be interpreted to eliminate or abrogate the requirement to comply with Section 411.35 of the Code of Civil Procedure or to affect the liability of design professionals, including architects and architectural firms, for claims and damages not covered by this title.

938. This title applies only to new residential units where the purchase agreement with the buyer was signed by the seller on or after January 1, 2003.

941. (a) Except as specifically set forth in this title, no action may be brought to recover under this title more than 10 years after substantial completion of the improvement but not later than the date of recordation of a valid notice of completion.

Gaw 45C

-41-

Buyer _____ Seller _____

(b) As used in this section, "action" includes an action for indemnity brought against a person arising out of that person's performance or furnishing of services or materials referred to in this title, except that a cross-complaint for indemnity may be filed pursuant to subdivision (b) of Section 428.10 of the Code of Civil Procedure in an action which has been brought within the time period set forth in subdivision (a).

(c) The limitation prescribed by this section may not be asserted by way of defense by any person in actual possession or the control, as owner, tenant or otherwise, of such an improvement, at the time any deficiency in the improvement constitutes the proximate cause for which it is proposed to make a claim or bring an action.

(d) Sections 337.15 and 337.1 of the Code of Civil Procedure do not apply to actions under this title.

(e) Existing statutory and decisional law regarding tolling of the statute of limitations shall apply to the time periods for filing an action or making a claim under this title, except that repairs made pursuant to Chapter 4 (commencing with Section 910), with the exception of the tolling provision contained in Section 927, do not extend the period for filing an action, or restart the time limitations contained in subdivision (a) or (b) of Section 7091 of the Business and Professions Code. If a builder arranges for a contractor to perform a repair pursuant to Chapter 4 (commencing with Section 910), as to the builder the time period for calculating the statute of limitation in subdivision (a) or (b) of Section 7091 of the Business and Professions Code shall pertain to the substantial completion of the original construction and not to the date of repairs under this title. The time limitations established by this title do not apply to any action by a claimant for a contract or express contractual provision.

Causes of action and damages to which this chapter does not apply are not limited by this section.

**942.** In order to make a claim for violation of the standards set forth in Chapter 2 (commencing with Section 896), a homeowner need only demonstrate, in accordance with the applicable evidentiary standard, that the home does not meet the applicable standard, subject to the affirmative defenses set forth in Section 945.5. No further showing of causation or damages is required to meet the burden of proof regarding a violation of a standard set forth in Chapter 2 (commencing with Section 896), provided that the violation arises out of, pertains to, or is related to, the original construction.

**943.**(a) Except as provided in this title, no other cause of action for a claim covered by this title or for damages recoverable under Section 944 is allowed. In addition to the rights under this title, this title does not apply to any action by a claimant to enforce a contract or express contractual provision, or any action for fraud, personal injury, or violation of a statute. Damages awarded for the items set forth in Section 944 in such other cause of action shall be reduced by the amounts recovered pursuant to Section 944 for violation of the standards set forth in this title.

(b) As to any claims involving a detached single-family home, the homeowner's right to the reasonable value of repairing any nonconformity is limited to the repair costs, or the diminution in current value of the home caused by the nonconformity, whichever is less, subject to the personal use exception as developed under common law.

**944.** If a claim for damages is made under this title, the homeowner is only entitled to damages for the reasonable value of repairing any violation of the standards set forth in this title, the reasonable cost of repairing any damages caused by the repair efforts, the reasonable cost of repairing and rectifying any damages resulting from the failure of the home to meet the standards, the reasonable cost of removing and replacing any improper repair by the builder, reasonable relocation and storage expenses, lost business income if the home was used as a

Gaw 45C

-42-

Buyer _____  Seller _____

principal place of a business licensed to be operated from the home, reasonable investigative costs for each established violation, and all other costs or fees recoverable by contract or statute.

**945.** The provisions, standards, rights, and obligations set forth in this title are binding upon all original purchasers and their successors-in-interest.  For purposes of this title, associations and others having the rights set forth in Sections 1368.3 and 1368.4 shall be considered to be original purchasers and shall have standing to enforce the provisions, standards, rights, and obligations set forth in this title.

**945.5.**   A builder, general contractor, subcontractor, material supplier, individual product manufacturer, or design professional, under the principles of comparative fault pertaining to affirmative defenses, may be excused, in whole or in part, from any obligation, damage, loss, or liability if the builder, general contractor, subcontractor, material supplier, individual product manufacturer, or design professional, can demonstrate any of the following affirmative defenses in response to a claimed violation:

(a) To the extent it is caused by an unforeseen act of nature which caused the structure not to meet the standard.  For purposes of this section an "unforeseen act of nature" means a weather condition, earthquake, or manmade event such as war, terrorism, or vandalism, in excess of the design criteria expressed by the applicable building codes, regulations, and ordinances in effect at the time of original construction.

(b) To the extent it is caused by a homeowner's unreasonable failure to minimize or prevent those damages in a timely manner, including the failure of the homeowner to allow reasonable and timely access for inspections and repairs under this title.  This includes the failure to give timely notice to the builder after discovery of a violation, but does not include damages due to the untimely or inadequate response of a builder to the homeowner's claim.

(c) To the extent it is caused by the homeowner or his or her agent, employee, general contractor, subcontractor, independent contractor, or consultant by virtue of their failure to follow the builder's or manufacturer's recommendations, or commonly accepted homeowner maintenance obligations.   In order to rely upon this defense as it relates to a builder's recommended maintenance schedule, the builder shall show that the homeowner had written notice of these schedules and recommendations and that the recommendations and schedules were reasonable at the time they were issued.

(d) To the extent it is caused by the homeowner or his or her agent's or an independent third party's alterations, ordinary wear and tear, misuse, abuse, or neglect, or by the structure's use for something other than its intended purpose.

(e) To the extent that the time period for filing actions bars the claimed violation.

(f) As to a particular violation for which the builder has obtained a valid release.

(g) To the extent that the builder's repair was successful in correcting the particular violation of the applicable standard.

(h) As to any causes of action to which this statute does not apply, all applicable affirmative defenses are preserved.

Gaw 45C

-43-

Buyer _____ Seller _____

## INSULATION DISCLOSURE
## ADDENDUM

**Insulation Disclosure:**    Insulation will be installed in the Unit in accordance with applicable governmental requirements.

Insulation will be installed in the Unit as follows:  (a)  the exterior wall at metal panel and spandrel glass is insulated with faced (foil-backed) insulation which according to the manufacturer will yield a R value of B.3 Thermafiber CW90 0087-08900.1; the mullions do not include a thermal break or insulation throughout (b) the demising walls at the corridor and between apartments will be insulated with unfaced batt insulation to the thickness of 3 1/2", or to fill cavity which will yield a R value of approximately R-11 (depending on the final manufacturer selected); (c) the roof over occupied spaces is insulated at different thicknesses with rigid insulation which will yield an minimum R value of 19, as specified by the architect.

Other areas of the Residence may contain insulation type materials; however, these materials have no influence on the thermal effectiveness of the Residence.  Buyer acknowledges and agrees that, notwithstanding the general specifications set forth above, insulation may be of lesser thickness and R-value than indicated in certain areas where the design and/or construction of the Residence do not permit greater thickness.  Examples of such locations where the thickness and R-value may vary include locations where the studs are placed in the walls, at corners, and windows where the roof trusses attach to outside walls.  These R-values are based upon the information provided by the manufacturer and/or installer of the insulation and Seller does not warrant or represent that the R-Values are correct.

Buyer's Initials _____  Buyer's Initials _____

Gaw 45C

-44-

Buyer _____  Seller _____

## PARKING ADDENDUM – UNIT 45C OF THE GRAND RESIDENCES AT MILLENNIUM TOWER

The Parking License Agreement attached to this Parking Addendum has been approved by the State of California Department of Real Estate. This is the form of Parking License Agreement to be made and entered into between Seller and Buyer for Unit 45C under the Residential Purchase Agreement and Escrow Instructions at The GRAND RESIDENCES at Millennium Tower dated **08/21/2012** at the Close of Escrow.

BUYER:
Date: _8/27_, 20_12_

Christina Gaw

Fair Breeze Company Limited

Date: _8/30_, 20_12_

SALES REPRESENTATIVE:

*[Signature is not acceptance]*

ACCEPTANCE BY SELLER:

Date: _8/30_, 20_12_

Mission Street Development LLC, a Delaware limited liability company

By:     Mission Street Holdings, LLC, its sole member

By:_____
Richard Baumert, Vice President

# EXHIBIT "A"

## MISSION STREET



BASEMENT — LEVEL 5

BUYER'S SPACE(S) =

BUYER'S INITIALS

SELLER'S INITIALS

MARTIN M. RON ASSOCIATES, INC.
LAND SURVEYORS

859 HARRISON STREET
SAN FRANCISCO, CA. 94107
(415) 543-4500

**RECORDING REQUESTED BY:**
Mission Street Development LLC
301 Mission Street
San Francisco, CA 94105

**WHEN RECORDED RETURN TO:**
Mission Street Development LLC
301 Mission Street, B1
San Francisco, CA 94105

---

**Designated Independent**
**PARKING LICENSE AGREEMENT**
by and between
Mission Street Development LLC, a Delaware limited liability company, as the Initial Licensor,

and
<u>**Christina Gaw and Fair Breeze Company Limited**</u>
<u>**as buyer in "Tenants as Common"**</u>, as Licensee,
**whose address is:**
<u>301 Mission Street, Unit **45C**, San Francisco, CA 94105</u>

**Dated:** _____, 20___ ("Effective Date")

License for Parking in the Parking Garage
of Millennium Tower
and Appurtenant to **Residential Condominium Unit <u>45C</u>** (the *"Residential Unit"*) of
THE **GRAND RESIDENCES** AT MILLENNIUM TOWER

**This License Agreement allows the Parking of One (1) Permitted Vehicle.**
**[Designated Stall P-<u>515</u> as shown on Exhibit "A" attached to this License Agreement.**

This Parking License Agreement (this *"Agreement"*) is made as of the Effective Date stated above by and between Mission Street Development, LLC, a Delaware limited liability company (as *"Initial Licensor"*) and the Millennium Tower Owners Association, a California nonprofit mutual benefit corporation (the *"Center Association"*) as the *"Licensor"* and the *Licensee*, with reference to the following facts:

      A.     Licensee is the owner of the above described Residential Unit located at the Millennium Tower, 301 Mission Street, in the City and County of San Francisco, California shown and described on that certain condominium plan entitles "A Mixed-Use Condominium Plan for Millennium Tower - 301 Mission Street San Francisco" filed on March 13, 2009 Reel J847, Image 0102 in the Official Records of the City and County of San Francisco.

      B.     The Residential Unit is part of a luxury high-rise development known as Millennium Tower (the *"Center"*) that is subject to and governed by that certain declaration of covenants and restrictions entitled "Declaration of Covenants, Conditions and Restrictions and Reciprocal Easement Agreement for Millennium Tower Owners Association," recorded in the Official Records of the City and County of San Francisco" which was recorded on March 19, 2009, Reel J851, Image 0169 in the Official Records of the City and County of San Francisco (as said declaration may hereafter be amended from time-to-time, the *"Center Declaration"*).

      C.     The Center is governed by Millennium Tower Owners Association, a California nonprofit mutual benefit corporation ("Center Association") under the Center Declaration which after the Effective Date of this License shall become the "Licensor" under this License Agreement.

- 1 -

D.      Initial Licensor has reserved the rights as Declarant under the Center Declaration to assign, license and otherwise transfer rights to park over portions of the Parking Garage (the **"Parking Garage"**) located within a portion of Parcel A on the Condominium Map entitled "Final Map 4146 A 420 Residential Unit and 8 Commercial Unit Mixed-Use Condominium Project, filed for record in the Office of the Recorder of the City and County of San Francisco, State of California, on May 15, 2008, in Book 105 of Condominium Maps, page(s) 146-147 (the "Center Map") and  as the "Parking Component" in the Center Declaration.

E.      The Parking Garage is a Common Element of the Center owned by the Center Association as described in the Center Declaration, which ownership is expressly made subject to this Parking License Agreement and the Parking License and rights set forth herein.  The Center Association or the Initial Licensor will engage a parking garage operator ("Parking Garage Operator") to operate and manage the Parking Garage.

F.      The Initial Licensor and Licensee desire to enter into this Agreement (i) to grant to Licensee, and its designated tenants or guests, a license to self park or have parked by valet service in the Parking Garage a Permitted Vehicle, as herein defined, in a designated parking space or parking area with such parking to be provided by self park or the valet parking services to be provided by Licensor or the Parking Garage Operator and (ii) to provide certain standards for the use, maintenance and operation of the Parking Garage and the allocation of the cost thereof.

G.      After this License has been established and made between Licensee and Initial Licensor, the obligations of Licensor stated herein and the rights granted to the Licensor hereunder shall be undertaken by the Center Association, and all references to Licensor shall thereupon be deemed to refer to the Center Association after the Effective Date of this License Agreement.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      **Grant of Licenses**.  Initial Licensor hereby grants to Licensee the following licenses:

A.      **Parking License.**  The right to park the number of vehicles designated on page 1 that are defined in this License Agreement as a Permitted Vehicle, within the designated parking stall or stalls of the Parking Garage, which parking shall be facilitated through self parking or the use of a valet parking service ( **"Parking License Rights"**).

2.      **Nature and Scope of Licenses**. The Parking License Rights shall be perpetual and shall operate as covenants running with the land, shall encumber the Parking Garage for the benefit of the Licensee and shall be appurtenant to the Licensee's Residential Unit. Except as provided in Paragraph **18.D,** below, none of the Licenses nor any right herein set forth shall be transferable except upon or in connection with the transfer of ownership of the Residential Unit.

3.      **Use of Licenses**.

A.      The Parking License Rights may be used by Licensee and/or any of Licensee's designated tenants or guests who are in occupancy of the Residential Unit for the parking of the vehicles designated on Page 1 that are "Permitted Vehicles" as defined in this Agreement and for no other use or purpose. "Permitted Vehicles shall mean passenger automobiles, sports utility vehicle, light truck or motorcycle that conform in type, size and use to the parking garage rules adopted by the Licensor or Licensor's designated operator of the Parking Garage on behalf of Licensor ("Garage Operator") that are owned, leased or otherwise used by Licensee or its designated tenants, or guests.

**B.**     The Parking License Rights do not include any right to store or park any articles of personal property, any recreational vehicles (including but not limited to trailers, motor homes, boats and boat trailers) or other oversized vehicles.  Only those commercial vehicles which are used both for business and personal use of Licensee or its designated tenants or guests shall be permitted to be parked under the Parking License Rights.

**C.**     The Licensee agrees to park or have parked through use of a valet service Licensee's permitted vehicle or vehicles within the Parking Garage at Licensee's own risk and expense.

**D.**     The Licensee shall give the Licensor and the Garage Operator, written notice of the name and address of any tenant or guest who is given the right to use Licensee's Parking License, which notice shall be on Licensor's or the Garage Operator's approved form. Such tenant or guest who is provided the right of use shall be occupying the Licensee's Residential Unit as described on Page 1.

**E.**     The Licensee shall make no alterations or modifications to the Parking Garage, or any improvements in the Parking Garage. Licensee shall comply with all Rules adopted for the use of the Parking Garage and all applicable governmental legal requirements and or conditions now or hereinafter imposed upon the use of the Parking Garage.  Licensee shall reimburse the Licensor, or any operator of the Parking Garage on behalf of Licensor, for any damage to the Parking Garage caused by the Licensee, its tenants or guests using the Parking Garage.

> **F.**             Only vehicles that are appropriate in size as are able to be fully parked within a parking space shall be permitted to be parked pursuant to this Agreement. Licensee acknowledges that the parking spaces and the Parking Garage may not accommodate larger vehicles, such as sports utility vehicles and vans. The Licensee shall have the obligation to assure that the vehicles used by the Licensee or its permitted assigns can fit within the Parking Garage and the Parking Space. **[Note: Not all motor vehicles will fit into a designated Parking Space. The Licensee shall have the obligation to be sure that Licensee's motor vehicle fits entirely within the designated parking space. Licensor or the Parking Garage Operator may require removal of any motor vehicle that does not appropriately fit fully within a designated parking space.]**

4.     **Initial Parking License Fee: Licensee hereby agrees to pay the Initial Licensor the Initial Parking License Fee of Seventy-Five Thousand Dollars ($75,000).  Until and unless such Initial Parking License Fee is paid by Licensee to the Initial Licensor, this Parking License shall not be operative.**

5.     **Parking Charge.**   In addition to the Initial Parking License Fee, and any other consideration paid by Licensee for the right to park hereunder, Licensee shall pay to the Center Association or the Parking Garage Operator, at the direction of Licensor, a parking charge (the *"Parking Charge"*) in an amount equal to One Hundred Ninety ($190.00) per month [for each Parking Space] as adjusted pursuant to Paragraph **5.B.**  *The Parking Charge is based on a prorated share of the Parking Garage Estimated Operating Budget attached to this License Agreement as Exhibit "B".*

**A.**     Except as provided in Paragraph **10**, the Parking Charge shall not be adjusted for reason of any permanent or temporary reduction, discontinuation or waiver of the use of any rights of Licensee hereunder.

**B.**     Licensor or the Parking Garage Operator may change the Parking Charge from time to time to reflect changes in the costs and expenses incurred by Licensor or the Parking Garage Operator in connection with the management, operation, maintenance, repair, and ownership of the Parking Garage, including, without limitation costs incurred in connection with operation of any and all valet services offered within the Parking Garage as allocated to the Parking Space on a prorated basis.

- 3 -

**C.**      The Parking Charge shall be paid in accordance with such frequency, times and manner as may be specified by Licensor and may be subject to such interest and late fees as may be specified by Licensor.

**D.**      Licensor and Licensee acknowledge and agree that the City and County of San Francisco (the "City") has a policy of discouraging the use of automobiles and that it is possible that the City might at some later date impose a tax applicable to the rights granted herein. Licensor and Licensee agree that in the event that the City or any governmental agency imposes any such tax, such tax will be paid by Licensee in addition to the Parking Charge imposed hereunder.

**LICENSEE'S INITIALS: (_____)(_____)         LICENSOR'S INITIALS: (_____)(_____)**

**E.**      Licensee acknowledges and agrees that the per vehicle Parking Charge charged hereunder is the same as the per vehicle Parking Charge charged to Owners of other Residential Condominiums within the Center, regardless of whether such are being granted self-park rights or not and regardless of whether they use valet services or not.
**LICENSEE'S INITIALS: (_____)(_____)         LICENSOR'S INITIALS: (_____)(_____)**

**F.      Payments of Charges.**  All payments of Parking Charge hereunder shall be payable to the Licensor, or the Garage Operator, or its designated agent, in lawful money of the United States, without previous notice or demand, and without deduction, offset or counterclaim, whatsoever. The obligation to pay Parking Charges is a covenant separate and independent from any obligations of Licensor or any Garage Operator. Licensor or any Garage Operator shall have the right to change the place where payment of Parking Charges shall be paid, by written notice to the Licensee.

**G.      Late Charge; Interest.**  Any payments or installment of Parking Charges not paid on the due date thereof shall be subject to a late charge of five percent (5%) of such installment and in addition such unpaid installment shall bear interest until paid at the lesser of eighteen per cent (18%) per annum or the maximum rate permitted to be charged under applicable law.

**6.      Waiver of Liability.**  Neither Initial Licensor, Licensor, or Garage Operator, nor any of the officers, directors, shareholders, partners, members, employees, agents, representatives affiliates, lenders, successors or assigns thereof, (collectively, the *"Licensor Parties"*) shall be liable to Licensee, and Licensee hereby waives all claims against the Licensor Parties for and releases the Licensor Parties from any injury or damage to any person or property in or about the Parking Garage by or from any cause whatsoever, including improper construction or repair (other than the gross negligence or willful misconduct of Licensor Parties), and without limiting the generality of the foregoing, whether caused by water leakage of any character from the roof, walls, floors, basement, or other portion of the Project or the building within which the Parking Garage is located, or caused by gas, fire, earthquake, flood, explosion, oil, electricity, theft, vandalism, malicious mischief, Act of God, or any cause whatsoever, in, on, or about the Parking Garage or any part thereof (other than that caused by the gross negligence or willful misconduct of Licensor Parties).

**7.      Indemnity.**  Except to the extent caused by the gross negligence or willful misconduct of the Licensor Parties, Licensee shall indemnify, defend and hold harmless the Licensor Parties from and against any and all claims, liabilities, losses, damages, costs and expenses (including attorneys' fees) arising out of, related to or incurred in connection with the use by Licensee or any person who is a tenant or guest of Licensee as to such use, or in the operation, maintenance, repair and replacement of parking spaces or otherwise occurring in the Parking Garage, except to the extent the same is caused by the gross negligence or willful misconduct of Licensor. Licensee's obligations under this Paragraph **7** shall survive the termination of this Agreement, but only with respect to events occurring prior to any such

- 4 -

termination. The obligations of Licensee pursuant to this Paragraph **7** shall be subject to the provisions of Section 1466 of the California Civil Code.

8.     **Security.** Licensee acknowledges and agrees that Licensor and/or the Garage Operator shall have the right, but not the obligation, to install and operate security cameras or other security equipment and/or provides any other services that could be construed as being intended to enhance security within the Parking Garage and further acknowledges and agrees that neither Licensor nor the Garage Operator shall have any obligation to Licensee or any tenant or guest of Licensee, for any damage, claim, loss or liability related to any claim that Licensor and/or the Garage Operator had a duty to provide security or that the equipment or services provided by Licensor and/or the Garage Operator were inadequate, inoperative or otherwise failed to provide adequate security. Any such claim made against Licensor and/or the Garage Operator by any tenant, employee or guest of Licensee shall be included within Licensee's obligation of indemnity and defense set forth in Paragraph **7** above.

9.     **Rules and Regulations; Rights of Licensor.** Licensor and/or the Garage Operator shall from time-to-time adopt, amend and enforce reasonable rules and regulations regulating and governing the use of the Licenses, all facilities within the Parking Garage, and the conduct of Licensee and its designated tenants or guests while within the Parking Garage, including without limitation rules and regulations governing the means of access to and security within the Parking Garage, and the type and nature of vehicles that are vehicles that are permitted to be parked and stored in the Parking Garage. Neither Licensor nor the Garage Operator shall be responsible for the nonperformance by any other person of any such rules or regulations. If Licensor and/or the Garage Operator reasonably requires, the Licensor and/or the Garage Operator may close any portion of the Parking Garage to whatever extent required in the reasonable opinion of the Licensor's counsel to prevent a dedication of any of the Parking Garage or the accrual of any prescriptive rights of any person or of the public to the Parking Garage; provided that such closures do not materially and adversely affect Licensee's use of a Parking Space. Licensor and/or the Garage Operator may temporarily close any portion of the Parking Garage for maintenance purposes, for emergencies and/or for repairs; provided that such closures do not materially and adversely Licensee's use of a Parking Space for more than a reasonable time determined by the circumstances. Licensor may effect reasonable security measures for use of the Parking Garage provided that such measures do not materially and adversely affect Licensee's use of a Parking Space.

10.     **Casualty and Condemnation.**

A.     **Casualty.** In the event of any damage or destruction to the Parking Garage or any portion thereof by fire, flood, earthquake or other casualty event ("Casualty"), the Licensor shall repair and restore the damaged or destroyed improvements as required under the Center Declaration and in accordance with the provisions of the Center Declaration. If a Casualty prevents or interferes with the reasonable and/or safe use and occupancy of the Parking Garage, Licensor may temporarily obstruct, prohibit or restrict use of the Parking Garage or a Parking Space or any Access Rights until such time as Licensor, or Center Board, or its designated manager, in its reasonable discretion determines that its is reasonable and safe for use and occupancy of the Parking Garage, a Parking Space or any Access Rights. Payment of the Parking Charge by Licensee shall be abated during such time as such use is obstructed, prohibited or restricted because of a Casualty. In the event that a Casualty occurs that damages or destroys improvement within the Parking Garage to such an extent that Licensor determines cannot be reasonably repaired or restored, or which are not subject to being repaired or restored because of actions by the City or the Center Association under the Center Declaration, then Licensor may terminate this Parking License and the Access Rights granted hereunder upon written notice from Licensor to Licensee. If the improvements in the Parking Garage are repaired and restored in a manner that is substantially similar to the improvements before the Casualty, then Licensor shall permit Licensee the use of the Parking Garage, the Parking Space and the Access Rights when such use is reasonable and safe. Insurance proceeds for insurance carried by the Licensor if the Parking Garage is not repaired and restored shall first be allocated and used for all repairs and restoration work that is made by Licensor, or to remediation work and costs of Licensor if the improvements in the Parking Garage are not repaired or restored. Any remaining insurance proceeds shall be allocated between the Licensor, as owner of the Parking Garage, and the Licensee and other licensees having licenses for use of a Parking Space or the

- 5 -

Parking Garage, and their respective mortgagees in a manner that reflects the relative value of their interests. The relative values of such interests shall be determined by Appraisal as set forth in Paragraph **10.9** of the Center Declaration. Any rights of Licensor or Licensee expressed in this Paragraph **10.A** are expressly subject to the terms and provisions of the Center Declaration.

**B.    Condemnation.** In the event of the Parking Garage or any portion thereof is taken by eminent domain to an extent or manner that obstructs, prohibits or otherwise eliminates the use of the Parking Garage as a parking garage or takes the use of the parking garage from Licensor, or prevents or interferes with the reasonable and/or safe use and occupancy of a Parking Space or any Access Rights the Licensor or the Licensee may terminate the Parking License Rights by providing written notice to the other party. If the taking of the Parking Garage is temporary in nature, then Licensor may suspend the rights of use by Licensee of the Parking License Rights during such period of temporary taking. Payment of the Parking Charge by Licensee shall be abated during such time as such use is obstructed, prohibited or restricted because of any such taking. If use of the Improvements in the Parking Garage is restored in a manner that is substantially similar to the use of improvements before the taking, then Licensor shall permit Licensee the use of the Parking License Rights when such use is reasonable and safe. Any proceeds for any such taking shall first be allocated and used for any repairs and restoration work that is made by Licensor, or to remediation work and other costs of Licensor caused by any such taking. Any remaining condemnation proceeds awarded for any such taking of the Parking Garage shall be allocated between the Licensor, as owner of the Parking Garage, and the Licensee and other licensees having licenses for use of a Parking Space or the Parking Garage, and their respective mortgagees in a manner that reflects the relative value of their interests. The relative values of such interests shall be determined by Appraisal as set forth in Paragraph **10.9** of the Center Declaration. Any rights of Licensor or Licensee expressed in this Paragraph **10.B** are expressly subject to the terms and provisions of the Center Declaration.

11.    **Remedies/Enforcement.** The parties and their respective successors and assigns shall have the right to enforce, by proceedings at law or in equity, the terms and conditions of this Agreement. The right to enforce this Agreement shall include the right to maintain a proceeding at law or in equity against any person or persons who have violated or who are attempting to violate any of the provisions of this Agreement, to enjoin or prevent them from doing so, to cause the violations to be remedied, and/or to recover damages.

**A.    Failure to Contribute.** Failure of Licensee to pay its Parking Charges assessed to Licensee within thirty (30) days following delivery of a written notice from Licensor that such payment is delinquent shall constitute a material breach of this Agreement and shall forthwith, upon such default, give rise to the following remedies:

(1)    The right to bring legal action for such unpaid amounts and the costs of collection;

(2)    Disconnect or deprogram or otherwise deny or disable the access rights of Licensee to the parking garage and the right to park until and unless such breach is cured including full payment of all amounts in arrears plus all late charges and interest.

(3)    Terminate this License if such material breach is not cured by Licensee within ninety (90) days after written notice from Licensor to Licensee.

**B.    Other Defaults of Licensee.** If Licensor determines that Licensee has failed in the performance of any obligation stated in this Agreement, Licensor may give written notice of such failure to Licensee stating the nature of such failure. If Licensee fails to remedy such failure within ten (10) days following delivery of such written notice from Licensor then Licensor may exercise any of the following remedies:

- 6 -

(1)     Bring legal action against the Licensee to enforce or compel performance by Licensee of the performance of the obligation stated in this Agreement;

(2)     Remedy the failure if such failure is subject to being remedied by action of Licensor, and charge the costs of such failure to Licensee as a reimbursement charge, which costs shall be paid by Licensor to Licensee within thirty (30) days after written notice from Licensor to Licensee.

12.     **Covenants Running with the Land.**  The burdens and benefits of the covenants, conditions and restrictions contained herein shall run with and against the Parking Garage and the Residential Unit, and benefit and be binding upon each successive owner (during such person's ownership) of the Parking Garage and the Residential Unit, and upon each person having any interest therein derived through any owner thereof. All of the provisions of this Agreement shall be enforceable as equitable servitudes and constitute covenants running with the land pursuant to applicable law, including but not limited to Section 1468 of the Civil Code of the State of California.

13.     **Perpetual Nature of the Licenses and Limitation of Remedies.**  It is the intention of Licensee and Licensor that the Licenses herein granted are irrevocable and not subject to termination for any reason whatsoever, other than as stated in Paragraph **10** or by a written agreement between Licensor and Licensee specifically and expressly agreeing to the termination of the Licenses. Upon the occurrence of any default by Licensee in the performance of its obligations under this Agreement or upon any misuse of the Parking License Rights by the Licensee or any designated tenant or guest of Licensee, Licensor shall have the remedies described in Paragraph **11**.

14.     **Right to Encumber.**  Licensee shall be entitled to mortgage or hypothecate its interest in and to this License, provided however that any such mortgage or hypothecation shall be made solely as part of the mortgaging or hypothecation of the Residential Unit owned by the Licensee, and not separately therefrom.  Any ownership of the Licenses resulting from foreclosure or other transfer pursuant to the  mortgage or other hypothecation of the Licenses shall be subject to the terms and provisions of this Agreement.

15.     **Effect of Licensee's Activities On Insurance.**  Licensee shall not do or permit to be done any act or thing upon or about the Parking Spaces, the Access Areas, or otherwise in the Parking Garage or the Center  that will (I) result in assertion of any defense by the insurer of the Parking Garage or the Center to any claim under, (ii) invalidate, (iii) be in conflict with the insurance policies covering the Parking Garage or the Center, or the fixtures or property therein, or which would increase the rate of fire or casualty insurance applicable to the Parking Garage or the Project to an amount higher that it otherwise would be, and Licensee shall neither do nor permit to be done any act or thing upon or about the Parking Garage or the Project which shall or might subject Licensor to any liability or responsibility for injury to any person or persons or to property.

16.     **Property at Licensee's Risk.**  Licensee agrees that all vehicles and all personal property left in any vehicle while it is in the Parking Garage shall be at the sole risk of Licensee or the persons owning the same, and that neither Initial Licensor nor Licensor shall in any event be liable for the loss, destruction theft or damage to such vehicle or property.  Licensee agrees that neither Initial Licensor nor Licensor shall be required to have any agent or attendant in the Parking Garage at any time, and that neither Initial Licensor nor Licensor shall be liable for loss or damage to said vehicle[s] or its contents, from any cause or causes, including, but not limited to fire, theft or collision. Initial Licensor, Licensor or Licensor's agent or manager, and their respective agent's servants and employees shall not be liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain leaks from any part of the Project or from the pipes, appliances or plumbing works, or from the roof, street or subsurface or from any other place or resulting from dampness or resulting from any other cause of whatsoever nature.

17.     **Liability and Property Insurance.**  Licensee shall maintain appropriate automobile liability insurance and property damage insurance with minimum limits.

- 7 -

18.    **General Provisions.**

        **A.**    **Successors and Assigns.** This Agreement shall be binding upon and shall insure to the benefit of Licensor and Licensee and their respective successors and assigns in title to the Parking Garage and the Licenses, respectively. All assignments by Licensee shall be subject to Paragraph **18.D** hereof.

        **B.**    **Rights of Access.** Licensor, or any operator of the Parking Garage on behalf of Licensor shall have the right of enter the Parking Spaces at any time in case of emergencies and at reasonable hours to inspect the Parking Spaces, to see that the Licensee is complying with the terms and obligations of this Agreement, to show the Parking Spaces to prospective purchasers, mortgagees or tenants, or to make repairs, provide services, or utilities to any portion of the Parking Garage.

        **C.**    **Notices.** All notices and other communications under this Agreement shall be properly given only if made in writing and either mailed by first class United States Mail, postage prepaid, or delivered by hand (including messenger or recognized delivery, courier or air express service) to the party at the address set forth in this Paragraph **18.C** or such other address as such party may designate by notice to the other party.  Such notices and other communications shall be effective on the date of receipt (evidenced by the certified mail receipt) if mailed or on the date of hand delivery if hand delivered.  If any such notice or communication is not received or cannot be delivered due to a change in the address of the receiving party of which notice was not previously given to the sending party or due to a refusal to accept by the receiving party, such notice or other communication shall be effective on the date delivery is attempted.  Any notice or other communication under this Agreement may be given on behalf of a party by the attorney for such party.

    If to Initial Licensor:
        Mission Street Development LLC, a Delaware limited liability company,
        301 Mission Street
        San Francisco, CA  94105
        Attn: Richard Baumert

    If to Licensor:
        Millennium Tower Owners Association
        301 Mission Street
        San Francisco, CA 94105
        Attn: Richard Baumert

    If to Licensee:  At the address stated on Page 1, above.

        **D.**    **Transfer of Rights.** Licensee shall have the right to sell or otherwise transfer this Parking License and, only in conjunction therewith, the Access Rights related thereto, subject to the following criteria and preconditions:

        (1)    Such sale or transfer is made to the successor of an Owner who purchases the Unit from the Licensee;

        (2)    Such transfer is made to a person who is renting or leasing and occupying the Unit from the Licensee provided that such transfer is expressly limited to the duration of the period of such occupancy.

Licensee may transfer its Parking License Rights hereunder to the owner of another Unit in the Center if such proposed transfer is approved in writing in advance by the Center Association's Board.

- 8 -

**E.** **Notification of Transfer of Rights.** Within five (5) business days after the consummation of a sale or transfer of the Parking License and the Access Rights related thereto, the transferee shall notify the Licensor, or any Garage Operator of such transfer by Licensee in writing of such sale or transfer. Such notification shall set forth (i) the name of the transferor and the transferee, (ii) the street address of the Residential Unit, if any(iii) the transferee's mailing address, and (iv) the date of sale. Prior to the receipt of such notification, any and all communications required or permitted to be given by the Licensor or the Garage Operator shall be deemed to have been duly made and given to the transferee if duly and timely made and given to said transferee's transferor.

**F.** **Entire Agreement.** This Agreement contains the entire agreement between the parties relating to the subject of this Agreement. This Agreement may be modified only by a written and recorded agreement signed by both parties or their respective successors or assigns.

**G.** **Attorneys' Fees.** In the event of any controversy, claim or dispute between the parties relating to the Agreement or the breach thereof, the prevailing party as determined by arbitration or judicial proceedings shall be entitled to recover from the losing party its reasonable expenses, including reasonable attorneys' fees and costs.

**H.** **Exhibits.** All exhibits attached to this Agreement are incorporated in and made a part of this Agreement by reference.

**I.** **Counterparts.** The parties hereto agree that separate counterparts of this Agreement may be separately executed by each of the parties, all with the same full force and effect as though the same counterpart had been executed simultaneously by, all of the parties.

**J.** **Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the State of California.

**K.** **Terms Generally.** The defined terms in this Agreement shall apply equally to both the singular and the plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The term "person" includes individuals, corporations, partnerships, limited liability companies, trusts, other legal entities, organizations and associations, and any government or governmental agency or authority. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "notice" shall be deemed to be preceded by the word "written." After this License has been established and made between Licensee and Initial Licensor, the obligations of Licensor stated herein and the rights granted to the Licensor hereunder shall be undertaken by the Center Association, and all references to Licensor under this Agreement shall thereupon be deemed to refer to the Center Association.

**L.** **Partial Invalidity.** If any provision of this Agreement is determined by a proper court to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement and this Agreement shall remain in full force and effect without such invalid, illegal or unenforceable provision.

**M.** **Waivers.** No waiver of any provision of this Agreement or any breach of this Agreement shall be effective unless such waiver is in writing and signed by the waiving party and any such waiver shall not be deemed a waiver of any other provision of this Agreement or any other or subsequent breach of this Agreement.

**N.** **Dispute Resolution.** The parties agree that all claims or controversies or disputes whether based on contract, tort, other legal or equitable theories or upon statute, arising out of or related to this Agreement, or in connection with, or in relation to the interpretation, performance or breach of this Agreement, or any subsequent agreement among the parties concerning the subject matter of this Agreement, with the exception of the failure of Licensee to pay Parking Charges as and when stated in Paragraph **5**, ("Dispute") shall be resolved in the manner herein provided, unless any such

- 9 -

subsequent agreement expressly disclaims the application of the contract provision. Notwithstanding the foregoing, and the fact that there is a Dispute, the Licensee shall continue to be obligated to pay the Parking License Fees then due and owing, and failure of the Licensee to do so will entitle the Licensor to withhold access to the Parking Garage by such Licensee until such Parking License Fees are paid in full.

**O.    Mediation.**  If the Dispute cannot be resolved by negotiations among the parties involved, in the judgment of any party involved therewith that efforts at negotiations have not yielded sufficient progress to encourage further and continued negotiations, the parties to the Dispute shall submit the Dispute to mediation by a mediator mutually selected by the parties involved with the Dispute. If the parties are unable to agree upon a mediator within thirty (30) days from the date of service by any party upon the other parties of a notice to mediate, then the mediator shall be appointed under the procedure stipulated in the Rules of Commercial Mediation of the Judicial Arbitration and Mediation Services, Inc. ("JAMS"), unless the parties agree to some other mediation service. The parties shall reserve no more than five (5) business days for the mediation process. If the dispute is not resolved within the reserved time period, the parties shall be required to resolve such Dispute by arbitration as set forth below.

**P.    Arbitration.**  All claims, disputes and other matters in question between the Initial Licensor or Licensor and Licensee, that arise out of or relate to this Agreement, whether arising in contract or tort (hereinafter referred to collectively as "Arbitrable Matter"), which are not resolved by negotiations or mediation, shall be decided by binding arbitration in accordance with the then obtaining seven step Rules of Practice and Procedure (Rules of Practice and Procedure for Arbitration of Commercial Disputes) of Judicial Arbitration and Mediation Services, Inc. ("JAMS"), as set forth below, unless the Licensor and Licensee each elect not to participate in arbitration.

(1)    Notice of the demand for arbitration shall be filed in writing with the other party to this contract and with JAMS. The demand shall be made within a reasonable time after the Arbitrable Matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

(2)    The arbitrator shall decide whether the dispute is an Arbitrable Matter. In addition, the arbitrator shall award to the prevailing party its costs and attorney's fees actually incurred.

(3)    Either party shall, within fifteen (15) days of receipt of the date that the hearing time and date is set, have the right to demand in writing, served personally or by facsimile, that the other party provide a list of witnesses it intends to call designating which witness will be called as expert witness, and a list of documents it intends to introduce at the hearing. A copy of such demand shall be served on the arbitrator. Such lists shall be mutually exchanged and served personally or by facsimile on the opposing party within fifteen (15) days thereafter. Copies thereof shall be served on the arbitrator. Listed documents shall be made available for the inspection and copy at reasonable times prior to the hearing.

(4)    Depositions for discovery shall not be taken unless leave to do so is first granted by the arbitrator and in no event is any party entitled to more than four (4) depositions, two percipient witnesses and two experts.

(5)    Neither party shall be entitled to serve any form of written discovery request (interrogatories, requests for admission, requests for authentication, requests for document production or written depositions) on any other party in the arbitration. The only document productions allowed shall be done pursuant to the demand above.

(6)    Costs and fees of the arbitration shall ultimately be borne as determined by the arbitrator(s);

- 10 -

(7)      costs and fees, including ongoing costs and fees of the arbitration be paid equally by the parties, with the costs and fees of the arbitration to ultimately be borne as determined by the arbitrator(s);

(8)      neutral and impartial individual(s) shall be appointed to serve as arbitrator(s), with the arbitrator(s) to be appointed within a period of time, which in no event shall be more than 60 days from the administrator's receipt of a written request from a party to arbitrate the claim or dispute. In selecting the arbitrator, the provisions of §1297.121 of the Code of Civil Procedure shall apply. an arbitrator may be challenged for any of the grounds listed in §1297.121, or in §1297.124 of the Code of Civil Procedure;

(9)      venue of the arbitration to be in the County of San Francisco, unless the Licensor and Licensee agree to some other location;

(10)     the arbitrators shall be authorized to provide all recognized remedies available in law or equity for any cause of action that is the basis of arbitration; provided however that the there shall in no event be any award of punitive damages.

**NOTICE:** BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION OR JUDICIAL REFERENCE, AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL.  BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION OR JUDICIAL REFERENCE, AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION OF DISPUTES PROVISION IS VOLUNTARY.  WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL BINDING ARBITRATION AS HEREIN PROVIDED.

BY PLACING THEIR INITIALS HERE (INITIAL LICENSOR _____) (LICENSOR _____) (LICENSEE _____) THE PARTIES AGREE TO ARBITRATION AS SET FORTH HEREIN.

In Witness Whereof, Initial Licensor and Licensee have executed this Agreement as of the date first set forth above.

**INITIAL LICENSOR:**
Mission Street Development LLC, a Delaware limited liability company
By: Mission Street Holdings LLC, its sole member

By:_____
   Richard Baumert, Its: Vice President

**LICENSEE:**
_____
Christina Gaw

Fair Breeze Company Limited

**AGREED AND ACCEPTED**
**LICENSOR:**
Millennium Tower Owners Association, a California nonprofit mutual benefit corporation

By:_____
   Richard Baumert, Its: President

- 11 -

**STATE OF CALIFORNIA**      )
                                   ) *SS*

**COUNTY OF** _____ )

On _____, 20_ , before me, _____ Notary Public, personally appeared _____ , proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the forgoing is true and correct.

WITNESS my hand and official seal.

Signature:_____

*(Notary seal above)*

- 12 -

---

**STATE OF CALIFORNIA** )

                          ) *SS*

**COUNTY OF** _____ )

On _____, 20__ , before me, _____ Notary Public, personally appeared _____ , proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the forgoing is true and correct.

WITNESS my hand and official seal.

Signature:_____

*(Notary seal above)*

- 13 -

**STATE OF CALIFORNIA**            )
                                   ) *SS*
**COUNTY OF** _____      )

On _____, 20__ , before me, _____ Notary Public, personally appeared _____ , proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the forgoing is true and correct.

WITNESS my hand and official seal.

Signature:_____

*(Notary seal above)*

- 14 -

EXHIBIT "A"

PARKING PLAN

**EXHIBIT "B"**

**PARKING GARAGE ESTIMATED OPERATING BUDGET**

# Millennium Tower Association - Parking Garage
# 2013 Budget Package

| G/L # | Account Title | Budget 2013 |
|---|---|---|
| | Income | |
| 425000 | Monthly Parking Income | 809,400 |
| 425000 | Transient Parking Income | 115,200 |
| | **TOTAL INCOME** | **924,600** |
| | **TOTAL REVENUE** | **924,600** |
| | **OPERATING EXPENSES** | |
| | **CONTRACT SERVICES** | |
| 542110 | Contract Cleaning | 13,000 |
| 542100 | Maintenance Contracts | 5,000 |
| 543000 | Repairs & Maintenance | - |
| 547000 | Elevator Maintenance | 14,940 |
| | **TOTAL CONTRACT SERVICES** | **32,940** |
| | **Parking Garage** | |
| 509000 | Parking Garage Expenses | 852,980 |
| | **Total Garage Expenses** | **852,980** |
| | **Insurance** | |
| 585000 | Insurance | 3,158 |
| | **TOTAL INSURANCE** | **3,158** |
| | **UTILITIES** | |
| 530020 | Electric | 15,000 |
| 5306000 | Utilities Other | - |
| | **TOTAL UTILITIES** | **15,000** |
| | **TOTAL EXPENSES** | **904,078** |
| | **NET OPERATING INCOME** | **20,522** |

# 2013 Budget Package

Parking Income

| Unit | Apr-12 (30) | May-12 (31) | Jun-12 (31) | Jul-12 (28) | Aug-12 (31) | Sep-12 (30) | Oct-12 (31) | Nov-12 (30) | Dec-12 (31) | Jan-13 (31) | Feb-13 (28) | Mar-13 (31) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Garage Parking Charges | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 809,400.00 |
| | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 67,450.00 | 809,400.00 |

| | |
|---|---|
| Expense per 2013 Budget | 904,078 |
| Reserves to be funded | 19,476 |
| less: Transient Garage Revenue | -115,200 |
| Annual Revenue Required | 808,354 |
| Cost per space | $ 2,277.05 |
| Cost Per Space per month | $ 189.75 |
| Rounded to nearest Dollar | $ 190.00 |
| Parking Rate Increase | 11.76% |

Financial Statements

# Exhibit B

**FIRST ADDENDUM**
**TO**
**RESIDENTIAL PURCHASE AGREEMENT AND ESCROW INSTRUCTIONS**
**GRAND RESIDENCES AT MILLENNIUM TOWER**

Mission Street Development LLC ("Seller"), a Delaware Limited Liability Company and Christina Gaw and Fair Breeze Company Limited as buyer in "Tenants as Common" ("Buyer") agree to the following First Addendum to the Residential Purchase Agreement and Escrow Instructions at the Grand Residences at Millennium Tower for Unit 45C ("Unit") dated August 21, 2012 (the "Purchase Agreement"):

The Purchase Agreement shall be amended as follows:

1.  The Close of Escrow under the Purchase Agreement is contingent on Buyer's ability to confirm a buyer for the purchase for Buyer's home located at 333 Bush Street, #3805, San Francisco, CA 94104 ("Buyer's Residence") by November 21, 2012 ("Contingency") as follows:

    a)  Buyer shall use best efforts to procure a purchaser for Buyer's Residence by November 21, 2012.

    b)  If Buyer does not give written notice to Seller prior to 5 p.m. on November 21, 2012 that Buyer is unable to confirm a purchaser for Buyer's Residence, both Buyer and Seller agree that the Contingency shall be deemed to have been automatically removed without further action of either Buyer or Seller and that the Purchase Agreement shall be considered fully executed and non-contingent.  Buyer shall Close Escrow on or before December 7, 2012 ("Closing Date").

    c)  If Buyer delivers written notice to Seller prior to 5 p.m. on November 21, 2012 that Buyer is unable to confirm a purchaser for Buyer's Residence, the Purchase Agreement shall be considered fully canceled and Seller shall direct Escrow Holder to return Buyer's Initial Deposit to Buyer.

2.  Seller acknowledges Buyer will be conducting a 1031 exchange for the sale and purchase of Unit 45C at Millennium Tower.  Buyer shall conduct all necessary work required for the 1031 exchange through the escrow company and exchange accommodator and shall pay any and all associated costs and expenses.  Buyer has not relied on Seller or its agents or representatives as to any income matters regarding this transaction and Seller makes no representations to Buyer regarding such income tax matters.  Buyer is relying on its own advisors as to any such income tax matters.

BUYER:

Date: _Aug 21_, 2012

_____
Christina Gaw

_____
Fair Breeze Company Limited

ACCEPTANCE BY SELLER:

Date: _8/30_, 2012

Mission Street Development LLC, a Delaware limited liability company
By:  Mission Street Holdings, LLC, its sole member

    By: _____
        Richard Baumert, Vice-President

Exhibit C

**SECOND ADDENDUM**
**TO**
**RESIDENTIAL PURCHASE AGREEMENT AND ESCROW INSTRUCTIONS**
**GRAND RESIDENCES AT MILLENNIUM TOWER**

Mission Street Development LLC ("Seller"), a Delaware Limited Liability Company and Christina Gaw and Fair Breeze Company Limited as buyer in "Tenants as Common" ("Buyer") agree to the following Second Addendum to the Residential Purchase Agreement and Escrow Instructions at the Grand Residences at Millennium Tower for Unit 45C ("Unit") dated August 21, 2012 (the "Purchase Agreement"):

The Purchase Agreement shall be amended as follows:

1)    All references to Buyer shall be amended to <u>Christina Gaw</u> only. All previously executed documents under the Purchase Agreement by Christina Gaw and Fair Breeze Company Limited shall remain fully executed and intact.

BUYER:

Date: _____ 2012

_____    X    _____
Christina Gaw                          Fair Breeze Company Limited

ACCEPTANCE BY SELLER:

Date: _____, 2012

Mission Street Development LLC, a Delaware limited liability company
By: Mission Street Holdings, LLC, its sole member

    By: _____
         Richard Baumert, Vice-President

# Exhibit D

**Treadwell&Rollo**

18 February 2009
Project 3157.04

Mr. Derrick Roorda, SE
DeSimone Consulting Engineers
160 Sansome Street, 16th Floor
San Francisco, California 94111

Subject:    Response to DBI Letter
            Settlements at 301 Mission Street
            San Francisco, California

Dear Mr. Roorda:

This letter presents our responses to a letter by San Francisco Department of Building Inspection dated 2 February 2009 regarding settlements at 301 Mission Street. Specifically, our responses to questions two through six in the referenced letter are presented below:

Question 2:     *What are the actual settlements now? What is the rate of settlements? Are the settlements still continuing? What the expected final total settlement of each building?*

Response 2:     The actual settlement of the Tower is 8.3 inches. This is based on the latest survey of the benchmark on the core wall which was read on 12 February 2009. The rate of settlement from the latest survey reading is 0.003 inches/day. A plot of the settlement is attached. The results of our latest evaluations indicate that approximately two to four inches of additional settlement could occur in the future. We do not anticipate settlement for the Podium/Mid-Rise structure.

Question 3:     *Are there any differential settlements within the high-rise building?*

Response 3:     We are not aware of any differential settlement issues within the high-rise Tower.

Question 4:     *Are the actual total and differential settlements being monitored now?*

Response 4:     Currently the benchmark on the core wall is being monitored.

Question 5:     *What are the reasons for the larger than expected settlements?*

Response 5:     The larger than anticipated settlement can be attributed to several possible factors including extensive and longer than expected dewatering during the construction of Podium/Mid-Rise structure and limited effectiveness of predrilling during the installation of pile foundations for the Tower.

Question 6:     *Has the geotechnical engineer of record been alerted to the settlement and what is their course of action?*

Response 6:     Treadwell & Rollo, Inc. as the geotechnical engineer of record has been aware of the settlement of the Tower and continues to evaluate the results of the monitoring by Martin M. Ron Associates, Inc. While the settlement of the Tower is greater than originally anticipated, this settlement should not pose issues with foundation support for the Tower.

**Treadwell&Rollo**

Mr. Derrick Roorda, SE
DeSimone Consulting Engineers
18 February 2009
Page 2

We trust this letter provides the responses requested.  If you have any questions, please call.

Sincerely yours,
TREADWELL & ROLLO, INC.

Ramin Golesorkhi, G.E.
Principal

31570417.RG

Attachment:   Settlement Plot

cc:   Mr. Steven Hood (Millennium Partners)

**Treadwell&Rollo**

Project No. 3157.04
301 Mission TOWER Settlement

| Type | date | El (feet) | Movement between readings (feet) | Movement between readings inches | days between readings | inches per day | Total Elapsed Time (days) | Total Settlement (inches) |
|---|---|---|---|---|---|---|---|---|
| Wabcor reading | 9/20/2006 | 7.829 | | | | 0.000 | 0 | 0 |
| MR reading | 1/22/2007 | 7.779 | 0.050 | 0.602 | 124 | 0.005 | 124 | 0.602 |
| MR reading | 3/7/2007 | 7.744 | 0.035 | 0.420 | 44 | 0.010 | 168 | 1.022 |
| MR reading | 4/18/2007 | 7.715 | 0.029 | 0.348 | 42 | 0.008 | 210 | 1.370 |
| MR reading | 6/5/2007 | 7.673 | 0.042 | 0.504 | 48 | 0.011 | 258 | 1.874 |
| MR reading | 6/28/2007 | 7.653 | 0.020 | 0.240 | 23 | 0.010 | 281 | 2.114 |
| MR reading | 8/3/2007 | 7.607 | 0.046 | 0.552 | 36 | 0.015 | 317 | 2.666 |
| MR reading | 8/28/2007 | 7.58 | 0.027 | 0.324 | 25 | 0.013 | 342 | 2.990 |
| MR reading | 9/17/2007 | 7.557 | 0.023 | 0.276 | 20 | 0.014 | 362 | 3.265 |
| MR reading | 10/14/2007 | 7.511 | 0.046 | 0.552 | 27 | 0.020 | 389 | 3.818 |
| MR reading | 11/7/2007 | 7.478 | 0.033 | 0.396 | 24 | 0.017 | 413 | 4.214 |
| MR reading | 12/11/2007 | 7.425 | 0.053 | 0.636 | 34 | 0.019 | 447 | 4.850 |
| MR reading | 1/10/2008 | 7.377 | 0.048 | 0.576 | 30 | 0.019 | 477 | 5.426 |
| MR reading | 1/31/2008 | 7.338 | 0.039 | 0.468 | 21 | 0.022 | 498 | 5.894 |
| MR reading | 3/25/2008 | 7.292 | 0.046 | 0.552 | 54 | 0.010 | 552 | 6.446 |
| MR reading | 5/1/2008 | 7.261 | 0.031 | 0.372 | 37 | 0.010 | 589 | 6.818 |
| MR reading | 7/1/2008 | 7.231 | 0.030 | 0.360 | 61 | 0.006 | 650 | 7.178 |
| MR reading | 10/14/2008 | 7.177 | 0.054 | 0.648 | 105 | 0.006 | 755 | 7.826 |
| MR reading | 11/14/2008 | 7.169 | 0.008 | 0.096 | 31 | 0.003 | 786 | 7.922 |
| MR reading | 12/19/2008 | 7.151 | 0.018 | 0.216 | 35 | 0.006 | 821 | 8.138 |
| MR reading | 2/12/2009 | 7.136 | 0.015 | 0.180 | 55 | 0.003 | 876 | 8.318 |
| | | 0.693 | | | | | | |

6/17/2006 Tower Mat Pour
9/13/2006 street level poured (core up ~3 levels)
1/22/2007 Decks to L9, core to L13
3/7/2007 Decks to L13, core to L18
4/18/2007 Decks to L18, core to L22
2/7/2008 Dewatering wells shut-off

## tower settlement



# HANDEL ARCHITECTS LLP

Gary E. Handel AIA
Glenn Rescalvo AIA
D.B. Middleton AIA
Frank Fusaro AIA
Michael Arad AIA

February 18, 2009

Derrick Roorda, SE
DeSimone Consulting Engineers
160 Sansome Street, 16th Floor
San Francisco, CA 94104

RE:  301 Mission Street, Settlement Issues

Dear Derrick,

Handel Architects, in conjunction with DeSimone Consulting Engineers, has designed 301 Mission for the settlement anticipated in the original Geotechnical Report prepared by Treadwell & Rollo. In addition, we are aware that additional settlement has occurred, and may continue to occur, and we have taken these conditions into account with modifications to the original design where necessary:

- Utility lines have been designed and installed with flexible connections (allowing for horizontal and vertical movement) wherever they cross the expansion joint between the buildings and at service entry points in the tower.
- Hinge slabs between the two buildings, which were originally designed for settlement that would not result in slopes exceeding requirements where handrails would have been required, have now been equipped with handrails which can be adjusted in the future if required.
- Utilities under portions of the tower but above ceilings and walls supported from the Mid-Rise have been routed to avoid possible interference from future anticipated settlement.
- Expansion joint covers at walls, ceilings and floors have been designed to accommodate settlement and seismic movement. Where the current additional or anticipated future settlement has affected waterproofing design at settlement joints, we have worked with the installer to modify the joint design to accommodate the anticipated future settlement up to 4" and continue to function as originally intended.
- Interior floor surfaces adjoining exterior walkways on the north and west of the tower have been raised where possible to allow for increased sidewalk slope away from entry and exit doors in case future settlement might decrease or negate the current slope. Where interior floor levels could not be raised, new trench drains have been installed outside the entry doors in case settlement causes a reversal of sidewalk water flow. The porte cochere driveway elevations were redesigned, taking into account the current settlement and relationship to existing street and sidewalk elevations, so that the main entries, stairs and elevator sills could remain at their original floor elevations relative to floors above, even though they are now lower than originally predicted.

Sincerely yours,

Gerald W. Sams, AIA
Handel Architects, LLP

cc: Glenn Rescalvo
    Steve Hood

SAN FRANCISCO    735 Market St, 2nd Fl  San Francisco, CA 94103  t 415 495 5588  f 415 495 3828  www.handelarchitects.com
NEW YORK

# DESIMONE

NEW YORK
MIAMI
SAN FRANCISCO
NEW HAVEN
LAS VEGAS
HONG KONG
ABU DHABI

February 25, 2009

City and County of San Francisco
1660 Mission Street, 2nd Floor
San Francisco, CA 94103

DeSimone Project # 4069B
301 Mission - Structural Design Services

Attn:   Raymond Lui
Re:     301 Mission Settlement

Mr. Lui:

The following is offered in response to your letter dated February 2, 2009 regarding settlement of Millennium Tower at 301 Mission Street.

1. The original project design by DeSimone and Handel Architects accommodated 6 inches of total settlement under the Tower. The adjacent podium and 12-story Mid-rise building are completely separated structurally from the Tower, and are not expected to settle at all. In fact, part of the podium and Mid-rise is actually tied down to prevent upward movement due to the net upward pressure supplied by groundwater.

2. See attached letter from Treadwell & Rollo dated February 18, 2009.

3. All columns and shear walls comprising the Tower structure are supported on a single, continuous pile cap. No differential settlements between adjacent walls/columns are expected and none have been reported to DeSimone. See also the attached letter from Treadwell & Rollo dated February 18, 2009.

4. See attached letter from Treadwell & Rollo dated February 18, 2009.

5. See attached letter from Treadwell & Rollo dated February 18, 2009.

6. See attached letter from Treadwell & Rollo dated February 18, 2009.

7. Since settlement of the Tower was anticipated and planned for during design, it has created no known problems for the Tower or Mid-rise structures. The only connections between the Tower and Mid-rise structures are at "hinge slabs", which were detailed to allow settlement of the Tower to occur relative to the Mid-rise. These slabs could accommodate at least an additional 6" of settlement with no detrimental structural impact. DeSimone has not observed, and has not been informed, of any cracks in walls or any other negative structural impact from the Tower settlement. It is our professional opinion that the structures are safe.

8. See attached letter from Handel Architects dated February 18, 2009.

**DESIMONE CONSULTING ENGINEERS**

Derrick D. Roorda, SE, LEED AP
Senior Associate Principal

Cc:   Steve Hood, Millennium Partners
      Glenn Rescalvo, Handel Architects
      Ramin Golesorkhi, Treadwell & Rollo



**TRANSBAY JOINT POWERS AUTHORITY**
Maria Ayerdi-Kaplan • Executive Director

January 14, 2010

Steven C. Hood
Millennium Partners
735 Market Street, 4th Floor
San Francisco, CA 94103

Subject:   Transbay Transit Center Program
           Buttress Construction Documents

Dear Mr. Hood,

In accordance with the Easement Agreement dated October 10, 2008, between the Transbay Joint Powers
Authority (TJPA) and Mission Street Development LLC, we are attaching for your review three copies of
the Buttress Construction Documents (drawings and specifications).

With this submittal we are soliciting feedback from your designers regarding the design of the Buttress to
enable TJPA to complete the design and construct the Buttress. These documents should be reviewed in
conjunction with the Report on the Preliminary Design of the Buttress for Limiting Excavation-Induced
Deformations at 301 Mission Street previously provided to you with our letter of November 18, 2009.

Additionally, we are requesting responses from your designers to the questions outlined below to allow
our designers to better understand your building's design and performance as they finalize the Buttress
Construction Documents. Accompanying the correspondence you will find three plates referenced in the
questions to assist.

General

1.0   For what magnitude of movement have the utility service connections been designed?
2.0   For the building systems which are adversely affected by building movement, e.g., below-grade
      waterproofing (including penetration seals), exterior drainage (exterior door thresholds, sidewalk
      cross-falls, driveway and service entrance drainage), exterior skin/ cladding, elevators, expansion
      joints, finishes, etc., how much total movement can be accommodated without affecting their
      performance?
3.0   What are the pile design criteria and installation criteria issued to the original contractor? What is
      the pile head displacement used in the design?

Tower Settlement

1.0   Treadwell and Rollo, in their letter referenced by DeSimone to the San Francisco Department of
      Building Inspection of February 25, 2009, reported that the settlement of the tower core was 8.3
      inches and estimated that approximately 2 to 4 inches of additional settlement could occur in the
      future. Please see Plate 1-1 and 1-2 attached. On the basis of these current data, how much
      additional total and differential settlement is now expected under the tower?

Page 2 of 2

2.0   What are the reasons for larger than anticipated settlements at the tower core? Does Treadwell and Rollo remain of the opinion that the additional settlement is due to longer dewatering and limited effectiveness of predrilling of piles?

3.0   What is the explanation for the differential settlements at the south end of the tower? Please see Plate 2 attached, which is based on surveyed settlement marker elevations.

4.0   Does the observed differential movement, shown in Plate 2, affect the structural performance of the 301 Mission building? How much movement can the structure accommodate?

5.0   What amount of total measured settlement is from undrained deformation and what settlement is from consolidation?

6.0   Is the Old Bay Clay stressed into the virgin compression zone, or is the settlement entirely due to recompression?

7.0   What is the estimated degree of consolidation of the Old Bay Clay at this time? How long will it take to reach 95% consolidation?

8.0   Is the slow rate of observed settlement within the last 9 months an indication of slow primary consolidation, or is the settlement secondary compression?

Foundation Design

1.0   In the foundation design, was the assumption made that the 10-foot mat and the piles would perform as a rigid block? At what depth was it assumed that the building load was applied?

2.0   Was the full dead load plus full live load used to calculate the building settlement, or was a reduced live load used?

Seismic Considerations

1.0   What are the periods of vibration, mass participation factors and mode shapes for the first 5 modes of the tower?

2.0   What is the shear corresponding to the maximum shear and bending moment capacity of the lateral system of the tower?

3.0   What is the maximum base shear and moment that the structure is able to deliver to the foundation?

In order to expedite the review process, we are requesting that we meet the week of January 25, 2010, to review the responses to the above questions and any comments generated from your review of the Buttress Construction Documents.

Yours truly,

Brian R. Dykes, P.E.
Principal Engineer
Transbay Joint Powers Authority

Enclosure: Buttress Construction Documents

cc: R. Volenec, N. Riordan, B. Gibbons, Document Control



SURVEYED SETTLEMENT OF THE 301
MISSION TOWER: LINEAR TIME SCALE
Transbay Transit Center
301 Mission Performance
Transbay Joint Powers Authority
San Francisco, California

January 2010

**ARUP**

PLATE 1-1



PLATE 1-2

SURVEYED SETTLEMENT OF THE 301
MISSION TOWER, LOG TIME SCALE
Transbay Transit Center
301 Mission Pre-tower
Transbay Joint Powers Authority
San Francisco, California

January 2018

ARUP



## CONFIDENTIALITY AGREEMENT

Representatives of the Transbay Joint Powers Authority ("TJPA") and Mission Street Development, LLC and/or Millennium Partners ("Millennium"), identified below by name and signature, hereby acknowledge and agree that the discussion among such individuals which occurred on February 26, 2010, and any documents exchanged at that meeting or as result of that meeting, is/are and shall for all purposes be considered confidential to the extent allowed by law. Such discussion and any evidence of such discussion shall be protected from discovery in litigation, as if a mediation or mediation consultation under California Evidence Code section 1119, and inadmissible in a court of law as negotiations and offers to compromise under California Evidence Code section 1152 and the Federal Rules of Evidence.

Acknowledged and agreed as of this 26th day of February, in San Francisco, California:

| Print Name | Representing | Signature |
|---|---|---|
| Sean Jeffries | MP | |
| STEVE HOLD | MP | |
| Andrew Schwartz | TJPA | |
| Robert P. Beck | TJPA | |
| George Kleon | SF Ug Attys | |
| Cheryl Beegman | SF City Attorney For TJPA | |
| BRIAN DYKES | TJPA | |
| RAMIN GOLESORKHI | T&R | |
| | | |
| | | |
| | | |

# DESIMONE

NEW YORK

MIAMI

SAN FRANCISCO

NEW HAVEN

LAS VEGAS

HONG KONG

ABU DHABI

# MEMORANDUM

| | | | |
|---|---|---|---|
| FROM: | **NICOLAS RODRIGUES** | DATE: | **11-11-2010** |
| PROJECT NO.: | **4069** | VIA: | **EMAIL** |
| PROJECT NAME: | **301 MISSION** | PAGES: | **3** |

TO:
**Steven Hood**          **Millennium Partners**                    T: (415) 593-1488          Email
SHood@millenniumptrs.com   735 Market Street, 4th Floor, San Francisco, CA 94103     F: (415) 537-3895

---

**RE:    B4 BASEMENT WALL REPORT**

On November 11th 2010, Nicolas Rodrigues from DeSimone performed a site observation of the 301 Mission gridline 12 basement wall at level B4. He was accompanied by Steve Hood of Millennium Partners. It was brought to our attention the presence of a bulge in the concrete wall. This condition is similar to that observed by DeSimone in Nov of 2008 in the same wall.

This portion of the wall has delaminated and the wall appears to bulge as shown in Figure 1. At the bulge location, a large number of injection ports were present. It was noted by Steve Hood that injections have been made in this area of the wall in the last 6 months. It appears that a weak plane exists several inches from the inside face of the wall. It is possible that the formation of these weak planes may be related to the shotcrete process, whereby the 30" thick basement wall is built in adjoining layers, although this is not certain. When the expandable water sealing material was injected into the wall, it appears to have flowed into and traveled along this weak plane. As the material expanded the exterior concrete bulged and came loose.

The wall as a whole did not exhibit deflections consistent with flexural movement. If the wall was bulging or moving due to extreme loading, flexural cracks would have been present. No such cracks were present at the time of observation. It is also likely that the bulge would appear uniform from floor-to-floor with the maximum deflection occurring at mid-height of the floor. Instead, no bulge at all appears to be present at the top 2-3 feet from the B3 slab indicating that the bulge is not consistent with flexural movement. It is our opinion that the delaminated concrete is not related to flexural movement of the wall, and it is therefore not a safety concern.

It is recommended that the damaged concrete should be removed and replaced in accordance with SKS-033 (attached.)

Based on our experience in 2008, the following may be of importance:

1) Concrete should be removed until good substrate had been reached.
2) If remnants of the waterproofing foam are present on the surface, all such material must be completely removed prior to the placement of new concrete. See Figure 2.
3) If the rebar is found to be bowed towards the inside of the building, this bow need not be corrected. If the rebar appears cracked of if the bow is more than 1-1/2" out of vertical, please notify DeSimone for an additional inspection.

DESIMONE CONSULTING ENGINEERS  160 SANSOME STREET  16TH FLOOR  SAN FRANCISCO, CALIFORNIA  94104  P. 415.398.5740  F. 415.398.9834

# DESIMONE

Page 2 of 3

4) DeSimone should be contacted to perform a final inspection of the surface preparation immediately prior to installing formwork.



Figure 1: Concrete delamination causing a bulge. The waterproofing injection material can be seen at all cracks near the damaged area. This picture is from 2008, but is similar to the new bulge found in Nov 2010.

# DESIMONE

Page 3 of 3



Figure 2: Example of exposed rebar after delaminated concrete removal. Remnants of the waterproofing foam can be observed covering most of the concrete surface. Again, this is from 2008, but is similar to what is expected once the delaminated concrete is removed.



**Treadwell&Rollo**
*A LAMBAN COMPANY*

# MEMORANDUM

**TO:**       Steven Hood – Millennium Partners

**FROM:**     Ramin Golesorkhi, GE and Hadi J. Yap, GE

**CC:**       Nicolas Rodrigues, SE – DeSimone Consulting Engineers
              Richard D. Rodgers, GE – Treadwell & Rollo

**DATE:**     22 February 2012

**PROJECT:**  730315706

**SUBJECT:**  Evaluation of Measurements by Arup
              301 Mission Street
              San Francisco, California

No. of Pages: 2

As requested, this memorandum presents the results of our review and preliminary conclusions regarding the measurements obtained by Arup, Transbay Joint Powers Authority's (TJPA) consultant, from the monitoring points at the 301 Mission Tower and Low-rise.  Specifically, we reviewed recent memoranda, listed below, prepared by Arup and forwarded to us by you via email:

1.  Settlement data memorandum dated 23 December 2011, transmitted to us on 24 January 2012

2.  Crack Gauge Survey memorandum dated 20 January 2012, transmitted to us on 24 January 2012

3.  Tiltmeter Readings memorandum dated 10 February 2012, transmitted to us on 10 February 2012

Also, we reviewed the Inclinometer I-18M data that were transmitted to us via email on 14 December 2011.

The Inclinometer I-18M is located just south of the 301 Mission Street property boundary about 50 feet east of Fremont Street.  The results from this inclinometer were accompanied by an email from Mr. Brian Dykes of TJPA explaining the measurements.  The measurements indicate that ground has moved laterally towards the excavation (i.e. south) about 0.45 inches at a depth of about 30 feet and about 0.6 inches at depths ranging from about 85 to 100 feet below the ground surface.  According to Mr. Dykes, this movement occurred during the extraction of timber piles, installation of the CDSM shoring wall and 28 buttress piles.  The latest reading was obtained on 7 December 2011.  We believe the lateral movements at the depth of 30 feet are a result of the extraction of timber piles (about 0.3 inches) and during the installation of the CDSM wall and the buttress piles (about 0.15 inches).  In our opinion, the lateral movements at the depth range of 85 to 100 feet occurred during the installation of the CDSM wall and the buttress piles.

The I-18M movements at a depth of 85 to 90 feet correspond to the range of tip elevations of the foundation piles for the 301 Mission Tower.



Mr. Steven Hood
Millennium Partners
22 February 2012
Page 2

The last settlement measurements (14 December 2011) presented with the Arup memorandum dated 23 December 2011 show an increase in the rate of settlement of all points measured and plotted in Plates 4 and 5. These accelerated rates have not been measured during previous surveys beginning on 30 April 2009. Until the fall of 2011 the only major TJPA underground construction activity near 301 Mission Street consisted of extraction of the timber piles in May 2011. The lateral deformations measured at depth in inclinometer I-18M resulted in a corresponding vertical movement in the ground behind the inclinometer. Consequently, we believe the increase in the rate of settlement is likely a result of the construction activities south of the 301 Mission site. The TJPA has installed several other inclinometers along the boundary wall between its project and the 301 Mission property boundary and along Fremont Street. To better evaluate the effects of the TJPA construction on the 301 Mission structures it is imperative that we receive the results of all the inclinometers installed in the vicinity of 301 Mission Street including the readings obtained in February 2012. Also, we ask Millennium Partners inquire whether the TJPA design team considered movements during the installation of the CDSM wall and the buttress piles in its estimation of lateral movements. Furthermore, a timely transmittal of the survey and inclinometer results is critical in evaluating the impact of the construction activities on the 301 Mission structures (e.g. the settlement measurements were received a month after they were sent by Arup to TJPA).

The crack gauge measurements show movements less than 0.1 mm for most of the gauges. DeSimone Consulting Engineer should evaluate these measurements and provide its opinion.

The tiltmeter measurements show movements of the north, west, and south walls. Some of these tiltmeters show movements inwards and some show movements outwards. The magnitudes are typically less than 0.075%. The patterns of these movements are inconclusive at this time.

We trust this memorandum provides the information requested. Should you have any questions, please call.

730315706.02_RG_301 Mission Street

# DESIMONE

# MEMORANDUM

NEW YORK
MIAMI
SAN FRANCISCO
NEW HAVEN
LAS VEGAS
HONG KONG
ABU DHABI

| | | | |
|---|---|---|---|
| FROM: | **NICOLAS RODRIGUES** | DATE: | **24 Feb 2012** |
| PROJECT NO.: | **4069G** | VIA: | **EMAIL** |
| PROJECT NAME: | **301 MISSION STREET - SETTLEMENT EVALUATION** | PAGES: | **1** |

TO:
**Steven Hood**          **Millennium Partners**          T: (415) 874-4707          Email
SHood@millenniumptrs.com    301 Mission Street, Level B-1, San Francisco, CA 94103    F: (415) 874-4750

---

**RE:     DESIMONE COMMENTS AND RECOMMENDATIONS**

We have received and reviewed the following documents:

1) Arup report dated December 23, 2011, "Transbay Transit Center: Results of December 2011 Settlement Survey at 301 Mission Property"
2) Arup report dated January 20, 2011, " Transbay Transit Center - Results of Crack Gage Survey at 301 Mission: December 2011 – January 2012"
3) Arup report dated February 10, 2012, "Transbay Transit Center: Results of Tiltmeter Readings"
4) Inclinometer I-18M Data from December 7, 2011, no title, no reference location.

**Settlement:**

Based on the latest reports, it is evident that the tower at 301 Mission St. continues to settle. Coincidental with the Transbay excavation, the latest data seems to show an increase in the rate of settlement, which may be an indication that the excavation has affected the settlement rate.

Settlement has at least two major sources. One source is the direct effect of vertical load compressing layers of soil beneath the structure. We will call this "natural settlement" because it is common to high rise buildings. The other is due to the excavation of adjacent sites, such as the Transbay site. It is typically expected that excavating next to a building's foundation will cause some degree of settlement. The amount of which depends on the weight of the building, the proximity of the excavation to the site boundary, and the depth of the excavation. In the case of 301 Mission, the building had not finished going through its natural settlement period before Transbay began their excavation. This adds complexity to the issue of which sources of settlement are now contributing to the total settlement. The onus of answering this question should fall to the Transbay Authority. Until the Transbay Authority has thoroughly evaluated all of the settlement data, and is able to convince Millennium Partners that continuing with their planned excavation will not harm the tower, we recommend that Millennium Partners do everything in their power to stop the excavation.

With regards to the settlement, we have the following questions for Transbay:

o Has the Transbay Authority provided any documentation to date enumerating how much settlement they anticipate that their excavation is going to cause contrasted



against the natural tower settlement?

o   Did the Transbay Authority provide a method for separating the excavation-caused settlement from the natural settlement?

o   Has the Transbay Authority evaluated and made any conclusions with regards to this latest data?

o   Has the excavation been halted in order to further evaluate why the rate of settlement appears to be increasing or to take supplemental settlement measurements?

o   Were any predetermined excavation-caused settlement limits established by the Transbay Authority? If so, was this latest recorded data within these limits?

### Crack Gage Survey:

The new crack gage survey shows little-to-no change from the previous survey. Crack gages "Mission 1" and "Mission 2" seem to show crack sizes that may require further study/repair in order to protect the reinforcing steel from corrosion damage. However these crack gages are located away from the excavation and are likely not excavation related. We recommend further study by DeSimone of these areas, which would include a site walk to investigate.

Many crack gages show little-to-no movement. We are reassured by the limited amount of cracking along the Fremont street basement wall.

There seems to be a strong correlation between the cracks appearing in the 12-line wall near the Transbay excavation and the fact that there is some reduced settlement in the 3 foot mat in this vicinity. It may be possible that these two observations are related.

### Tiltmeter:

Along the line of excavation, 6 tiltmeters have been installed, 3 along the tower section and 3 along the midrise section. On the tower side of the excavation, there seems to be little to no clear tilt direction. The maximum value of 0.4 mm/m is equivalent to the ground floor slab moving ¼" relative to the foundation. We would consider this to be a relatively large displacement over a 15' tall basement wall, but since the inclinometer in this area doesn't show a similar displacement, we would suggest we simply continue to monitor these results for now.

### Inclinometer:

We have not been provided with a report as to what Transbay construction activities have occurred over this time frame, nor do we have a site plan showing the location of inclinometer I-18M. It seems clear based on this graph that some lateral movement of the soil has occurred due to the excavation. Almost 0.5 inches of lateral movement has occurred at the elevation of the pile cap and a little more than 0.5 inches near the tips of the piles. T&R should comment as to how much vertical settlement of the tower should be expected under the recorded level of lateral soil movement.

### Loads Provided by DeSimone to Treadwell & Rollo for Soil Settlement Analysis:

Originally, there were several iterations of load analyses performed by DeSimone during the early stages of the project. On several occasions, we provided T&R with a total estimated building weight based on preliminary assumptions. When our design was substantially completed, an email was sent

# DESIMONE

Page 3 of 3

on June 16 2006 by Mei Liu (a former employee of DeSimone) to Chris Ridley (a former employee of T&R) and Ramin Golesorkhi (T&R) that provided the weight of the building. In recently speaking with Dr. Golesorkhi, it was confirmed that this reported building weight was used to perform T&R's settlement calculations.

Last month, DeSimone performed an internal independent analysis of the building weight and found substantial agreement with the weight provided to T&R in June of 2006.

**Structural Issues:**

The portion of the tower mat which is 3 feet in depth seems not to be settling as much as the 10 foot deep tower foundation. This is to be expected if this portion of the mat is supported on something. In our case, it is not clear if this portion of the mat is being supported on soil, on shoring, or on something else. DeSimone designed this portion of the mat to be a cantilever and it is standard practice for shoring to be removed by the contractor before putting the building into service. In the case where a shoring wall is to be left in place, it is common practice to leave an adequate gap between the structure and the shoring wall so that the two systems will not interact. To the best of our knowledge, we are unsure if this potential situation may or may not have been properly addressed by the contractor and as such, the state of the soil and the shoring below the 3-foot deep section of the mat is unknown at this time. DeSimone recommends that Millennium investigate the area below the 3-foot section of the mat to determine what is keeping the mat from behaving as designed. There is concern that if the tower continues to settle, the damage observed to date within the 3-foot mat area may increase.

The overall tower settlement seems to be fairly uniform in nature (except for the 3-foot area.) So long as the settlement occurs uniformly over a tower foundation, there is little structural concern.

The measured settlement shows some minor differences in settlement between the shearwall core and the columns. Because this measured differential settlement is small between these elements, DeSimone finds no reason for concern at this time. However, the superstructure includes outriggers in the tower which connect the shearwall to the core, and any damage due to differential settlement would first occur in these locations. DeSimone recommends that a visual inspection of the concrete outrigger walls be performed to ascertain if any damage is occurring. Secondary locations for potential damage may also occur in the link beams. A visual inspection of representative concrete link beams may also be prudent.

Other potential concerns include:

o Reinforcement in the mat may be overloaded, which may cause strength deterioration and possible failure.
o The basement wall strength may deteriorate and be inadequate to retain the soil and support the traffic surcharges.
o Cracks in the basement walls may increase, allowing corrosion of the wall reinforcement to occur.
o Because this 3-foot mat occurs along only one side of the tower foundation, the continued settlement of the tower may become less uniform and the structure may begin to tilt slightly.

We would be pleased to meet with you at any time to discuss this report and your options further.

| From: | John Luciano |
|---|---|
| Sent: | Tuesday, January 18, 2011 3:16 PM |
| To: | Steven Hood; Sean Jeffries |
| Subject: | RE: December Settlement Monitoring at 301 Mission Street |

Guys, looking at the last chart I think we need to send this to NYC to let them know how severe the situation is getting. We are seeing changes in the building. Sidewalks, pipe chases, driveway separation and we have been taking on a lot more water the last two weeks. Not sure how it's all related but think we should disclose. Let me know what you think

**From:** Brian Dykes [mailto:bdykes@transbaycenter.org]
**Sent:** Friday, January 14, 2011 4:31 PM
**To:** Steven Hood; John Luciano; Sean Jeffries
**Cc:** Nick O'Riordan
**Subject:** December Settlement Monitoring at 301 Mission Street

Steve,
In response to your request during last month's demolition of the old Transbay Terminal I requested that Arup provide the latest settlement monitoring readings as surveyed during December.
Attached is the Arup memo dated January 5, 2011 with the plots of the survey records taken on December 9, 2010.
These records show that the tower building has continued to settle at the same rate that has been observed for the past 19 months (04/30/09 – 12/09/10).
Brian.

Brian Dykes
Principal Engineer
Transbay Joint Powers Authority
201 Mission Street, Suite 2100
San Francisco, CA 94105
415 597 4617 phone
415 597 4615 fax

Check out our progress at http://transbaycenter.org/construction-updates/construction-cameras

NOTE: This e-mail communication and any attachments hereto are covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521, and are legally privileged. The information contained herein is confidential, and is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient of this e-mail communication (or an employee or agent responsible for delivering this communication to its intended recipient(s)), you are hereby notified that any retention, copying or further distribution of this e-mail communication and any attachments is strictly prohibited. If you are not the intended recipient, please notify the sender by telephoning 415-597-4620, or by forwarding an e-mail reply message addressed to TransAdmin@TransbayCenter.org confirming that you have already destroyed (deleted) the original e-mail communication and any and all copies thereof. Thank you.

1

Confidential

MSD00312775